## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TAYLOR-WHARTON<br>INTERNATIONAL LLC[1], *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-14089 (_____)<br>(Joint Administration Pending) |

## DECLARATION OF LEONARD YORK IN SUPPORT OF DEBTORS'
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, LEONARD YORK, do hereby declare, under penalty of perjury, that:

1.      I am the Chief Financial Officer of debtor-in-possession Taylor-Wharton

International LLC ("TWI") and together with those entities listed below (collectively, the

"Debtors"), and have held that position since October 30, 2009.  Prior to assuming my position

as CFO, I served as a consultant to the Debtors for the past several months.  From serving in

these capacities, I have detailed knowledge of and experience with the business and financial

affairs of the Debtors

2.      As the CFO, I am one of the officers of the Debtors responsible for devising and

implementing the Debtors' business plans and strategies and overseeing the Debtors' financial,

operational, and other business affairs.  In addition, I am responsible for supervising the

maintenance of the Debtors' books and records.  Moreover, in my capacities as the CFO and as

an officer of the Debtors, I am fully familiar with the Debtors' restructuring process (the

"Restructuring"), and have been engaged in, *inter alia*, (a) the development, negotiation and

---

1      The Debtors in these cases, along with the last four digits of each Debtor's federal tax
identification number are: Taylor-Wharton International LLC (1577); TWI-Holding LLC (8154); Taylor-
Wharton Intermediate Holdings LLC (6890]); Alpha One Inc. (1392); Beta Two Inc. (1408); Gamma
Three Inc. (1367); Delta Four Inc. (1320); Epsilon Five Inc. (1344); TW Cryogenics LLC (1713); TW
Cylinders LLC (1665); Sherwood Valve LLC (1781); American Welding & Tank LLC (1945); and TW
Express LLC (6414).

implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness; (b) supervision of the document preparation necessary to implement the Restructuring; and (c) consultation on a periodic basis, with the Debtors' other officers and executives, and members of the Debtors' Board of Directors, with respect to the foregoing.

3.    On November 18, 2009 (the "Petition Date"), the Debtors each filed voluntary petitions (the "Petitions") for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in an effort to preserve and maximize the value of their Chapter 11 estates.

4.    The Debtors intend to operate their business and to manage their properties as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

5.    I have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334.  In addition, I have also been advised by counsel that venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    No request has been made for the appointment of a trustee or examiner, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no Official Committee of Unsecured Creditors has been appointed in the Debtors' Chapter 11 cases.

**Overview of the Debtors' Corporate Structure,
Businesses Operations, History and Capitalization**

A.    **Introduction**

7.    The Debtors, through their operating companies, are a leading global manufacturer and provider of propane and cryogenic tanks, high and low pressure cylinders, valves and pressure gauges for gas applications.

8.      The Debtors benefit from a broad product line and strong brand recognition. Geographically, the bulk of the Debtors' sales are in North America, with approximately 25% in Europe and Asia combined. As of October 31, 2009, the Debtors owned, leased and/or operated eleven operating facilities in the United States and six facilities in China, Malaysia, Slovakia, Australia and Germany. Two of the eleven operating facilities in the United States are currently idled. The Debtors also lease two properties for corporate administrative functions, one of which is idled. See Exhibit A for a list of facilities, their locations, and the businesses they operate.

9.      TWI's immediate corporate parent is Taylor Wharton Intermediate Holdings, Inc. ("TWI Holdings"). TWI Holdings is in turn owned by five 'C' corporations, Alpha One, Inc., Beta Two, Inc., Gamma Three, Inc., Delta Four, Inc. and Epsilon Five, Inc., and these entities are, in turn, owned by TWI-Holding, LLC ("Holdings"). Holdings in an investment vehicle of the private equity firm Wind Point Partners, along with certain other investors and members of Debtors' management. See Exhibit B for a chart illustrating the corporate structure.

B.      **Corporate Structure and the Harsco Acquisition**

10.      TWI is a Delaware limited liability holding company that wholly owns, through separate Delaware corporations, five distinct subsidiary limited liability companies, each of which is engaged in specific manufacturing operations generally engaged in the field of gas technology (the "Operating Companies").

11.      TWI acquired its various businesses from Harsco Corporation ("Harsco") pursuant to an Asset and Stock Purchase Agreement dated as of November 27, 2007 (the "Asset Purchase Agreement"), pursuant to which TWI paid Harsco $300 million in cash and agreed to pay up to an additional $40 million on a contingent "earnout" basis, subject to various adjustments, including a traditional post-closing working capital adjustment.

12.    Thereafter TWI, through the Operating Companies, commenced operations within its current corporate structure. Certain managerial and related financial functions are centralized at the TWI level, although each Operating Company has a distinct operation. More specifically, the former Harsco businesses are now organized among the TWI Operating Companies as follows:

i.    **TW Cryogenics LLC** ("Cryogenics"). Cryogenics has operations in Theodore, Alabama and Jesup, Georgia, and its wholly-owned subsidiaries have operations in China, Malaysia, Slovakia, Germany and Australia. Cryogenics is engaged principally in the manufacturing of cryogenic portable and bulk storage tanks. The products are used for storing cryogenic liquids, providing economical solutions for transporting, storing and dispensing liquefied gasses, medical applications, beverage carbonation applications and other related storage and delivery solutions. Customers for these products include liquid gas distribution and production companies, cryoscience equipment distributors, carbonation system retailers and distributors, and others engaged in the cryogenics business.

ii.   **Sherwood Valve LLC** ("Sherwood"). Sherwood has manufacturing facilities in Washington, Pennsylvania, Niagara Falls, New York and Cleveland, Ohio and is the leading valve producer for the industrial gas industry. Sherwood supplies valves to other TWI Operating Companies, with significant inter-affiliate sales. Among its products are industrial gas valves, propane tank valves and regulators, air conditioning and refrigeration products and SCBA, life support, SCUBA and oxygen valves. Customers include multiple tank and cylinder manufacturers (including the affiliated Operating Companies), gas packages, refrigeration rack manufacturers, air conditioning manufacturers, SCBA, SCUBA and medical industry manufacturers.

iii.  **American Welding & Tank LLC** ("AWT"). AWT has manufacturing facilities in Jesup, Georgia, Fremont, Ohio, Bloomfield, Iowa, Crossville, Tennessee and West Jordan, Utah and is a world leader in the design, manufacturing, repair, refurbishment and conversion of propane tanks for residential commercial, industrial and agricultural applications. AWT's products include bulk steel above-ground and underground propane storage tanks as well as tanks designed for anhydrous ammonia. Customers for manufactured and refurbished products include nationwide and regional propane distributors.

iv.   **TW Express LLC** ("TW Express"). TW Express is a distribution company which primarily serves AWT and holds the transportation assets and leases of TWI.

- 4 -

13.    TWI also has a fifth operating business, TWI Cylinders LLC ("Cylinders"), which has operations in Harrisburg, Pennsylvania and Huntsville, Alabama and is engaged in the manufacturing of high and low pressure cylinders.    The Debtors have been marketing the Cylinders business for sale and expect to complete a sale of this business pursuant to Section 363 of the Bankruptcy Code during the pendency of these Chapter 11 cases.

14.    Shortly after the closing of the transactions pursuant to which the Debtors acquired their assets from Harsco, the Debtors determined that they had significant claims against Harsco for breaches of representations and warranties which Harsco made under the Asset Purchase Agreement. These claims pertained to the nature and value of the assets which the Debtors had acquired from Harsco and also to the amount of the working capital adjustment to the purchase price for those assets.    The Debtors thereafter commenced an arbitration proceeding against Harsco to realize on such claims and ultimately settled their dispute with Harsco over these issues in October 2009.

15.    As of October 31, 2009, the Debtors employed approximately 750 employees nationwide (collectively referred to as the "Employees").    The Debtors have the following general categories of Employees: (1) corporate support personnel that primarily work out of the Debtors' corporate office; and (2) personnel who support the Debtors' manufacturing businesses at the Debtors' plants.    Debtors TW Cylinders LLC, TW Cryogenics LLC, Sherwood Valve LLC, American Welding & Tank LLC, and Taylor-Wharton International LLC are the employers of all of the Employees.    Approximately 380 employees are represented by labor unions ("Unionized Employees").    The terms of employment for the Unionized Employees are governed by 4 separate collective bargaining agreements (the "CBAs").

- 5 -

C.    **Pre-petition Capitalization**

16.    As of the Petition Date, two levels of secured debt encumbered the Debtors' assets. The Debtors' have $73.9 million currently outstanding under a senior secured debt facility, in addition to $7.1 million of undrawn letters of credit (the "Senior Debt") pursuant to a Credit Agreement, dated as of December 7, 2007, originally by and among the Debtors, General Electric Capital Corporation as Agent ("GE"), Merrill Lynch Business Financial Services Inc., and The CIT Group/Business Credit Inc. The Debtors also have $73.3 million outstanding on senior subordinated secured notes plus accrued interest (the "Mezzanine Debt") issued pursuant to the Note Purchase Agreement, dated as of December 7, 2007, by and among the Debtors, U.S. Bank National Association, as collateral agent and three other financial institutions.

