IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TAYLOR-WHARTON<br>INTERNATIONAL LLC[1], et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-14089 (BLS)<br>(Joint Administration Pending) |

## APPLICATION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF ALVAREZ & MARSAL SECURITIES, LLC AS FINANCIAL ADVISOR FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

Taylor-Wharton International LLC ("TWI"), on its behalf and on behalf of its affiliated debtors and debtors in possession (collectively, the "Debtors"), hereby applies (this "Application") to this Court for entry of an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors to employ and retain Alvarez & Marsal Securities, LLC ("A&M"), as financial advisor for the Debtors, effective *nunc pro tunc* to the Petition Date (defined below). In support of this Application, the Debtors rely on the Declaration of George Varughese, Managing Director of A&M (the "Varughese Declaration") attached hereto as Exhibit B and the Declaration of Leonard York in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "York Declaration") filed concurrently herewith. In further support of this Application, the Debtors respectfully represent as follows:

### Jurisdiction

1. The Court has jurisdiction over the Motion under 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Taylor-Wharton International LLC (1577); TWI-Holding LLC (8154); Taylor-Wharton Intermediate Holdings LLC (6890); Alpha One Inc. (1392); Beta Two Inc. (1408); Gamma Three Inc. (1367); Delta Four Inc. (1320); Epsilon Five Inc. (1344); TW Cryogenics LLC (1713); TW Cylinders LLC (1665); Sherwood Valve LLC (1781); American Welding & Tank LLC (1945); and TW Express LLC (6414).

2. Venue of these Chapter 11 cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory and rule-based predicates for the relief requested herein are sections 327(a) and 328(a) of title 11 of the United States Code (11 U.S.C. §§ 101–1532, as amended, the "<u>Bankruptcy Code</u>"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 2014-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

## Background

4. On November 18, 2009 (the "<u>Petition Date</u>"), the Debtors filed Voluntary Petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (the "<u>Bankruptcy Code</u>"). No request has been made for the appointment of a trustee or examiner and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no Official Committee of Unsecured Creditors has been appointed in the Debtors' Chapter 11 cases.

5. The Court and the parties in interest herein are respectfully referred to the contemporaneously filed York Declaration for a plenary discussion of the Debtors' background and for a further recitation of the facts supporting this application.

### A. The Debtors' Businesses

6. TWI is a Delaware limited liability holding company that wholly owns, through separate Delaware corporations, five distinct subsidiary limited liability companies, each of which is engaged in specific manufacturing operations generally engaged in the field of gas technology (the "<u>Operating Companies</u>").

7. TWI acquired its various businesses from Harsco Corporation ("Harsco") pursuant to an Asset and Stock Purchase Agreement dated as of November 27, 2007 (the "Asset Purchase Agreement"), pursuant to which TWI paid Harsco $300 million in cash and agreed to pay up to an additional $40 million on a contingent "earnout" basis, subject to various adjustments, including a traditional post-closing working capital adjustment.

8. Thereafter TWI, through the Operating Companies, commenced operations within its current corporate structure. Certain managerial and related financial functions are centralized at the TWI level, although each Operating Company has a distinct operation. More specifically, the former Harsco businesses are now organized among the TWI Operating Companies as follows:

   i. **TW Cryogenics LLC** ("Cryogenics"). Cryogenics has operations in Theodore, Alabama and Jesup, Georgia, and its wholly-owned subsidiaries have operations in China, Malaysia, Slovakia, Germany and Australia. Cryogenics is engaged principally in the manufacturing of cryogenic portable and bulk storage tanks. The products are used for storing cryogenic liquids, providing economical solutions for transporting, storing and dispensing liquefied gasses, medical applications, beverage carbonation applications and other related storage and delivery solutions. Customers for these products include liquid gas distribution and production companies, cryoscience equipment distributors, carbonation system retailers and distributors, and others engaged in the cryogenics business.