17.    The Senior Debt required the Company to maintain interest rate protection for at least three years with a notional amount of at least $64 million. On December 24, 2007, the Company entered into an interest rate swap agreement with a notional amount of $75 million and a term of three years. On January 17, 2008, the Company entered into an interest rate cap and collar agreement with a notional amount of $25 million and a term of three years. The unrealized loss related to these instruments as of the Petition Date is $3.9 million.

18.    Currently, GE has retained $5.4 million of cash from recent asset divestitures to collateralize both portions of the letters of credit outstanding as well as the exposure to the interest rate protection described below. $4.2 million is collateralizing the $7.1 million balance of letters of credit outstanding and $1.2 million is collateralizing $3.9 million of market exposure on interest rate protection.

19.    In the event of default, the Agent may terminate all loan facilities under the Credit Agreement and may accelerate all unpaid principal and all accrued and unpaid interest thereon. All of the Debtors' obligations to the Agent and the holders of the Senior Debt under the Credit

Agreement are secured by liens on and security interests in substantially all of the now existing and hereafter acquired real and personal property of the Debtors.

20.     The relationship between the holders of the Senior Debt and the Mezzanine Debt is governed by a Subordination and Intercreditor Agreement, dated as of December 7, 2007 (the "Intercreditor Agreement"). The Intercreditor Agreement provides, among other things, that the Senior Debt must be paid in full before the payment of any and all of the Mezzanine Debt can be repaid. See Exhibit B for a chart illustrating where the debt resides.

21.     As of the Petition Date, the Debtors had incurred an estimated $13.5 million in unpaid trade debt to their suppliers and other vendors. The Debtors also have $55 million of outstanding obligations pursuant to unsecured PIK Notes (the "Unsecured Notes") which are contractually subordinated in right of payment to the Senior Debt and the Mezzanine Debt and structurally subordinated to most of the Debtors' other creditors.

**D.     Events Leading to the Debtors' Bankruptcy Filing**

21.     A number of macroeconomic factors related to the global economic downturn are the primary cause of a steep decline in the Debtors' operating revenues and their attendant need to restructure. The Debtors' revenues have declined from approximately $404 million in 2008 to a forecasted amount of approximately $237 million in 2009. The first nine months of fiscal year 2009 produced revenues of $183 million. As a result, the Debtors no longer have the financial ability to service their non-trade related debt.

22.     As of April 1, 2009, the Debtors were in covenant default with respect to the Senior Debt and also were in payment default with respect to the Mezzanine Debt for having missed an interest payment. On April 24, 2009, GE advised TWI that it had exercised its right to sweep excess cash and block the transfer of additional funds from the Debtors' accounts. Thereafter, TWI repaid approximately $21 million in cash which had been drawn under the

revolving credit facility portion of the Senior Debt and GE released the blockage of TWI's accounts to the extent necessary to allow TWI to operate under a budget which the Debtors prepared and which reflected all projected operating expenses. The Debtors and GE entered into a Forbearance Agreement and, during the months that followed, the Debtors and the holders of the Senior Debt and the Mezzanine Debt negotiated the terms of the financial restructuring which is described below.

### E.    Terms Of The Debtors' Financial Restructuring

23.    The Debtors diligently evaluated a number of options to address their financial issues. Those efforts included sharing information with and engaging in discussions with a variety of the Debtors' stakeholders with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities. These discussions resulted in an agreement on the terms of a financial restructuring between the Debtors and the holders of all of their Senior Debt and Mezzanine Debt and a majority of their equity interests.

24.    The terms of the Debtors' financial restructuring provide for the investment of $12 million of new capital and the cancellation of an aggregate of $120 million in debt as follows: (i) the Senior Debt will be restructured into a $20 million revolving credit facility, a $30 million Senior Term A Facility (collectively, "Term A Debt"), and a $39 million Term B Facility ("Term B Debt"); (ii) the $12 million of new capital will be invested as payment-in-kind debt (the "Investor PIK Debt"), which will be subordinate to the Term A Debt and pari passu with the Term B Debt; (iii) all of the Mezzanine Debt and Unsecured Notes will be cancelled; (iv) the holders of the Mezzanine Debt will receive the right to purchase not less than one-half of the principal amount of the Investor PIK Debt; (v) 7% of the Debtors' reorganized equity also will be issued pro rata to the holders of the Mezzanine Debt and the balance will be issued pro

rata to the purchasers of the Investor PIK Debt, to be allocated as agreed among them; and (vi) substantially all of the Debtors' trade and other unsecured creditors will be paid or otherwise satisfied in full.

25.    The terms of this restructuring have been documented in a Restructuring Lock-Up Agreement between the Debtors and the holders of all of the Senior Debt and Mezzanine Debt (the "Lock-Up Agreement"), which is being filed substantially contemporaneously herewith. The Lock-Up Agreement provides that the parties have agreed to and will support the Debtors' proposed Plan of Reorganization which also is being filed substantially contemporaneously herewith. It further provides for the specific terms of the Debtors' Term A Facility, Term B Facility, Investor PIK Debt and LLC Operating Agreement to be entered into upon confirmation of the Plan, all as reflected in the agreements and other documents attached as exhibits to the Lock-Up Agreement. Finally, the Debtors have committed to file a draft disclosure statement and an accompanying motion to schedule a hearing for its approval and related matters within the next five business days.

26.    The Debtors seek to pay virtually all trade creditors immediately, with the permission of the Bankruptcy Court, under authority of the orders relating to the First Day Pleadings next discussed.

F.    **First Day Pleadings**

27.    I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in their first-day applications and motions described herein (collectively referred to as the "First Day Pleadings"), (b) the need for the Debtors to continue to effectively operate, (c) the deleterious effects if the Debtors do not obtain the requested relief, and (d) the immediate and irreparable harm that the Debtors' will be exposed to in the event that the Court does not approve the relief requested in the First Day Pleadings. My opinions are based upon my first-hand

experience initially as a consultant to the Debtors for the past several months and currently as CFO for the Debtors, through my general review of various materials and information, discussions with other executives of the Debtors, and discussions with the Debtors' outside advisors.

28.     This Declaration is submitted in support of the Debtors' voluntary petitions and the First Day Pleadings.

29.     I reviewed each of the First Day Pleadings and participated in the preparation thereof. I believe, to the best of my knowledge and reliance on other executives of the company, that the facts set forth in the voluntary petitions and the First Day Pleadings are true and correct. This representation is based upon information and belief and through my general review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the key facts set forth in each of the First Day Pleadings.

30.     The relief sought in the First Day Pleadings will minimize the adverse impact of these cases on the Debtors and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Pleadings is necessary to enable the Debtors to operate effectively as Chapter 11 debtors-in-possession.

31.     As described more fully below, the Debtors carefully tailored the relief requested in the First Day Pleadings in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm. I personally participated in the analysis that led to the creation of each of the First Day Pleadings and assisted in the drafting and development of the relief requested therein.

The relief requested is narrowly tailored to address those issues that require urgent relief to sustain the Debtors' immediate operability.

## 1. **Debtors' Motion Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 for Order Authorizing Joint Administration**

32.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect all of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 cases.

33.     Given the integrated nature of the Debtors' operations, in order to optimally and economically administer the Debtors' pending Chapter 11 cases, such cases should be jointly administered for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 cases under the case number assigned to TWI and also request that an entry be made on the docket of each of the Debtors' Chapter 11 cases, other than that of TWI, to reflect the joint administration of these Chapter 11 cases.

34.     The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, and minimize the number of unnecessary delays.  Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.  For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

- 11 -

**2.    Debtors' Motion for Order Authorizing the Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Debtors' Top Thirty Creditors**

35.    The Debtors seek an order for the authorization to file a consolidated list of creditors and a consolidated list of the Debtors' thirty (30) largest unsecured creditors. The Debtors have identified hundreds of entities to which notice of certain proceedings in these Chapter 11 cases must be provided.    The Debtors anticipate that such notices will comprise, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under Chapter 11 of the Bankruptcy Code, (b) the initial meeting of the Debtors' creditors in accordance with Section 341 of the Bankruptcy Code, (c) applicable bar dates for filing of proofs of claims, (d) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization; and (e) the hearing to confirm a plan of reorganization (collectively, the "Notices").

36.    The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these cases.    The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents.    Accordingly, by this Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' business.