   ii. **Sherwood Valve LLC** ("Sherwood"). Sherwood has manufacturing facilities in Washington, Pennsylvania, Niagara Falls, New York and Cleveland, Ohio and is the leading valve producer for the industrial gas industry. Sherwood supplies valves to other TWI Operating Companies, with significant inter-affiliate sales. Among its products are industrial gas valves, propane tank valves and regulators, air conditioning and refrigeration products and SCBA, life support, SCUBA and oxygen valves. Customers include multiple tank and cylinder manufacturers (including the affiliated Operating Companies), gas packages, refrigeration rack manufacturers, air conditioning manufacturers, SCBA, SCUBA and medical industry manufacturers.

   iii. **American Welding & Tank LLC** ("AWT"). AWT has manufacturing facilities in Jesup, Georgia, Fremont, Ohio, Bloomfield, Iowa, Crossville, Tennessee and West Jordan, Utah and is a world leader in the design, manufacturing, repair, refurbishment and conversion of propane tanks for residential commercial,

industrial and agricultural applications. AWT's products include bulk steel above-ground and underground propane storage tanks as well as tanks designed for anhydrous ammonia. Customers for manufactured and refurbished products include nationwide and regional propane distributors.

iv. **TW Express LLC** ("TW Express"). TW Express is a distribution company which primarily serves AWT and holds the transportation assets and leases of TWI.

9. TWI also has a fifth operating business, TWI Cylinders LLC ("Cylinders"), which has operations in Harrisburg, Pennsylvania and Huntsville, Alabama and is engaged in the manufacturing of high and low pressure cylinders. The Debtors have been marketing the Cylinders business for sale and expect to complete a sale of this business pursuant to Section 363 of the Bankruptcy Code during the pendency of these Cases.

10. Shortly after the closing of the transactions pursuant to which the Debtors acquired their assets from Harsco, the Debtors determined that they had significant claims against Harsco for breaches of representations and warranties which Harsco made under the Asset Purchase Agreement. These claims pertained to the nature and value of the assets which the Debtors had acquired from Harsco and also to the amount of the working capital adjustment to the purchase price for those assets. The Debtors thereafter commenced an arbitration proceeding against Harsco to realize on such claims and ultimately settled their dispute with Harsco over these issues in October 2009.

B. **Pre-petition Capitalization**

11. As of the Petition Date, two levels of secured debt encumbered the Debtors' assets. The Debtors have $73.9 million currently outstanding under a senior secured debt facility, in addition to 7.1 million of undrawn letters of credit (the "Senior Debt") pursuant to a Credit Agreement, dated as of December 7, 2007, originally by and among the Debtors, General Electric Capital Corporation as Agent ("GE"), Merrill Lynch Business Financial Services Inc.,

4

and The CIT Group/Business Credit Inc. The Debtors also have $73.3 million outstanding on senior subordinated secured notes plus accrued interest (the "Mezzanine Debt") issued pursuant to the Note Purchase Agreement, dated as of December 7, 2007, by and among the Debtors, U.S. Bank National Association, as collateral agent and three other financial institutions.

12. The relationship between the holders of the Senior Debt and the Mezzanine Debt is governed by a Subordination and Intercreditor Agreement, dated as of December 7, 2007 (the "Intercreditor Agreement"). The Intercreditor Agreement provides, among other things, that the Senior Debt must be paid in full before the payment of any and all of the Mezzanine Debt can be repaid.

13. As of the Petition Date, the Debtors had incurred an estimated $13.5 million in unpaid trade debt to their suppliers and other vendors. The Debtors also have $55 million of outstanding obligations pursuant to unsecured PIK Notes (the "Unsecured Notes") which are contractually subordinated in right of payment to the Senior Debt and the Mezzanine Debt and structurally subordinated to most of the Debtors' other creditors.

C. **Events Leading to the Debtors' Bankruptcy Filing**

14. A number of macroeconomic factors related to the global economic downturn are the primary cause of a steep decline in the Debtors' operating revenues and their attendant need to restructure. The Debtors' revenues have declined from approximately $404 million in 2008 to a forecasted amount of approximately $237 million in 2009. The first nine months of fiscal year 2009 produced revenues of $183 million. As a result, the Debtors no longer have the financial ability to service their non-trade related debt.