37.    Moreover, the Debtors will be filing a motion (the "Claims, Noticing and Balloting Agent Motion") seeking the appointment of The Garden City Group, Inc. (the "Agent") as claims, noticing and balloting agent in these Chapter 11 cases.    If the Claims, Noticing and Balloting Motion is granted, the Agent will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor and security holder database, and

(b) complete the mailing of the Notices to the parties in these databases. After consultation with the Agent, the Debtors believe that filing the lists in the format or formats currently maintained in the ordinary course of business will be sufficient to permit the Agent to notice promptly all applicable parties.

38.     The Debtors submit that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. Therefore, the Debtors respectfully request authorization to file a single consolidated list of their thirty (30) largest unsecured creditors in these cases.

39.     For the foregoing reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

3.      **Debtor-In-Possession Financing and Use of Cash Collateral Motion**

40.     To provide the liquidity necessary to ensure the proper administration of these Cases, the Debtors have contemporaneously herewith filed a motion (the "DIP Motion"),[2] pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e), 365, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure, and Del. Bankr. L.R. 4001-2, for entry of a proposed interim order (the "Interim Order") and a final order (the "Final Order") that, if granted, will among other things:

---

2       Capitalized terms not defined in this subsection of the York Affidavit shall have the meanings ascribed thereto in the DIP Motion.

a.    authorize the Debtors to obtain or guaranty obligations in respect of a senior secured, super priority, non-amortizing revolving credit facility of up to $20 million in aggregate principal amount (which includes a letter of credit subfacility in an amount not to exceed $11 million and a swingline loan subfacility, as set forth in the DIP loan documents);

b.    authorize a roll-up of all of the Prepetition First Lien Indebtedness, including without limitation any amounts owing by the Borrowers upon termination of any outstanding swap agreements, but excluding letters of credit, which are assumed and become part of the DIP Facility;

c.    authorize the Borrowers at any time prior to the entry of the Final Order to borrow under the Revolving DIP Facility in an aggregate outstanding principal amount not to exceed $11,000,000.00, which amount will be used primarily to support outstanding letters of credit and any additional letters of credit that may be issued pursuant to the DIP Credit Agreement;

d.    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

e.    authorizes the Debtors to grant Liens on all of the DIP Collateral which shall be senior to certain of the Primed Liens and super-priority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates;

f.    authorizes the use of cash collateral;

g.    grants certain adequate protection to the Prepetition Second Lien Secured Parties;

h.    vacates the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

i.    schedules a Final Hearing; and

j.    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of the Interim Order.

41.    Approval of the DIP Credit Agreement and the use of Cash Collateral will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs.    The inability to make such expenditures would (i) result in immediate and

- 14 -

irreparable harm to the Debtors' businesses, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to reorganize and maximize value.  In the event that the Debtors' available and projected Cash Collateral is insufficient to fund such expenditures, the credit provided under the DIP Credit Agreement is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders.    Additionally,  the  availability  of  credit  under  the  DIP  Credit Agreement will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors'  employees,  thereby  promoting  a  successful  reorganization.    Accordingly,  the  timely approval of the relief requested in the DIP Motion is imperative.

4.      **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed. R. Bankr. P. 2015, and Del. Bankr. L.R. 2015-2 for an Order (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Pre-Petition Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions, and (IV) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis**

42.      In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect funds, transfer them to a concentration account and disburse them, through other accounts, to pay operating expenses (the "Cash Management System").  The Debtors seek entry of an order of the Court (a) authorizing and approving the continued use of their existing Cash Management System, (b) authorizing the continued use of their existing bank accounts and business forms, (c) authorizing the continuation of ordinary course intercompany transactions, and (d) waiving the requirements of Section 345(b) on an interim basis with respect to the Debtors' deposit practices.

(a)      *Debtors' Cash Management System and Existing Bank Accounts*

43.      In order to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these Chapter 11 cases, it is vital to the Debtors that they maintain their existing Cash Management System.  The Debtors' Cash Management System is similar to

those commonly employed by corporate entities of comparable size and complexity. Large, multi-entity businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to: (a) expeditiously create status reports on the location and amount of funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. I believe that granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into the Chapter 11 cases.

44.    The Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new post-petition bank accounts be opened. If enforced in these cases, such requirements would cause enormous disruption to the Debtors' businesses and would impair the Debtors' Chapter 11 efforts. The Debtors' bank accounts comprise an established Cash Management System that the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying debts incurred post-petition, and to ensure as smooth a transition to Chapter 11 as possible, the Debtors should be permitted to continue to maintain the existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations. Otherwise, transferring the bank accounts will be disruptive, time consuming and expensive.

45.    The Debtors represent that if the relief requested is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of pre-petition claims, except for those otherwise authorized by the Court, the Debtors will work closely with the banks participating in the Cash Management System to

- 16 -

ensure appropriate procedures are in place to prevent checks and other items issued pre-petition from being honored absent this Court's approval.

### (b)    Debtors' Existing Business Forms

46.    The Debtors also request that they be authorized to continue to use all correspondence and business forms existing immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession.[3]    Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and publicity surrounding these cases.  If the Debtors were required to change their preprinted correspondence and business forms, they would be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar.  Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization and for the Debtors' employees, customers and vendors.  I believe that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationary and business forms.  The Debtors respectfully submit that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

### (c)    Intercompany Transactions

47.    In the ordinary course of the Debtors' businesses, the Debtors provide a number of services to and engage in intercompany transactions with each other (collectively, the "Intercompany Transactions").    The Intercompany Transactions cover a variety of items,

---

3    To the extent that the Debtors do not utilize preprinted check stock, letterhead and business forms, the relief described in this section does not apply to such checks, letterhead and business forms; any such non-preprinted checks, letterhead and business forms will contain a reference to the Debtors' status as a debtor-in-possession.

depending on the entity, including, without limitation, payroll transactions and other general corporate transactions made by one entity on behalf of another.

48.    The Intercompany Transactions are ordinary course transactions that are integral to the Debtors' businesses and the function of their Cash Management System and reduce the Debtors' administrative costs. The Debtors maintain records of all Intercompany Transactions, including fund transfers, and thus, can ascertain, trace and account for the Intercompany Transactions. All Intercompany Transactions are reflected in each individual debtor entities' books and records. Intercompany Transactions are cash neutral and as such, do not affect creditors. I believe the continuance of the Intercompany Transactions postpetition is necessary to avoid disruption to the Debtors' operations and is in the best interests of the Debtors' estates.

        *(d)*     *Waiver of Section 345(b) Requirements on an Interim Basis*

49.    The Debtors request that the Court waive the requirements of Section 345(b) on an interim basis and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under Section 345(b) of the Bankruptcy Code on a final basis. Given the complexity of the Debtors' Cash Management System and the relative security of the Cash Management System, I believe that cause exists to grant an interim waiver of the requirements of Section 345(b) of the Bankruptcy Code for a period of sixty (60) days and that such waiver would be in the best interests of the Debtors and their estates.

- 18 -

5.     **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 507(a) for an Order (I) Authorizing the Debtors in Their Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor and Pay Certain Check Presented for Payment and to Honor Certain Fund Transfer Requests**

50.     The Debtors have filed a Motion for Authority to Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits (the "Employee Wages and Benefits Motion"). The continued loyalty of Debtors' approximately 750 employees is a necessary component to the Debtors' successful reorganization. If the relief requested in the Employee Wages and Benefits Motion is not granted, the morale of the Debtors' employees will suffer significantly and the Debtors will risk losing a substantial portion of their current workforce. This type of employee disruption would cause the Debtors significant financial hardship and would negatively affect the Debtors chances for a successful reorganization.

51.     The Debtors have a current work force of approximately 750 employees nationwide (collectively referred to as the "Employees"). The Debtors have the following general categories of employees: (1) corporate support personnel that primarily work out of the Debtors' corporate office; and (2) personnel who support the Debtors' manufacturing businesses at the Debtors' plants. Debtors TW Cylinders LLC, TW Cryogenics LLC, Sherwood Valve LLC, American Welding & Tank LLC, and Taylor-Wharton International LLC are the employers of all of the Employees. Approximately 380 employees are represented by labor unions ("Unionized Employees"). The terms of the employment for the Unionized Employees is governed by 4 separate collective bargaining agreements (the "CBAs").

52.     As more fully described below, the Debtors are obligated to pay or honor a variety of "Pre-Petition Employee Claims" including (i) accrued salary, wages, bonuses, and other compensation that were earned prior to Petition Date, but which are scheduled to be paid

post-petition; (ii) outstanding claims for reimbursement of business expenses that were incurred and paid by employees pre-petition, but for which they have not yet been reimbursed; (iii) withholding taxes to federal, state and local authorities related to these payments; (iv) obligations under workers' compensation programs; (v) certain amounts withheld from some of the Employees' payments for a number of benefits programs including, but not limited to, certain insurance programs and retirement plans; (vi) earned vacation time and/or vacation time compensation; and (vii) other miscellaneous benefits as described below. The foregoing pre-petition employee claims are collectively referred to herein as the "Pre-petition Employee Claims").