15. As of April 1, 2009, the Debtors were in covenant default with respect to the Senior Debt and also were in payment default with respect to the Mezzanine Debt for having

5

missed an interest payment. On April 24, 2009, GE advised TWI that it had exercised its right to sweep excess cash and block the transfer of additional funds from the Debtors' accounts. Thereafter, TWI repaid approximately $21 million in cash which had been drawn under the revolving credit facility portion of the Senior Debt and GE released the blockage of TWI's accounts to the extent necessary to allow TWI to operate under a budget agreed upon with GE. The Debtors and GE entered into a Forbearance Agreement and, during the months that followed, the Debtors and the holders of the Senior Debt and the Mezzanine Debt negotiated the terms of the financial restructuring which is described below.

### D. Terms Of The Debtors' Financial Restructuring

16. The Debtors diligently evaluated a number of options to address their financial issues. Those efforts included sharing information with and engaging in discussions with a variety of the Debtors' stakeholders with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities. These discussions resulted in an agreement on the terms of a financial restructuring between the Debtors and the holders of all of their Senior Debt and Mezzanine Debt and a majority of their equity interests.

17. The terms of the Debtors' financial restructuring provide for the investment of $12 million of new capital and the cancellation of an aggregate of $120 million in debt as follows: (i) the Senior Debt will be restructured into a $20 million revolving credit facility, a $30 million Senior Term A Facility (collectively, "Term A Debt"), and a $39 million Term B Facility ("Term B Debt"); (ii) the $12 million of new capital will be invested as payment-in-kind debt (the "Investor PIK Debt"), which will be subordinate to the Term A Debt and *pari passu* with the Term B Debt; (iii) all of the Mezzanine Debt and Unsecured Notes will be cancelled; (vi) the holders of the Mezzanine Debt will receive the right to purchase not less than one-half of

6

the principal amount of the Investor PIK Debt; (v) 7% of the Debtors' reorganized equity also will be issued pro rata to the holders of the Mezzanine Debt and the balance will be issued pro rata to the purchasers of the Investor PIK Debt, to be allocated as agreed among them; and (vi) substantially all of the Debtors' trade and other unsecured creditors will be paid or otherwise satisfied in full.

18. The terms of this restructuring have been documented in a Restructuring Lock-Up Agreement between the Debtors and the holders of all of the Senior Debt and Mezzanine Debt (the "Lock-Up Agreement"), which is being filed substantially contemporaneously herewith. The Lock-Up Agreement provides that the parties have agreed to and will support the Debtors' proposed Plan of Reorganization, a draft version of which is being filed substantially contemporaneously herewith for informational purposes only. The Lock-Up Agreement further provides for the specific terms of the Debtors' Term A Facility, Term B Facility, Investor PIK Debt and LLC Operating Agreement to be entered into upon confirmation of the Plan, all as reflected in the agreements and other documents attached as exhibits to the Lock-Up Agreement. Finally, the Debtors have committed to file a draft disclosure statement and an accompanying motion to schedule a hearing for its approval and related matters within the next five business days.

## Relief Requested

19. The Debtors seek the entry of an order, substantially in the form of the proposed order submitted herewith, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, authorizing their retention of A&M, effective as of the Petition Date, as financial advisor, in accordance with the fee structure described below and pursuant to the terms and conditions of the engagement letter between A&M and the Debtors dated June 1, 2009 (the "Engagement

Letter").[2] A copy of the Engagement Letter is attached hereto as Exhibit C and incorporated herein by reference. The Debtors selected A&M after considering their reorganization efforts.

### Qualifications of A&M

20. In consideration of the size and complexity of their businesses, as well as the exigencies of the circumstances, the Debtors have determined that the services of experienced financial advisors will substantially enhance their attempts to maximize their enterprise value.