*(a)*     ***Wages, Salary, and Other Compensation Obligations***

53.    Approximately 50% of employees are paid every two weeks while the remainder are paid on a weekly basis. Approximately 30% of the Employees are compensated through fixed salaries and the remaining Employees are compensated on an hourly basis. In addition to the hourly and salaried compensation paid to employees, the Debtors also pay overtime, certain bonuses & commissions relating to sales achievement and, where applicable, severance for one terminated employees as of the Petition Date.

54.    Based upon the Debtors' ordinary course payroll schedule, the average monthly payroll obligations are approximately $4.0 million. The Debtors estimate they owe approximately $1.5 million on account of prepetition wages, salaries and other compensation excluding reimbursable expenses, vacation pay, withholding taxes and amounts due to employee benefit programs. The aggregate amount of current earned and unpaid pre-petition wages and salaries could be higher as some payroll checks from prior work periods may be and/or remain outstanding and may need to be reissued due to the Debtors' filing for Chapter 11 protection. No

- 20 -

individuals will have unpaid pre-petition wages and salaries which will exceed the $10,950 priority limit in Section 507(a)(4) of the Bankruptcy Code.

55.    The majority of the Employees are reliant on the timely payment of their wages and salaries to cover their monthly living expenses. The Debtors' failure to remit full amount of the Pre-Petition Employee Claims to the Employees would inflict great hardship on the Employees and would seriously damage morale at a very critical time for the Debtors. The full commitment of the Employees is required for the Debtors to successfully navigate through the bankruptcy process.

   *(b)*    ***Employee Business Expenses and Corporate Credit Card Obligations***

56.    Prior to the Petition Date, certain of the Employees regularly incurred business expenses, which are reimbursable by the Debtors in the ordinary course of business. These reimbursable expenses include, but are not limited to, expenses for travel, auto expenses, telephone charges and meals. In certain circumstances, the Employee incurs and pays the expense with cash or a credit card and then the Debtors reimburse the Employee after submission and approval of the expense reimbursement request. These business expenses are processed on a periodic basis. In addition, sometimes there is some lag time between the time the expenses were incurred and the time an expense reimbursement request is submitted. Therefore, it is difficult to determine with any precision the aggregate outstanding amount of such Employee expense obligations. The average monthly expense incurred is approximately $525,000 – 550,000 and the Debtors estimate that the pre-petition Employee expense obligations are approximately $125,000 as of the Petition Date.

57.    It would be inequitable to require the Employees to personally bear these expenses, all of which were incurred on behalf of the Debtors with the expectation that they would be reimbursed promptly. Therefore, the Debtors seek authority to reimburse the

Employees for pre-petition business expenses in the ordinary course of business, regardless of when such obligations arose.

58.    In addition, Debtors maintained corporate credit card programs (the "Corporate Card Programs") with Visa through PNC Bank (the "Credit Card Company"). Under the Corporate Card Programs, certain of Debtors' Employees were issued with a credit card in the Debtors' name for payment of regularly incurred business expenses (the "Corporate Credit Cards"). On or about November 2, 2009, the Corporate Card Programs were terminated; however, Debtors may still have outstanding balances on the Corporate Credit Cards. The average total monthly expense incurred under the Corporate Card Programs averaged approximately $500,000. Payments under the Corporate Credit Cards are direct obligations of the Debtors but the Employees in possession of these Corporate Credit Cards are or may be secondarily liable. It would be inequitable to require these Employees to personally bear the expenses under the Corporate Credit Cards, all of which were incurred on behalf of the Debtors with the expectation that Debtors would promptly pay all bills related thereto. Therefore, the Debtors request authority to pay any outstanding indebtedness owed to the Credit Card Company in an aggregate amount not to exceed $50,000.

### (c)    *Tax Obligations*

59.    The Debtors are obligated to pay federal, state and local withholding taxes. Such withholding taxes and social security contributions are withheld from payroll by the Debtors. These taxes are paid to the appropriate authorities on a weekly basis, as appropriate, from the Debtors' concentration account. Therefore, an order confirming the Debtors' authority to pay any and all local, state and federal withholding and payroll-related taxes relating to the pre-petition periods, including, but not limited to, all withholding taxes, Social Security taxes and Medicare taxes, is warranted.

60.    The average monthly tax amount is approximately $1.2 million, inclusive of both the Debtors' and Employees' portions and approximately $425,000 is accrued but unpaid as of the Petition Date. The Debtors request authorization to pay any outstanding withholding taxes, tax deposits and processing fees that accrued and were owed to the taxing authorities prior to the Petition Date. In addition, the Debtors seek authorization to pay all federal, state and local withholding taxes, tax deposits and processing fees in the ordinary course of business on a going forward basis.

### (d)    Workers' Compensation

61.    The various states in which the Debtors conduct business have laws that require the Debtors to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims that arise from or are related to their employment with the Debtors. The Debtors provide workers' compensation benefits to their Employees through policies with and through the State of Ohio or ACE American Insurance Company (the "Workers' Compensation Policies"). Before the commencement of the Debtors' chapter 11 cases, the claims under the Workers' Compensation Policies were administered by independent third party claims administrators, ESIS ("Administrators").[4]

62.    Historically, the Debtors have paid approximately $335,000 in premiums annually on account of their Workers' Compensation Policies. The Debtors anticipate that the average monthly expense for their Workers' Compensation Policies will be approximately $102,000 in claims over the premium cost.

---

4    In State of Ohio, the claims under the Workers' Compensation Policies are handled directly through the state.

63.    The Debtors' failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the commencement of legal or administrative proceedings. In addition, failure to maintain the workers' compensation insurance could subject the Debtors and their officers and directors to material fines.

64.    Furthermore, the Debtors contract with ADP, a third party unemployment administrator to administer the Debtors' unemployment tax, claims, and benefit management functions (the "Unemployment Obligations"). The Debtors anticipate a monthly run-rate of approximately $46,000 for the next six months, and has accrued but unpaid approximately $7,500 as of the Petition Date.

65.    The Debtors request authority to continue paying all outstanding amounts related to Workers' Compensation Policies and Unemployment Obligations that arose prior to the Petition Date, including, without limitation, any payments for workers compensation claims, premiums and fees owed for administrative costs and other amounts required in connection with the Debtors workers' compensation programs, as such amounts become due in the ordinary course of business.

### (e)    *Employee Benefit Programs*

66.    Prior to the Petition Date, the Debtors offered the Employees certain standard employee benefits funded by either the Debtors, the Employees, or both, including among others: (i) medical, dental, prescription drug, long and short term disability, and life insurance; (ii) 401(k) plan to eligible Employees; (iii) pension plans for certain hourly employees; and (iv) other miscellaneous benefits described below (collectively, the "Employee Benefits"). I believe that failure to continue these Employee Benefits would severely undermine the Employees' morale and result in significant hardship to the Employees as well as violate numerous collective bargaining agreements. To retain the services of the Employees and maintain their morale and

loyalty during these Chapter 11 cases, the Debtors seek authority: (a) to pay any amounts related to the Employee Benefits that were due as of the Petition Date, and (b) to continue to provide the Employee Benefits to the Employees after the Petition Date.

### (f)    Self-Insured Medical & Dental Programs

67.    As of the Petition Date, the Debtors were obligated to pay certain accrued, but unpaid, expenses under their self-insured medical and dental plans and premiums, administrative costs, and employee withholding for other benefits under such benefit plans (collectively, the "Benefit Contributions"). Although the Debtors are current on these payments, certain of the Benefit Contributions accrued either in whole or in part prior to the commencement of these Chapter 11 cases, but will not become payable in the ordinary course of the Debtors' business until a later date.

68.    Dental coverage is offered for certain eligible Employees and COBRA participants through a plan administered by Delta Dental (the "Dental Plan"). There are approximately 550 Employees currently participating in the Dental Plan. The Debtors estimate that as of the Petition Date the total claims, premiums, and administrative fees owing under the Dental Plan are approximately $34,000.

69.    Medical coverage, including prescription drug coverage, is offered for certain eligible Employees and COBRA participants through Highmark Blue Shield (the "Medical Plan"). There are approximately 582 Employees currently participating in the Medical Plan. The Debtors estimate as of the Petition Date the total claims, premiums, administrative fees owing under the Medical Plan are approximately $900,000.

70.    The Debtors seek authority to pay all Benefit Contributions and estimate that the total of such Benefit Contributions as of the Petition Date is approximately $1 million. The

- 25 -

Debtors also seek authority to continue the Employee Benefits in the ordinary course of business post-petition.

### (g)    *Third-Party Medical, Prescription and Dental Program*

71.    Several Tennessee employees participate in a separate local plan. The Debtors estimate that as of the Petition Date the total claims and administrative fees owing are approximately $3000.