21. A&M has extensive experience in providing restructuring and financial advisory services in reorganization proceedings and has an excellent reputation for the services it has rendered in Chapter 11 cases on behalf of debtors and creditors throughout the United States. *See, e.g., Dunmore Homes, Inc.*, Case No. 07-13533 (Bankr. S.D.N.Y.); *In re Global Power Equip. Group Inc.*, Case No. 06-11045 (Bankr. D. Del.); *In re TSLC I, Inc.*, Case No. 04-24134 (Bankr. M.D. Fla.); *In re Adventure Parks Group, LLC*, Case No. 06-70659 (Bankr. M.D. Ga.); *In re Wild Adventures Valdosa, LLC*, Case No. 06-70660 (Bankr. M.D. Ga.); *In re Cypress Gardens Adventure Park, LLC*, Case No. 06-70661 (Bankr. M.D. Ga.); *In re USI Senior Holdings, Inc., et al.*, Case No. 09-11150 (Bankr. D. Del.); *In re Arclin US Holdings Inc., et al.*, Case No. 09-12628 (Bankr. D. Del.); *In re Comfort Co., Inc., et al.*, Case No. 08-12305 (Bankr. D. Del.). As such, the Debtors believe that A&M is well qualified and able to advise the Debtors in a cost effective, efficient and timely manner.

22. The resources, capabilities and experience of A&M in advising the Debtors are crucial to the Debtors' successful restructuring. An experienced financial advisor, such as A&M, fulfills a critical need that complements the services offered by the Debtors' other professionals. Broadly speaking, A&M will render financial advice and services to the Debtors in connection

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Engagement Letter. In the event of any inconsistencies between the description of the A&M engagement described in this Application and the terms of the Engagement Letter, the Engagement Letter shall control.

with their restructuring efforts contemplated by these Chapter 11 Cases. For these reasons, the Debtors require the services of a capable and experienced financial advisory firm such as A&M.

23. Furthermore, as a result of prepetition work performed on behalf of the Debtors, A&M acquired significant knowledge of the Debtors and their business and is now intimately familiar with the Debtors' financial affairs, debt structure, operations and related matters. Likewise, in providing prepetition services to the Debtors, A&M's professionals have worked closely with the Debtors' management and their other advisors. Accordingly, A&M has developed relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services to the Debtors in these Chapter 11 cases.

### Scope of Services

24. Subject to the Court's approval, as set forth more fully in the Engagement Letter, A&M may, as appropriate and to the extent requested and/or directed by the Debtors' management, perform the following financial advisory services:

   a) advise the Debtors with respect to a plan of reorganization and/or a valuation analyses of the Debtors and their assets;

   b) assist with the formulation, evaluation, and implementation of a plan of reorganization of the Debtors' businesses;

   c) provide financial advisory services to the Debtors in connection with developing, and seeking approval for, a Restructuring Plan (a "Plan") under Chapter 11 of the Bankruptcy Code;

   d) provide financial advisory services to the Debtors in connection with the structuring of any new securities to be issued under the Plan;

   e) assist the Debtors in negotiations with creditors, shareholders and other appropriate parties in interest;

   f) participate in hearings before the bankruptcy court with respect to matters upon which A&M has provided advice, including coordinating with the Debtors' counsel with respect to testimony in connection therewith; and

   g) any other tasks as mutually agreed upon by A&M and the Debtors.

25. The Debtors do not anticipate that the services described above to be rendered by A&M will be duplicative in any manner with the services performed by any other professional that the Debtors intend to retain. The Debtors firmly believe that A&M will provide these necessary services in a cost-effective, efficient and timely manner.

### Compensation

26. A&M intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these Chapter 11 Cases, subject to the Court's approval and in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the Office of the United States Trustee for the District of Delaware, any applicable orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "Fee Structure"); provided, however, that A&M's retention is subject to the standard of review under section 328(a) of the Bankruptcy Code and not subject to any other standard of review, including the standard of review under section 330 of the Bankruptcy Code.

27. Notwithstanding the foregoing, the Debtors understand that it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys and other professionals who are compensated on an hourly basis or maintain time on a "project category basis." The Debtors believe that if A&M was required to keep detailed time entries or keep time records on a "project category" basis as required by the rules of this Court, it would be unduly burdensome and time consuming. Thus, given that the nature of A&M's Fee Structure is not based upon the amount of time spent providing financial advisory services, the Debtors and A&M request that the Local Rules of this Court be modified with

respect to A&M so as to allow A&M to submit its billing records to the court in a summary format which sets forth only a general description of the services rendered by A&M.