72.    The Debtors seek authority to honor all obligations owed under the Medical Plans and Dental Plans, including (a) payment of all claims premiums and administrative fees currently in arrears; and (b) payment of any claims premiums and administrative fees that may have accrued prior to the Petition Date but will not become due until a later date (collectively, the "Medical Plan Obligations"). The Debtors also seek authority to continue the Medical Plans and Dental Plans, including payment of arising claims, premiums and administrative fees, in the ordinary course of the Debtors' business.

### (h)    *Life, Disability and Travel Insurance*

73.    The Debtors offer basic and supplemental life insurance to certain eligible Employees. Life and Accidental Death & Dismemberment ("AD&D") insurance coverage is offered through Lincoln Financial Group (collectively, the "Life Insurance Policies"). The Debtors pay the premium for basic life insurance and AD&D coverage (which varies by employee type and location). The Employees are responsible for the contributions associated with the supplemental life insurance coverage, which are withheld through payroll and remitted on their behalf. The Debtors seek authority to continue to offer the Life Insurance Policies to their Employees in the ordinary course of the Debtors' business.

74.    The Debtors also offer certain Employees access to short term disability coverage (the "STD Coverage"). In addition, the Debtors offer certain Employees long term disability

coverage (the "LTD Coverage," and together with the STD Coverage, the "Disability Coverage"). The Disability Coverage is provided by payroll continuation for salaried employees by direct payment through payroll for certain hourly employees and through local carriers for other hourly employees. LTD Coverage is provided through the Lincoln Financial Group for all covered employees.

75.    The Debtors provide certain employees who travel on Company business with added AD&D insurance coverage for accidents involving business travel. The premium is annual and paid for calendar 2009. The Debtors seek authority to continue to offer the Business Travel Accident coverage ("BTA Coverage") to their employees in the ordinary course of the Debtors' business.

76.    The Debtors seek authority to continue the Life Insurance Policies, Disability Coverage, and BTA Coverage, including the payment of valid claims and administrative fees, in the ordinary course of the Debtors' business.

### (i)    *Retirement Programs*

#### 401(k) Plan

77.    The Debtors offer a qualified 401(k) plan (the "401(k) Plan") for certain Employees. As of the Petition Date, there were approximately 900 Employees participating in the 401(k) Plan, which is administered by Diversified Investment Advisors ("DIA"). For these services, DIA receives certain administrative fees from the Debtors (the "401(k) Plan Administrative Fees").

78.    Under the 401(k) Plan, participating Employees may make voluntary contributions up to the extent permitted by applicable law. The Debtors match the 401(k) contributions according to various match schedules based on employee type and location. If approval of the Board of Directors is obtained, the Debtors can make additional contributions.

79.    The amount typically contributed to the 401(k) Plan by the Employees is approximately $140,000 per month (the "Employee Contributions"). As of the Petition Date, the Debtors' matching contributions to the 401(k) Plan that were accrued and unpaid were approximately $215,000 (the "Outstanding 401(k) Plan Match Obligations"). Additionally, Employee repayment of loans against their 401(k) balances are withheld from paychecks and disbursed to the vendor. These amounts vary weekly in the range of $3,000 to $10,000 per week.

80.    The Debtors request authorization to (a) make the contributions comprising the Outstanding 401(k) Plan Match Obligations up to an aggregate amount of $25,000 over any two week period, (b) make Employee Contributions up to an aggregate amount of $125,000 over any two week period; (c) pay any 401(k) Plan Administrative Fees outstanding as of the Petition Date; and (d) continue the 401(k) Plan in the ordinary course of the Debtors' business. It is essential for morale and maintaining the trust of employees that necessary steps are taken to protect the 401(k) Plan, including Outstanding 401(k) Plan Match Obligations.

Pension Programs

81.    The Debtors provide Pension benefits to hourly employees at a number of operations in Pennsylvania, Ohio, Alabama, and to vested former employees in New York. These benefits are provided through two separate, defined benefit pension plans. The assets of these plans are held in trusts established through MTB Investment Advisors. Most of the participating locations have benefits defined in the Collective Bargaining Agreements ("CBAs") for their hourly employees. Several locations have future increases in benefit levels defined in those CBAs. A significant number of retirees draw regular benefit payments from the trusts.

82.    Both plans require periodic funding to maintain adequate assets to cover the promised benefits and to meet Pension Protection Act ("PPA") and ERISA funding

requirements. Employees and retirees have expectations that the plans will provide the promised benefits. Failure to provide those benefits would inflict great hardship on the Employees and retirees, would seriously damage morale at a very critical time for the Debtors, and would violate the terms of the CBAs involved, all at a very critical time for the Debtors. Therefore, the Debtors request authority to continue to provide the benefits to the Employees and retirees, to make scheduled disbursements from the trusts, to make actuarially defined contributions to the trusts as may be required to ensure compliance with the PPA, ERISA, and benefit commitments made pre-petition, and to otherwise continue to operate the pension plans in the ordinary course of business.

### (i)    *Vacation Obligations*

83.    Certain Employees are eligible for paid vacation. Pursuant to the Debtors' procedures and policies, certain Employees are entitled to earn vacation based upon years of service or age. Approximately 750 Employees qualify for vacation. Vacation is earned on a monthly basis at most locations, except where statutory law or labor agreements may define it differently. Except for California and Iowa employees, vacation is normally used or lost on an annual basis. Some limited carryover of vacation from 2008 was permitted for corporate employees.

84.    Certain Employees are eligible for holiday pay for designated holidays. Approximately 750 employees qualify for holiday pay.

85.    Accordingly, the Debtors request authority, in accordance with the Debtors' pre-petition policies and procedures, to honor pre-petition earned vacation. In addition, the Debtors request authority to continue to accrue vacation obligations for post-petition periods in accordance with the Debtors' pre-petition policies and procedures. Further, the Debtors request

authority to permit all Employees to take ordinary course vacation time in accordance with the Debtors' pre-petition policies and procedures.

### (k)    *Other Miscellaneous Benefits and Obligations*

#### Flexible Spending Accounts

86.    The Debtors offer certain Employees the ability to contribute a portion of their annual earnings into a flexible spending account for health and/or dependent care (the "Flexible Spending Account Plan"). The Flexible Spending Account Plan is administered by NCAS. Under the terms of the Flexible Spending Account Plan, eligible Employees can elect to make pre-tax contributions through payroll deductions, which the Debtors pay to NCAS as requested to cover reimbursements made under the Flexible Spending Account Plan. Approximately 125 Employees participate in the Flexible Spending Account Plan. The Employee contributions are approximately $14,000 per month (the "Employee Contributions"). The Debtors typically pay approximately $900 per month for the administration of the Flexible Spending Account Plan. The Debtors' pre-petition unpaid administrative costs associated with these obligations are estimated by the Debtors to be approximately $900.

87.    Accordingly, the Debtors seek authorization to pay the Employee Contributions to NCAS to pay to NCAS any administrative fees outstanding as of the Petition Date; and continue making payments on account of the Flexible Spending Account Plan in the ordinary course of their businesses.

#### Miscellaneous Withholdings

88.    The Debtors withhold money from the Employee payroll pursuant to instructions from certain Employees or orders by judicial or administrative authorities (collectively, the "Designated Withholdings") to pay for, among other things, supplemental insurance programs, savings plans, child support, and garnishments. Out of an abundance of caution, the Debtors

request authority to remit and continue to remit these withholdings from Employees' payroll checks.

<u>Employee Assistance Program</u>

89.    The Debtors provide Employee Assistance Program benefits to certain Employees. Most are provided through a plan included in the premiums paid for Life Insurance through LFG. Others are covered under a local plan at Sherwood, with an average monthly cost of approximately $600. These benefits are important to Employees and their families when a variety of counseling services are needed. Accordingly, the Debtors seek authorization to pay the premiums outstanding for pre-petition period and to continue to provide the EAP coverage in the ordinary course of the Debtors' business.

<u>Other</u>

90.    In addition to the programs described above, the Debtors also maintain accounts to pay for Employee union dues. The average monthly union dues are approximately $18,500.

91.    Furthermore, the Debtors provide the Employees miscellaneous benefits described below that are designed to reward employee loyalty and performance (the "Miscellaneous Benefits"). For example, certain Employees are entitled to periodic bonus payments for safety achievements. In addition, certain Employees are entitled to periodic bonus payments for scrap reduction and/or productivity improvements.

92.    The Debtors request authority to maintain the Miscellaneous Benefits in the ordinary course of business and in accordance with their pre-petition practices. The Debtors believe that the costs associated with the Miscellaneous Benefits will be *de minimis*.

**6.    Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for an Order Authorizing the Payment of Certain Pre-petition Claims of Certain Critical Vendors**

93.    The Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to pay certain prepetition claims (the "Critical Vendor Claims") of certain critical vendors and service providers (the "Critical Vendors") that are essential to the Debtors' business operations, in an aggregate amount not to exceed $7.6 million (the "Critical Vendor Cap"). The immediate payment of the Critical Vendor Claims is not only critical to the Debtors' reorganization efforts, but immediately necessary in light of the industry in which the Debtors operate.