28. The Fee Structure provided for in the Engagement Letter is consistent with and typical of arrangements entered into by A&M and other comparable firms in connection with the rendering of similar services under similar circumstances. As set forth further in the Engagement Letter, with respect to all financial advisory services, the Debtors shall pay A&M $150,000 per month (the "<u>Monthly Fee</u>"), beginning upon the date of execution of the Engagement Letter, and on every monthly anniversary date thereafter. Moreover, upon the earlier of (a) the consummation of any out-of-court Restructuring Transaction (as defined in the Engagement Letter) and (b) the effective date of a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code, A&M shall earn, and the Debtors shall promptly pay to A&M, a transaction fee (the "<u>Restructuring Transaction Success Fee</u>") of $1,100,000 less $50,000 from each Monthly Fee earned by A&M since the payment of the Monthly Fee allocable to September, 2009 (which was the fourth Monthly Fee paid to A&M pursuant to the Engagement Letter).

29. In addition to the Fee Structure set forth above, the Debtors will reimburse A&M for all reasonable out-of-pocket expenses incurred in connection with these cases on a monthly basis.

30. Given the numerous issues that the A&M Personnel may be required to address in the performance of their services, A&M's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in Chapter 11, the Debtors

11

submit that the Fee Structure in the Engagement Letter is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

**<u>Dispute Resolution Procedures</u>**

31. The Debtors and A&M have agreed, subject to the Court's approval of this Application, that notwithstanding the Engagement Letter: (a) any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Application or the services provided by A&M to the Debtors as outlined in this Application, including any matter involving a successor in interest or agent of any of the Debtors or of A&M, shall be brought in this Court or the United States District Court for the District of Delaware (the "<u>District Court</u>") (if the reference is withdrawn); (b) A&M and the Debtors and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such courts do not have or retain jurisdiction over such claims or controversies) for the resolution of such claims, causes of actions, or lawsuits; (c) A&M and the Debtors, and any and all successors and assigns thereof, waive trial by jury, such waiver being informed and freely made; (d) if this Court, or the District Court (if the reference is withdrawn), does not have or retain jurisdiction over the foregoing claims and controversies, A&M and the Debtors, and any and all successors and assigns thereof, will submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures (as set forth in <u>Exhibit D</u> attached hereto); and (e) judgment on any arbitration award may be entered in any court having proper jurisdiction. By this Application, the Debtors seek approval of this agreement by the Court. Further, A&M has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of this Court or the District Court (if the reference is withdrawn) to hear or determine any

controversy or claims with respect to, in connection with, arising out of, or in any way related to this Application or the services provided hereunder.

## Indemnification

32. Subject to the approval of the Court and as more fully described in the Engagement Letter, the Debtors will indemnify and hold harmless A&M, its shareholders, employees, agents, representatives and subcontractors (collectively, the "Indemnified Parties") under certain circumstances.[3]

33. The Debtors and A&M believe that the indemnification is customary and reasonable for financial advisory services, both out-of-court and in Chapter 11 cases, and reflects the qualifications and limitations on indemnification provisions that are customary in this district and other jurisdictions. *See, e.g., In re Tribune Co.*, Case No. 08-13141 (KJC); *In re Washington Mut., Inc.*, Case No. 08-12229 (MFW); and *In re PPI Holdings, Inc.*, Case No. 08-13289 (KG); *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. December 17, 2008); *In re Ziff Davis Media Inc.*, Case No. 08-10768 (BRL) (Bankr. S.D.N.Y. March 31, 2008), *In re DJK Residential LLC*, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. February 25, 2008), *In re Dunmore Homes, Inc.*, Case No. 07-13533 (Bankr. S.D.N.Y. December 20, 2007).

34. The terms and conditions of the Engagement Letter were negotiated by the Debtors and A&M at arm's-length and in good faith. The Debtors respectfully submit that the indemnification provisions contained in the Engagement Letter, viewed in conjunction with the other terms of A&M's proposed retention, are reasonable and in the best interests of the Debtors,

---

[3] The indemnification provision in the Engagement Letter provides that the Debtors will indemnify and hold harmless A&M and the other Indemnified Parties against any and all loses, claims, damages, liabilities, penalties, obligations, and expenses (collectively, "Losses") as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) A&M's engagement; provided, however, such indemnity shall not apply to any such Loss to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

their estates, and creditors in light of the fact that the Debtors require A&M's services to successfully reorganize. Accordingly, as part of this Application, the Debtors request that the Court approve the indemnification provisions of the Engagement Letter.