94.    The Critical Vendors generally consist of the parties that supply, either directly or as a distributor, steel, machine parts, fiber, valves, pipe, other metals, finished tanks, and other parts, known as "Materials" related to the manufacturing of tanks, cylinders, valves, and other products which are sold by the Debtor.  Critical Vendors also include so-called MRO (maintenance, repair, and operations) providers and other service providers that render vital services to all of the Debtors' business locations in a uniform, satisfactory, and cost-effective basis.

95.    The Critical Vendors are absolutely essential to the Debtors' ability to operate the Business.  The failure to pay the Critical Vendor Claims would result in the Critical Vendors refusing to provide goods or services to the Debtors post-petition which could have an immediately devastating effect on the Debtors' ability to operate their businesses.  Moreover, the delay attendant to the Debtors changing from a Critical Vendor to another vendor of similar products or services (assuming one could be located) would very likely delay the Debtors' ability to operate their businesses, which would have a severely negative impact on Debtors' operations.

96.     The Debtors and their advisors have examined and continue to examine whether the payment of Critical Vendor Claims is necessary, will ameliorate immediate and irreparable harm to the Debtors' business operations, and will ensure that the Debtors have access to adequate trade credit post-petition. Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors to identify those vendors who are essential to the Debtors' operations.

97.     In determining an estimate of the Critical Vendor Claims, the Debtors consulted with key employees to identify those vendors that are most essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" or "limited source" provider, (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor post-petition would result in significantly higher costs to the Debtors and/or inadequate or unsatisfactory services, and (c) the overall impact on the Debtors' operations if the particular Critical Vendor ceased or delayed shipments or services.

98.     After evaluating the information received in response to these inquiries, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors and, further, considered the Debtors' urgent need to continue to receive goods and services uninterrupted, their ability to find alternate sources, or satisfactory alternate services, and the likelihood that a vendor would extend trade terms post-petition despite the Debtors' failure to pay such vendors pre-petition outstanding trade debt. Based on the forgoing considerations, the Debtors anticipate that the amount of Critical Vendor Claims will be less than the Critical Vendor Cap.

99.     If the Debtors are unable to pay their Critical Vendors and those vendors cease or delay delivery of those products or services, the Debtors could not operate their business.

Without Materials, the Debtors would be extremely disadvantaged in a highly competitive market segment and would suffer an immediate erosion in customer, creditor and employee trust and confidence which would be difficult, if not impossible, to restore. Therefore, I believe that the granting authorization to the Debtors, in their sole discretion, to pay Critical Vendor Claims that are essential to the Debtors' business operations is in the best interests of the Debtors estates, their creditors, and all other parties in interest.

7. **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 503(b)(9), and 507(a) for an Order Authorizing Debtors to Pay Certain Pre-Petition Claims of Suppliers and Vendors of Goods Entitled to Administrative Priority**

100.    In order to obtain and ensure timely delivery from their suppliers and vendors of certain supplies and raw materials (collectively, the "Supplies"), and to help ensure that the Debtors have access to post-petition trade credit from the suppliers of these vital Supplies, the Debtors seek entry of an order authorizing payment, in the ordinary course, of pre-petition claims of suppliers and vendors entitled to administrative priority under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (such suppliers and vendors together, the "503(b)(9) Vendors") for those undisputed obligations arising from Supplies received by the Debtors from such Vendors in the ordinary course of business within 20 days before the Petition Date (such administrative expense claims, "503(b)(9) Vendor Claims").

101.    In the ordinary course of the Debtors' businesses, numerous 503(b)(9) Vendors provide the Debtors with Supplies that will be essential to the sustained operations of the Debtors both in the short term and during the reorganization period. If the 503(b)(9) Vendors are not paid in the ordinary course on account of their 503(b)(9) Vendor Claims, such 503(b)(9) Vendors are unlikely to provide the Debtors with post-petition trade credit and may refuse to continue providing the Debtors with Supplies after the Petition Date. Because the Debtors are in the business of operating 17 manufacturing facilities (including those idled but still owned) that rely

- 34 -

on necessary deliveries from the 503(b)(9) Vendors and goods related to the preparation and service thereof multiple times per week, any delay or disruption in the continuous flow of Supplies to the Debtors could result in an immediate shut down of the Debtors' operations. As of the Petition Date, the Debtors estimate that the 503(b)(9) Vendor Claims total approximately $7.4 million.

102.    Absent the relief requested in this Motion, the Debtors would face the very real possibility that 503(b)(9) Vendors would cease delivery of Supplies, causing a significant disruption to, if not cessation of the Debtors' businesses. An order of this Court confirming that all obligations of the Debtors arising from Supplies delivered in the ordinary course of the Debtors' businesses in the 20 days prior to the Petition Date may be paid by the Debtors in the ordinary course pursuant to Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code will help ensure continuous delivery of Supplies to the Debtors. Accordingly, I believe that the relief requested should be granted because it is critical to the Debtors' continued operation and, consequently, is in the best interests of creditors and the estates.

8.    **Motion of Debtors for Authorization to (A) Maintain Certain Customer Programs and (B) Honor or Pay Related Prepetition Obligations to Their Customers**

103.    In the ordinary course of the Debtors' businesses, the Debtors maintain, in current effect, Rebate and other Customer programs (the "Rebates") which entitle customers to payments for meeting the prior year's sales thresholds. Debtors also make refund payments to customers for any credit balances in customer accounts caused by credit issued for damaged products, duplicate payments, misdirected lockbox payments, and similar circumstances (the "Refunds", and together with the Rebates, the "Programs" or "Customer Programs"). The Programs, including Rebates and Refunds, are essential to the preservation of the Debtors' businesses, properties and assets.

104.    The Customer Programs were designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer loyalty, improve profitability, and generate goodwill for the Debtors and their products, thereby retaining current customers, attracting new ones, and ultimately enhancing net income.    To that end, the Debtors seek authority to continue making Program payments to customers.    In view of the importance of maintaining the customer relationships with respect to their business activities, the Debtors believe it is in the best interest of creditors in these Chapter 11 cases for the Court to authorize the Debtors to honor their Program obligations.    Any other alternative would likely result in disputes with customers resulting in lost future sales and would be detrimental to the Debtors' Chapter 11 efforts.    Finally, if the Debtors fail to make the payments due, the Debtors may be exposed to litigation.    I believe the Debtors must quickly assure customers of the Debtors' continued ability to fulfill their obligations under the prepetition Customer Programs in order to maintain their valuable customer relationships following the commencement of these chapter 11 cases, particularly given the increased pressure from competitors that the Debtors believe will inevitably arise.

9.    **Debtors' Motion for Order Pursuant to Sections 105(a), 363(b), 541, and 507(a)(8) of the Bankruptcy Code Authorizing (a) Payment of Certain Prepetition Taxes, and (b) Financial Institutions to Process and Cash Checks and Transfers Related Thereto**

105.    In the ordinary course of their business, the Debtors are required to collect certain taxes, including sales and use taxes, from third-parties and hold them for a period of time before remitting them to the appropriate taxing authorities (the "Trust Fund Taxes").    In addition, certain taxing authorities are authorized under state law to collect certain unpaid business and occupation taxes directly from individual officers and directors of the Debtors (the "Business Taxes" and together with the Trust Fund Taxes and the penalties, interest or other such charges

that may be assessed thereon, the "Taxes"). The Taxes are paid monthly, quarterly or annually to the respective taxing authorities, depending on the given Tax and the relevant taxing authority to which it is paid.

106.    The Debtors seek authority to pay any Taxes that were accrued prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to the extent any such payments made prepetition were rejected, lost or otherwise not received in full by any taxing authority.  Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion.  Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

107.    Without this relief, some, if not all, of the taxing authorities may initiate an audit of the Debtors if the Taxes are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and result in unnecessary expenses. Moreover, I understand that if the Debtors do not pay such amounts in a timely manner, the taxing authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will irreparably and immediately harm the estates.  Additionally, I further understand that absent the relief requested herein, some states hold corporate officers personally liable for unpaid "trust fund" taxes, including sales and use taxes, in certain circumstances.  Moreover, I understand that to the extent that any such "trust fund" taxes remain unpaid by the Debtors, their officers could be subject to lawsuits or criminal prosecution during the pendency of these

Chapter 11 cases. Even the possibility of any such lawsuit or criminal prosecution would most certainly distract the Debtors and their officers from their efforts in these Chapter 11 cases.

108.    The Debtors estimate that outstanding prepetition liabilities owing to the various taxing authorities for Taxes will not exceed approximately $100,000 exclusive of any Taxes that may have been paid prior to Petition Date but had not cleared as of the Petition Date.