### Disinterestedness of A&M

35. To the best of the Debtors' knowledge and except to the extent disclosed herein and in the Varughese Declaration: (a) A&M is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates; and (b) A&M has no connection to the Debtors, their creditors or their related parties except as may be disclosed in the Varughese Declaration.

36. To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of A&M's retention are discovered or arise, A&M will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

### Legal Basis for Relief

37. The Debtors seek approval of the Fee Structure and Engagement Letter pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis ...." 11 U.S.C. § 328(a). Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including restructuring advisors and financial advisors, on more flexible terms that reflect the nature of their services and market conditions, which is a significant departure

from prior bankruptcy practice relating to the compensation of professionals. As the United States Court of Appeals for the Fifth Circuit recognized in *In re National Gypsum Co.*, 123 F.3d 861 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

*Id.* at 862 (citations omitted). Owing to this inherent uncertainty, courts in this district and in other jurisdictions have approved similar arrangements that contain reasonable terms and conditions under section 328. *See Artists Theatre Co. v. Walton*, 315 F.3d 217, 228-234 (3d Cir. 2003) (applying "market driven" approach and holding retention application of financial advisor, including indemnification provisions, was reasonable); *In re Insilco Techs., Inc.*, 291 B.R. 628, 633 (Bankr. D. Del. 2003) ("Section 328 authorizes the employment of professional persons on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis or on a contingent fee basis. Section 328 applies to all professionals, including financial advisors, that a debtor seeks to retain ... [T]he Court is guided by a standard of reasonableness when analyzing the terms and conditions of engagement of professionals, including retainers held by professionals."); *see also, e.g., In re Motor Coach Indus. Int'l, Inc.*, Case No. 08-12136 (Bankr. D. Del. Oct. 17, 2008); *In re Hilex Poly Co. LLC*, Case No. 08-10890 (Bankr. D. Del. May 30, 2008); *In re Global Power Equip. Group Inc.*, Case No. 06-11045 (Bankr. D. Del. Dec. 18, 2006); *In re J.L. French Auto. Castings, Inc.*, Case No. 06-10119 (Bankr. D. Del. March 24, 2006); *In re Flyi, Inc.*, Case No. 05-20011 (Bankr. D. Del. Dec. 5, 2005); *In re Foamex Int'l,*

*Inc.*, Case No. 05-12685 (Bankr. D. Del. Oct. 17, 2005); *In re Comdial Corp.*, Case No. 05-11492 (Bankr. D. Del. Jun. 21, 2005);

38. Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 328(a) of the Bankruptcy Code as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, <u>on a fixed or percentage fee</u> basis, or on a contingent fee basis.

11 U.S.C. § 328(a) (emphasis added). This change makes clear that debtors are able to retain a professional on a fixed fee basis with bankruptcy court approval.

39. The Debtors submit that the Fee Structure appropriately reflects the nature and scope of services to be provided by A&M, A&M's substantial experience with respect to financial advisory services and the fee structures typically utilized by A&M and other leading financial advisors.

### Notice

40. Notice of this Motion has been given to: (a) the United States Trustee; (b) the Debtors' pre-petition and proposed post-petition lenders or their counsel; and (c) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis. In light of the nature of the relief requested and the text of Local Rule 1015-1, which does not require notice or a hearing on a motion regarding joint administration, the Debtors submit that no further notice is required.

WHEREFORE the Debtors respectfully request for the reasons set forth herein and in the York Declaration that this Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing and approving the retention and employment by the Debtors of A&M, effective as of the Petition Date, and granting such other and further relief as the Court deems just and proper.

Dated: November 19, 2009

Respectfully submitted,

_____
Leonard H. York
Chief Financial Officer
Taylor-Wharton International LLC