109.    Failure to pay the Taxes could have a materially adverse impact on the Debtors' ability to operate in the ordinary course of business and to reorganize. Accordingly, I believe that it is necessary and in the best interests of the Debtors' estates, creditors, and other parties in interests for the Debtors to pay, in their sole discretion, the Taxes, including any penalties and interest thereon, if any, and any liability resulting from audits of pre-petition Taxes to the relevant taxing authorities in the ordinary course of the Debtors' businesses.

10.    **Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 for Interim and Final Order Finding Utilities Adequately Assured of Payment and Establishing Further Procedures**

110.    In the ordinary course of business, the Debtors regularly incur utility expenses for water, sewer, electricity, gas, local and long-distance telephone service, cellular phone service, internet service, and other utility services. Approximately 83 utility providers (as such term is used in section 366 of the Bankruptcy Code, the "Utility Providers") provide these services. A complete list of the Utility Providers is attached as Exhibit A to the Utilities Motion (the "Utility Service List"). The approximate monthly charges for the utility services provided by the Utility Providers totals $700,000. The provision of utility service by the Utility Providers is governed, in some instances, by applicable federal or state tariffs, and by service agreements.

111.    Prior to the Petition Date, the Debtors had a history of timely payment of utility costs. The Debtors are not currently aware of any past due amounts. However, due to the timing of the filings in relationship to the Utility Providers' billing cycles, the Debtors are aware of

- 38 -

utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtors. The Debtors are not seeking authority to pay any outstanding prepetition amounts.

112.    Given the number of Utility Providers from which the Debtors receive services, I understand, based on the advice of counsel, that procedures are necessary to deal with the adequate assurance requirements of section 366 of the Bankruptcy Code and to avoid any interruption of the utility services provided to the Debtors. I believe that the proposed procedures are necessary because if such procedures are not approve, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of the chapter 11 cases. Moreover, uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

## 11.    **Debtors' Motion for Order Extending the Time to File Schedules and Statements of Financial Affairs**

113.    Because of the size, complexity and geographic reach of the Debtors' operations, the press of business incident to the commencement of these chapter 11 cases, and the unexpectedly sudden need to file their petitions for relief, the Debtors were unable, prior to the Petition Date, to assemble all of the information necessary to complete and file the required schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements"). Accordingly, the Debtors request the entry of an order extending by sixty (60) days, or until January 18, 2010, the date by which the Schedules and Statements must be filed pursuant to Bankruptcy Rule 1007 and Local Rule 1007-1(b).

114.    The Debtors have worked diligently and have made significant progress towards completing their Schedules and Statements. Nonetheless, the Debtors need the aforementioned brief extension to file the Schedules and Statements. The necessity of the extension is largely due to the number of the Debtors' creditors, the size and complexity of the Debtors' business, and the limited staffing available to gather, process, and complete the Schedules and Statements. In addition, in anticipation of the Petition Date, and during the course of preparing the Schedules and Statements, the Debtors have been performing many critical tasks to position their estates to maximize value for their creditors. The time required to perform these tasks has necessarily limited the amount of time that the Debtors have been able to commit to preparing their Schedules and Statements.

115.    Based on the foregoing, I believe that the extension of time requested in this motion is necessary to enhance the accuracy of the Schedules and Statements while not prejudicing the rights of other claimants and parties in interest.

12.    **Application of Debtors and Debtors In Possession for an Order Pursuant to 11 U.S.C. §§ 327(a), 328, and 329, Fed. R. Bankr. P. 2014 and 2106, and Del. Bankr. L.R. 2014-1 and 2016-1 Authorizing the Employment and Retention of Reed Smith LLP as Their Bankruptcy Counsel *Nunc Pro Tunc* to the Petition Date**

116.    The Debtors request the entry of an Order authorizing them to employ and retain Reed Smith LLP ("Reed Smith") as their attorneys under a general security retainer to perform the legal services that will be necessary during these Chapter 11 cases. The Debtors request that this Court approve this Application as of the Petition Date to compensate Reed Smith for work performed after the Petition Date, but prior to the entry of the order approving this Application.

117.    I believe that Reed Smith is well-qualified to represent the Debtors because of Reed Smith's extensive experience and knowledge in cases under chapter 11 of the Bankruptcy Code, and because Reed Smith's appearance before this Court on applications, motions, and

other matters in these chapter 11 cases will be efficient and cost effective for the Debtors' estates.

118.     Reed Smith has also become uniquely familiar with the Debtors' business affairs and various legal issues that may arise during the bankruptcy cases. Prior to the Petition Date, the Debtors retained Reed Smith to advise and assist it in connection with various corporate matters and to provide legal advice in connection with matters concerning the Debtors' financial difficulties, including a possible restructuring of their financial affairs and capital structure and, ultimately to prepare documents and render legal advice related to the filing of these reorganization cases. Reed Smith has provided advice and assisted the Debtors in all aspects of their restructuring efforts and has been instrumental in the Debtors' efforts to address their financial difficulties and efforts in connection with filing these cases, including the negotiation and drafting of first-day motions and other pleadings necessary to facilitate the proper administration of these bankruptcy cases. For these reasons, I believe, and on behalf of the Debtors respectfully submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

13.     **Application of the Debtors for an Order Authorizing the Employment and Retention of Alvarez & Marsal Securities, LLC as Financial Advisor for the Debtors, *Nunc Pro Tunc*, to the Petition Date**

119.     The Debtors seek the entry of an order authorizing the retention of Alvarez & Marsal, LLC ("A&M"), as financial advisor. Upon information and belief, A&M is a financial advisory firm with extensive experience in providing restructuring and financial advisory services in reorganization proceedings and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States. I believe that A&M's financial and restructuring experience makes A&M well-qualified and able to advise the Debtors in a cost effective, efficient and timely manner.

- 41 -

120.   Moreover, I believe that the resources, capabilities and experience of A&M in advising the Debtors are crucial to the Debtors' successful restructuring.  As an experienced financial advisor, A&M fulfills a critical need that complements the services offered by the Debtors' other professionals.  A&M will render financial advice and services to the Debtors in connection with their restructuring efforts contemplated by these Chapter 11 Cases.

121.   Furthermore, as a result of prepetition work performed on behalf of the Debtors, A&M has acquired significant knowledge of the Debtors and their business and is now intimately familiar with the Debtors' financial affairs, debt structure, operations and related matters.  A&M's professionals have also worked closely with the Debtors' management and their other advisors in providing prepetition services to the Debtors.  Accordingly, A&M has developed relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services to the Debtors in these chapter 11 cases.  For these reasons, I believe, and on behalf of the Debtors respectfully submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**14.    Debtors' Application to Employ and Retain The Boathouse Group, LLC as Bankruptcy Consultant to the Debtors and Debtors In Possession Nunc Pro Tunc to the Petition Date Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014**

122.   The Debtors seek to employ and retain The Boathouse Group LLC ("Boathouse") as their bankruptcy consultant and to obtain approval of the terms under which Boathouse will be compensated.  Additionally, I understand that the Debtors request a waiver and modification of the application of certain of the information reporting requirements contained in Local Rule 2016-2.  I believe that Boathouse is well-qualified to serve as the Debtors' bankruptcy consultant because of Boathouse's substantial expertise in, among other things, corporate restructuring and

crisis management in Chapter 11 cases. Boathouse is also familiar with Debtors' businesses and has institutional knowledge gained from its prepetition relationship with the Debtors. Therefore, I respectfully submit that retention of Boathouse is in the best interests of the Debtors' estates and their creditors and should be approved *nunc pro tunc* to the Petition Date.

15.    **Debtors' Application Pursuant to 28 U.S.C. § 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L.R. 2002-1(f) for Entry of an Order Authorizing the Employment and Retention of the Garden City Group as Claims, Noticing, and Balloting Agent for the Clerk of the Court**

123.    The Debtors have over eight-hundred (800) creditors. The size of the Debtors' creditor body would most likely make it impracticable for the Clerk's Office of the Court to undertake the task of notice creditors and parties in interest in these chapter 11 cases, and administering the claims process.

124.    I believe that the most effective and efficient manner of notice creditors and parties in interest is for the Debtors to engage an independent third party to act as the Debtors' notice and claims agent. The Debtors may also require the services of an agent to administer votes pursuant to a plan of reorganization. Accordingly, the Debtors seek authority to retain and employ the Garden City Group ("GCG") as their claims, noticing and balloting agent (the "Agent"), *inter alia*, to assist the Debtors in distributing notices, as necessary, and to process other administrative information pertaining to these chapter 11 cases.

125.    Upon information and belief, GCG specializes in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases, and is frequently used in Chapter 11 cases. The Debtors chose GCG based on both its experience and the competitiveness of its fees. I believe that GCG is well qualified to serve as Agent in these cases and their employment will provide the Debtors with efficient management of the claims, noticing and balloting processes in

these cases leaving the Debtors' management and professionals to focus on the Debtors' reorganization efforts.

16.    **Debtors' Motion for An Order Pursuant to Sections 105(a), 327, and 328 of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Debtors to Employ and Compensate Professionals Utilized by the Debtors in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date**

126.    The Debtors seek authority (a) to employ and retain the services of certain professionals, including, but not limited to, attorneys and accountants (the "Ordinary Course Professionals") *nunc pro tunc* to the Petition Date; and (b) to pay the Ordinary Course Professionals, without application to the Court, 100% of their post-petition fees and expenses, not to exceed $50,000 per month individually.

127.    In the day-to-day performance of their duties, employees of the Debtors regularly employ certain professionals, including, but not limited to, attorneys, accountants, and others to assist in the performance of their responsibilities.    The Debtors require the services of the Ordinary Course Professionals in order to continue their normal business operations and to successfully restructure their businesses.    Due to the Ordinary Course Professionals' ongoing representations of the Debtors with respect to the specific matters for which they were employed (the "Pending Matters") and other matters, the Ordinary Course Professionals have valuable background knowledge regarding the Pending Matters and the Debtors' businesses in general. Thus, I believe that approval of the employment and compensation of the Ordinary Course Professionals is in the best interests of the estates, as it will minimize any disruption in the operation of the Debtors' businesses and avoid the duplicative fees and expenses that would result from retaining substitute professionals with respect to the Pending Matters.

128.    Further, approval of the procedures set forth in the Ordinary Course Professionals Motion will allow the Debtors to avoid additional fees that would be incurred by the Ordinary

Course Professionals in connection with preparing and prosecuting interim fee applications for relatively small amounts. Likewise, the procedure described in the motion set forth above will relieve the Court, the Office of the United States Trustee, and other interested parties of the burden of reviewing fee applications involving relatively small amounts of fees and expenses.

129.  In order to ensure that the Ordinary Course Professionals do not represent or hold interests materially adverse to the Debtors or their estates regarding matters upon which such professional is employed, each Ordinary Course Professional will be required to file an affidavit with the Court, stating that it does not hold an interest materially adverse to the Debtors. In addition, the Ordinary Course Professional must serve a copy of the affidavit on the Debtors, the Office of the United States Trustee, the Debtors' pre-petition and proposed post-petition lenders or their counsel, the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, and those parties requesting notice pursuant to Bankruptcy Rule 2002(g). Objections to the retention of any Ordinary Course Professional by any party in interest must be filed and served upon the Notice Parties within ten (10) business days of service of the Ordinary Course Professional's affidavit.

130.  I believe that the Ordinary Course Professionals are intimately familiar with the Debtors and their operations, and provide invaluable services to the Debtors, which are integral to the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the Ordinary Course Professionals Motion should be approved.

**17.      Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals**

131.  By this Motion, the Debtors request the entry of an order authorizing and establishing procedures for the compensation and reimbursement of Court-approved professionals on a monthly basis, on terms comparable to those procedures established in other

chapter 11 cases. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in these Chapter 11 cases more effectively.

132.    The Debtors propose that, except as otherwise ordered by the Court, the professionals retained pursuant to an order of the Court in these cases (collectively, the "Professionals") be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the following procedures (collectively, the "Compensation Procedures"):

133.    No earlier than the 25th day of each calendar month following the calendar month for which compensation is sought (a "Request Date"), each Professional seeking interim compensation must submit a monthly fee and expense statement (a "Monthly Statement") to: (i) the Debtors, 4718 Old Gettysburg Road, Suite 300, Mechanicsburg, PA 17055 (Attn: Leonard York); (ii) counsel to Debtors, Reed Smith LLP, 1201 N. Market, Suite 1500, Wilmington, DE 19801 (Facsimile: (302) 778-7575) (Attn: Mark W. Eckard) and 599 Lexington Avenue, New York, New York 10022 (Facsimile: (212) 521-5450) (Attn: Mark D. Silverschotz and Han J. Ahn); (iii) counsel for the post-petition lenders, Latham & Watkins, 233 South Wacker Drive, Suite 5800, Chicago IL 60606 (Attn: Richard Levy) and Proskauer Rose LLP, One International Place, Boston, MA 02110 (Attn: Stephen Boyko); (iv) counsel to any official Committee appointed; and (v) the Office of the United States Trustee, 844 North King Street, Room 2207, Lockbox 35, Wilmington, DE 19801 (collectively, the "Notice Parties"). Each Notice Party will have 20 days after service of a Monthly Statement (the "Review Period") to review the Monthly Statement. At the expiration of the Review Period, a Professional may file a certificate of no objection with the Court with respect to the unopposed portion of fees and expenses requested in

its Monthly Statement (a "CNO"). After a CNO is filed, the Debtors will promptly pay each Professional an amount (the "Actual Interim Payment") equal to the lesser of (i) 80 percent of the fees and 100 percent of the expenses requested in the Professional's Monthly Statement (the "Maximum Interim Payment") or (ii) the aggregate amount of fees and expenses not subject to an objection.

134.    If one of the Notice Parties objects to the interim payment of compensation or reimbursement of expenses sought in a particular Monthly Statement (a "Requested Amount"), any such party shall (i) prepare a written statement of its objection, along with an affidavit setting forth the precise nature of the objection and the amount of objectionable fees and expenses at issue (collectively, an "Objection"); and (ii) serve the Objection on the Professional that submitted the Monthly Statement and the other Notice Parties so that the Objection is received by these parties by the end of the Review Period. Thereafter, the objecting party and the affected Professional may attempt to resolve the Objection on a consensual basis. If the parties are unable to reach a resolution of the Objection within 20 days after service of the Objection (or longer if both the objecting party and the affected party agree to extend the time period), the affected Professional may either: (i) file the Objection with the Court, together with a request for payment of the difference, if any, between the Maximum Interim Payment and the Actual Interim Payment made to the affected Professional (the "Incremental Amount"); or (ii) forego payment of the Incremental Amount until the next interim or final fee application hearing, at which time the Court will consider and dispose of the Objection if requested by the parties.

135.    Each Professional may submit its initial Monthly Statement on or before January 25, 2010. This initial Monthly Statement will cover the period from the Petition Date through December 31, 2009.

- 47 -

136.    At three-month intervals, each of the Professionals may file with the Court and serve on the Notice Parties an application pursuant to Section 331 of the Bankruptcy Code (an "Interim Fee Application") for interim Court approval and allowance of fees and reimbursement of expenses incurred by the Professional during the prior three months (the "Interim Fee Period").  Interim Fee Applications may be filed within 45 days after the end of the Interim Fee Period for which the application seeks allowance of fees and reimbursement of expenses.  The first Interim Fee Application may be filed on or before April 15, 2010, and would cover the Interim Fee Period from the Petition Date through February 28, 2010.

137.    The Debtors will request that the Court schedule a hearing on the Interim Fee Applications at least once every three months, or at such other interval as the Court deems appropriate.

138.    The pendency of an Objection to payment of compensation or reimbursement of expenses will not disqualify a Professional from the future payment of compensation or reimbursement of expenses under the Compensation Procedures.

139.    Neither (i) the payment of or the failure to pay, in whole or in part, monthly interim compensation and reimbursement of expenses under the Compensation Procedures nor (ii) the filing of or failure to file an Objection will bind any party in interest or the Court with respect to the allowance of applications for compensation and reimbursement of expenses of Professionals.

140.    The Debtors further request that each member of the Committee be permitted to submit statements of expenses and supporting vouchers to Committee counsel, who will collect and submit the members' requests for reimbursement in accordance with the Compensation Procedures.

141.    The Debtors further request that the Court limit notice of interim and final fee applications to (a) the Notice Parties and (b) all parties that have filed a notice of appearance and request for such notice with the Clerk of this Court. In particular, Debtors request that (a) the Notice Parties be entitled to receive both the fee applications and the notice of hearing thereon (the "Hearing Notice") and (b) all other parties entitled to notice receive only the Hearing Notice, unless they request in writing (and at their expense) a copy of the interim and/or final fee applications from the applicant. Providing notice of fee applications in this manner will permit the parties most active in these Chapter 11 cases to review and object to professional fees and will save the expense of undue duplication and mailing.

142.    The Debtors will include all payments made to Professionals in accordance with the Compensation Procedures in their monthly operating reports, identifying the amount paid to each of the Professionals.

143.    The above-outlined procedure will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in these Chapter 11 cases. Further, they will avoid forcing the Professionals to finance these bankruptcy cases while awaiting final approval of their fees and expenses. Accordingly, I believe that the relief requested with regard to interim Compensation Procedures for Professionals is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

- 50 -

Dated: 11/16/2009

Leonard H. York
Chief Financial Officer
Taylor-Wharton International, LLC.