**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TAYLOR-WHARTON<br>INTERNATIONAL LLC[1], et al.,<br><br>           Debtors. | Chapter 11<br>Case No. 09-14089 (BLS)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF REORGANIZATION OF TAYLOR-WHARTON INTERNATIONAL LLC AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

THIS DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF TAYLOR-WHARTON INTERNATIONAL LLC AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND EQUITY INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

BY ORDER DATED _____, 2010, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Taylor-Wharton International LLC (1577); TWI-Holding LLC (8154); Taylor-Wharton Intermediate Holdings LLC (6890); Alpha One Inc. (1392); Beta Two Inc. (1408); Gamma Three Inc. (1367); Delta Four Inc. (1320); Epsilon Five Inc. (1344); TW Cryogenics LLC (1713); TW Cylinders LLC (1665); Sherwood Valve LLC (1781); American Welding & Tank LLC (1945); and TW Express LLC (6414). Each of the Debtors has a principal place of business at 4817 Old Gettysburg Road, Mechanicsburg, Pennsylvania 17055.

US_ACTIVE-102769680.4

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>5:00 P.M., EASTERN STANDARD TIME, _____</u>, 2010 UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE.**

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO EFFICIENTLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11. ADDITIONALLY, THE DEBTORS BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' CREDITORS UNDER THE CIRCUMSTANCES OF THESE CASES AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT CONTAIN ALL OF ITS TERMS AND PROVISIONS. ALL PARTIES WHO ARE ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN DOCUMENT AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN DOCUMENT ARE CONTROLLING.

US_ACTIVE-102769680.4

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN) WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN.

US_ACTIVE-102769680.4

# TABLE OF CONTENTS

Page

I.  SUMMARY ...........................................................................................................10
    A.    Why You Are Receiving This Document ............................................................10
    B.    Plan Overview .....................................................................................................11
            1.    Purpose – Reorganization ........................................................11
            2.    Substantive Consolidation .......................................................11
            3.    Summary of Plan Treatment .....................................................12
            4.    Executory Contracts and Unexpired Leases .............................20
    C.    Voting and Confirmation .....................................................................................20
    D.    Risk Factors and Disclaimer ...............................................................................20
II. VOTING ON AND CONFIRMATION OF THE PLAN .....................................................22
    A.    Deadline for Voting For or Against the Plan .......................................................22
    B.    Confirmation Hearing for the Plan .......................................................................23
    C.    Any Objections to Confirmation of the Plan .......................................................23
    D.    Recommendations for Voting ..............................................................................24
III. ORGANIZATION AND ACTIVITIES OF THE DEBTORS ...........................................24
    A.    The Debtors' Business ........................................................................................24
            1.    Corporate Structure and the Harsco Acquisition .....................26
            2.    Pre-Petition Capitalization .......................................................28
            3.    Debtor-in-Possession Financing and Use of Cash Collateral ...................29
            4.    Management ..............................................................................30
            5.    SCI Sale ....................................................................................31
            6.    Management Changes ...............................................................32
            7.    Operational Restructuring Efforts .............................................32
IV. THE CASES ..................................................................................................................32
    A.    Events Leading to the Debtors' Bankruptcy Filing .............................................32
    B.    The Debtors' Financial Restructuring ..................................................................33
    C.    Significant Events ...............................................................................................34
            1.    Summary of "First Day" Motions and Orders .........................34
            2.    Schedules and Statements of Financial Affairs ........................38
             3.    Execution of Trade Agreements ...............................................38
            4.    Retention of Professionals ........................................................39
             5.    Summary of Litigation ..............................................................39
            6.    Debtor-in-Possession Operating Reports ..................................40
            7.    Claims Bar Date and Review Process .......................................40
V.  SUMMARY OF THE PLAN OF REORGANIZATION .................................................41
    A.    Overview of Chapter 11 ......................................................................................41
    B.    Purpose of the Plan ..............................................................................................43
VI. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .....................................43
    A.    Introduction .........................................................................................................43
    B.    Classification Of Claims And Equity Interests ...................................................43
            1.    Unimpaired and Unclassified Claims. ......................................43
            2.    Description of the Classes .........................................................43
VII. TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS ....................44

US_ACTIVE-102769680.4

|      | A.   | DIP Facility Claims | 44 |
|      | B.   | Administrative Expense Claims | 44 |
|      | C.   | Priority Tax Claims | 45 |
|      | D.   | Class 1:  Pre-Petition Secured Revolver Claims | 45 |
|      | E.   | Class 2:  Pre-Petition Secured Term Loan Claims | 46 |
|      | F.   | Class 3, et seq.:  Other Secured Claims | 47 |
|      | G.   | Class 4:  Other Priority Claims | 47 |
|      | H.   | Class 5:  Pre-Petition Subordinated Note Claims | 48 |
|      | I.   | Class 6:  General Unsecured Claims | 49 |
|      | J.   | Class 7:  Holdco PIK Note Claims | 49 |
|      | K.   | Class 8:  Intercompany Claims | 49 |
|      | L.   | Class 9:  Equity Interests in TWI-Holding | 49 |
|      | M.   | Class 10:  Equity Interests in all Debtors other than TWI-Holding | 50 |
| VIII. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 50 |
|      | A.   | Presumed Acceptance of Plan | 50 |
|      | B.   | Voting Classes | 50 |
|      | C.   | Acceptance by Impaired Classes of Claims | 50 |
|      | D.   | Deemed Rejection of Plan | 50 |
|      | E.   | Cramdown | 50 |
|      | F.   | Substantive Consolidation of the Debtors for Voting and Distribution Purposes Only | 50 |
|      | G.   | Continued Organizational Existence | 51 |
|      | H.   | Cancellation of Existing Securities and Agreements | 51 |
|      | I.   | Issuance of New Equity Interests | 51 |
|      | J.   | Revesting of Assets | 52 |
|      | K.   | Rights of Action; Reservation of Rights | 52 |
|      | L.   | Effectuating Documents; Further Transactions | 52 |
|      | M.   | Sources of Liquidity | 53 |
|      |      | 1.   Restructured Credit Documents | 53 |
|      |      | 2.   Sale of Investor PIK Notes and New TWI-Holding Equity | 53 |
| IX.  | | RELEASES AND INJUNCTIONS RELATED TO RELEASES | 54 |
|      | A.   | Exculpation | 54 |
|      | B.   | Releases by Debtors | 54 |
|      | C.   | Releases by Holders of Claims and Equity Interests | 55 |
|      | D.   | Injunction Related to Releases | 55 |
|      | E.   | No Waiver | 56 |
|      | F.   | Deemed Consent | 56 |
|      | G.   | Survival of Indemnification Obligations to Personnel | 56 |
| X.   | | CORPORATE STRUCTURE OF THE REORGANIZED DEBTORS | 57 |
|      | A.   | Corporate Action | 57 |
|      | B.   | Corporate Structure of Reorganized Debtors | 57 |
|      | C.   | Board of Directors/Managers and Officers of Reorganized Debtors | 58 |
|      |      | 1.   Reorganized TWI-Holding's Board of Directors. | 58 |
|      |      | 2.   Reorganized TWI-Holding's Officers. | 58 |
|      |      | 3.   Reorganized Affiliates. | 58 |
|      | D.   | Indemnification of Directors and Officers | 58 |

US_ACTIVE-102769680.4

| | | | |
|---|---|---|---|
| | E. | Operating Agreement | 58 |
| XI. | | DISTRIBUTIONS UNDER THE PLAN | 59 |
| | A. | Distributions to Holders of Allowed Claims Only | 59 |
| | B. | Distribution Record Date | 59 |
| | C. | Disbursing Agent | 59 |
| | D. | Rights and Powers of the Disbursing Agent | 59 |
| | E. | Delivery of Distributions | 59 |
| | F. | Time Bar to Cash Payments | 60 |
| | G. | Fractional Shares | 60 |
| | H. | Set-Offs | 60 |
| XII. | | PROCEDURES FOR DISPUTED CLAIMS | 61 |
| | A. | Resolution of Disputed Claims; Estimation of Claims | 61 |
| | B. | No Distributions Pending Allowance | 61 |
| | C. | Distributions After Allowance | 61 |
| XIII. | | EXECUTORY CONTRACTS | 62 |
| | A. | Assumption of Executory Contracts and Unexpired Leases | 62 |
| | B. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases | 62 |
| | C. | Compensation and Benefit Programs | 62 |
| XIV. | | CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE | 63 |
| | A. | Conditions Precedent to Confirmation | 63 |
| | B. | Conditions Precedent to the Effective Date | 63 |
| | C. | Waiver of Conditions to Confirmation and Effective Date | 64 |
| | D. | Effect of Failure of Conditions of the Effective Date | 64 |
| XV. | | EFFECT OF CONFIRMATION | 65 |
| | A. | Discharge of Claims and Termination of Equity Interests | 65 |
| | B. | Binding Effect | 66 |
| | C. | Preservation of Insurance | 66 |
| | D. | Section 1146 Exemption | 68 |
| | E. | Compliance with Tax Requirements | 68 |
| | F. | Severability of Plan Provisions | 68 |
| | G. | Exemption from Securities Laws | 68 |
| | H. | Allocation of Plan Distributions Between Principal and Interest | 69 |
| XVI. | | RETENTION OF JURISDICTION | 69 |
| | A. | Post Effective-Date Jurisdiction | 69 |
| | B. | Jurisdiction Prior to the Effective Date | 71 |
| XVII. | | MISCELLANEOUS PROVISIONS | 71 |
| | A. | Substantial Consummation | 71 |
| | B. | Payment of Statutory Fees | 71 |
| | C. | Retiree Benefits | 71 |
| | D. | Professional Fee Claims | 71 |
| | E. | Modifications and Amendments | 71 |
| | F. | Corrective Action | 72 |
| | G. | Plan Revocation, Withdrawal or Non-Consummation | 72 |
| | H. | Modification of Exhibits | 72 |
| | I. | Governing Law | 73 |

US_ACTIVE-102769680.4

| J. | Time | 73 |
|---|---|---|
| K. | Section Headings | 73 |
| L. | Effectuating Documents and Further Transactions | 73 |
| M. | Successors and Assigns | 73 |
| N. | Notices | 73 |

XVIII. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST ..........................74

| A. | Feasibility of the Plan | 75 |
|---|---|---|
| B. | Best Interests Test | 77 |
| | 1. Generally | 77 |
| | 2. Best Interests of Creditors Test | 78 |
| | 3. Application of the "Best Interests" of Creditors Test to the liquidation Analysis and the Valuation | 79 |
| C. | Confirmation Without Acceptance by All Impaired Classes:  The 'Cramdown' Alternative | 79 |

XIX. IMPORTANT CONSIDERATIONS AND RISK FACTORS ..........................80

| A. | The Debtors Have No Duty To Update | 80 |
|---|---|---|
| B. | No Representations Outside The Disclosure Statement Are Authorized | 81 |
| C. | Information Presented Is Based On The Debtors' Books And Records, And No Audit Was Performed | 81 |
| D. | All Information Was Provided By Debtors And Was Relied Upon By Professionals | 81 |
| E. | Projections And Other Forward Looking Statements Are Not Assured, And Actual Results Will Vary | 81 |
| | 1. Claims Could Be More Than Projected | 81 |
| | 2. Projections | 81 |
| F. | No Legal Or Tax Advice Is Provided To You By This Disclosure Statement | 82 |
| G. | No Admissions Made | 82 |
| H. | No Waiver Of Rights Except As Expressly Set Forth In The Plan | 82 |
| | 1. Business Factors And Competitive Conditions | 82 |
| | 2. Access to Financing and Trade Terms | 83 |
| | 3. Market for New TWI-Holding Equity | 83 |
| | 4. Impact of Interest Rates | 84 |
| I. | Bankruptcy Law Risks and Considerations | 84 |
| | 1. Confirmation of the Plan is Not Assured | 84 |
| | 2. The Plan May Be Confirmed Without the Approval of All Creditors Through So-Called "Cramdown" | 84 |
| | 3. The Effective Date Might Be Delayed or Never Occur | 84 |
| | 4. The Projected Value of Estate Assets Might Not Be Realized | 85 |
| | 5. Allowed Claims in the Various Classes May Exceed Projections | 85 |
| J. | Tax Considerations | 85 |

XX. EFFECT OF CONFIRMATION ..........................85

| A. | Binding Effect of Confirmation | 85 |
|---|---|---|
| B. | Vesting Of Assets Free And Clear Of Liens, Claims And Interests | 85 |
| C. | Good Faith | 86 |
| D. | Discharge of Claims | 86 |

US_ACTIVE-102769680.4

E.     Judicial Determination of Discharge ........................................................86

XXI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........86

    A.     Federal Tax Consequences to the Debtors..........................................................87

         1.     Tax Classification of the Debtors and Certain Transactions Contemplated by the Plan. ..........................................................87

         2.     Cancellation of Indebtedness Income Generally. ...................................88

         3.     Bankruptcy Exception and the Reduction of Tax Attributes Generally..........................................................89

         4.     Disregarded and Pass-through Entities Discharging Indebtedness Generally..........................................................89

         5.     Debtors' COD Income Attributable to the Plan.......................................90

         6.     Accrued Interest. ..........................................................90

         7.     Alternative Minimum Tax. ..........................................................91

    B.     Federal Tax Consequences to the Claims and Equity Interests ............................91

    C.     Information Reporting and Backup Withholding. ..................................................91

XXII.    ALTERNATIVES TO THE PLAN ..........................................................92

    A.     Liquidation Under Chapter 7 ..........................................................92

    B.     Dismissal..........................................................92

    C.     Alternative Plan ..........................................................92

XXIII.  DEFINITIONS AND INTERPRETATION ..........................................................92

    A.     Scope of Definitions ..........................................................92

    B.     Definitions..........................................................92

XXIV.  CONCLUSION..........................................................106

US_ACTIVE-102769680.4

## TABLE OF EXHIBITS

Exhibit 1      The Plan

Exhibit 2      Solicitation Order

Exhibit 3      [reserved]

Exhibit 4      Reorganized Debtors' Financial Projections

Exhibit 5      Liquidation Analysis

US_ACTIVE-102769680.4

# I.    SUMMARY

On November 18, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtors are operating their businesses and managing their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors are leading global manufacturers, refurbishers and providers of propane and cryogenic tanks, high and low pressure cylinders, composite cylinders, and valves and pressure gauges for gas applications.

In response to a variety of financial challenges summarized herein, the Debtors determined that the commencement of these Chapter 11 cases would provide the best alternative to eliminate underproductive operations and to restructure their businesses and financial affairs.  As of the Petition Date, the Debtors owned and operated (directly or through non-Debtor affiliates) eleven facilities in the United States and six facilities in China, Malaysia, and Slovakia.

As the culmination of their reorganization efforts, the Debtors are seeking confirmation of their Chapter 11 plan of reorganization.  Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to dispose of a debtor's assets and treat claims against, and interests in, such debtor.  A plan of reorganization typically may provide for a debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both.  By the proposed plan, the Debtors seek to finally reorganize their operations and financial affairs and emerge from bankruptcy as strengthened businesses.

## A.    Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a Chapter 11 plan of reorganization prepare and file with the Bankruptcy Court a document called a "disclosure statement."  The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the Plan.  In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be.  ***This document, together with its attached exhibits, is the Disclosure Statement for the Plan.  The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.***

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.  The Disclosure Statement also discusses the events leading to the Debtors' filing their Chapter 11 cases, describes the main events that have occurred in the Debtors' Chapter 11 cases, and, finally, summarizes and analyzes the Plan.  The Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtors and Holders of Claims and Equity Interests, voting procedures and the confirmation process.

*All creditors should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Indeed, creditors should not rely solely on the Disclosure Statement but should also read the Plan. Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.*

B.      Plan Overview

1.      Purpose – Reorganization

The purpose of the Plan is to finalize the Debtors' Chapter 11 reorganization by, among other things, providing the Debtors with a capital structure that can be supported by cash flows from operations. The Debtors believe that the reorganization contemplated by the Plan is in the best interests of their creditors as a whole. If the Plan is not confirmed, the Debtors believe that they will be forced either to file an alternate liquidating plan of reorganization or to liquidate under Chapter 7 of the Bankruptcy Code. In either event, the Debtors believe that the Debtors' unsecured creditors would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims. See Article XVIII hereof and the values set forth in the Liquidation Analysis attached hereto as Exhibit 5.

2.      Substantive Consolidation

On the Effective Date, each of the Debtors' estates will be substantively consolidated pursuant to Section 105(a) of the Bankruptcy Code to the extent provided in the Plan for the limited purposes of allowance, treatment and distributions under the Plan. As a result of the substantive consolidation, on the Effective Date, and to the extent provided in the Plan, all property, rights and claims of the Debtors shall be deemed pooled for purposes of allowance, treatment and distributions under the Plan.

US_ACTIVE-102769680.4

3. **Summary of Plan Treatment**

**UNCLASSIFIED AND UNIMPAIRED CLAIMS**

| Unclassified Claims | Plan Treatment |
|---|---|
| DIP Facility Claims | The DIP Facility Claims shall be Allowed in full, including without limitation, (i) all Claims for unpaid principal, interest and other charges outstanding on the Effective Date and (ii) all Claims for fees and expenses and other charges provided for under the DIP Facility. Except to the extent that a holder of an Allowed DIP Facility Claim and the Debtors, or the Reorganized Debtors, as the case may be, agree to a different treatment, each Allowed DIP Facility Claim shall be paid in full in Cash on the Effective Date from the proceeds of the revolving credit facility under the Restructured Credit Documents; *provided*, *however*, that the (a) DIP Facility Claims in respect of letters of credit issued (or deemed issued) pursuant to the DIP Facility and (b) DIP Roll-Up Loan Claims shall be assumed by the Reorganized Debtors in full on the Effective Date in accordance with the terms of the Restructured Credit Documents. |
| Administrative Expense Claims | Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive a distribution of Cash in an amount equal to such Allowed Administrative Expense Claim, without interest, on or as soon as practicable after (but in no event more than ninety (90) days after, unless extended by the Bankruptcy Court) the later of (i) the Effective Date; and (ii) the first Business Day after the date that is ten (10) Business Days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that (y) Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (these Claims may include, without limitation, post-Petition Date salaries and other post-Petition Date benefits for employees, post-Petition Date rent for facilities and offices, amounts owed to vendors providing goods and services during the Debtors' Reorganization Cases and tax obligations incurred by the Debtors all in the ordinary course of business and after the Petition Date), as debtors or debtors in possession, may be paid in full and performed by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions and (z) Professional Fee Claims shall be paid in accordance with the applicable order of the Bankruptcy Court after filing a fee application, notice and a hearing pursuant to the procedures set forth in Section VII.B hereof. |

US_ACTIVE-102769680.4

| Unclassified Claims | Plan Treatment |
|---|---|
| Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, on account of such Claim, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code and at the option of the Debtors, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; (iii) over a period ending not later than 5 years after the Petition Date; and (iv) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan (other than payments in Cash made to a Class of creditors under Section 1122(b) of the Bankruptcy Code). Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided herein, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes. |

US_ACTIVE-102769680.4

**CLASSIFIED CLAIMS**

| Class | Claim | Plan Treatment of Class |
|-------|-------|-------------------------|
| 1 | Pre-Petition Secured Revolver Claims | The Pre-Petition Secured Revolver Claims are Allowed in an amount equal to all principal plus all interest (including interest accrued after the Petition Date) at the Allowed Interest Rate (compounded on each interest payment date to the extent not timely paid), and all fees and expenses payable in connection therewith in accordance with the terms of the Existing Senior Loan Agreements.

On the Effective Date, the Reorganized Debtors shall assume the Pre-Petition Credit Agreement and the Pre-Petition Security Documents, in each case, if applicable, as amended or amended and restated pursuant to the Restructured Credit Documents, and without limiting the foregoing, the Reorganized Debtors shall assume the Pre-Petition Secured Revolver Claims on the terms and conditions set forth in the Restructured Credit Documents.

All Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents, shall remain in full force and effect on and after the Effective Date, and all Liens, rights, interests, duties and obligations thereunder shall survive the Effective Date and shall continue to secure all Pre-Petition Secured Revolver Claims assumed by the Reorganized Debtors and all other obligations under the Restructured Credit Documents.  Without limiting the generality of the foregoing, all Liens and security interests granted pursuant to the Restructured Credit Documents (including, without limitation, the Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents) to the Pre-Petition Agent and the Pre-Petition Credit Agreement Secured Parties shall be (i) valid, binding, perfected, enforceable, Liens and security interests in the personal and real property described in such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization or subordination under any applicable law.  In addition to the foregoing, the relative priorities and rights in such property as among the Pre-Petition Revolver Lenders and the Pre-Petition Term Lenders shall be governed by the Restructured Credit Agreement.

The Restructured Credit Agreement shall be executed, delivered and performed by the Reorganized Debtors in accordance with its terms, and all fees and expenses and other |

US_ACTIVE-102769680.4

| Class | Claim | Plan Treatment of Class |
|-------|-------|-------------------------|
| | | amounts provided for thereunder shall be paid promptly when due.  **Class 1 is impaired and is entitled to vote.** |
| 2 | Pre-Petition Secured Term Loan Claims | The Pre-Petition Secured Term Loan Claims are Allowed in an amount equal to all principal plus all interest accrued at the non-default rate prior to the Petition Date, and all fees and expenses payable in connection therewith in accordance with the terms of the Existing Senior Loan Agreements.<br><br>On the Effective Date, the Reorganized Debtors shall assume the Pre-Petition Credit Agreement and the Pre-Petition Security Documents, in each case, if applicable, as amended or amended and restated pursuant to the Restructured Credit Documents.  Without limiting the foregoing, on the Effective Date, the Reorganized Debtors shall assume the Pre-Petition Secured Term Loan Claims on the terms and conditions set forth in the Restructured Credit Documents, and as set forth therein, $30 million of Pre-Petition Secured Term Loan Claims shall be restructured into a first-priority first-lien term loan ("Term Loan A"), and the remainder of the Pre-Petition Secured Term Loan Claims shall be restructured pursuant to the Restructured Credit Agreement into a second-priority first-lien term loan ("Term Loan B").<br><br>All Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents, shall remain in full force and effect on and after the Effective Date, and all Liens, rights, interests, duties and obligations thereunder shall survive the Effective Date and shall continue to secure all Pre-Petition Secured Term Loan Claims assumed by the Reorganized Debtors and all other obligations under the Restructured Credit Documents.  Without limiting the generality of the foregoing, all Liens and security interests granted pursuant to the Restructured Credit Documents (including, without limitation, the Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents) to the Pre-Petition Agent and the Pre-Petition Credit Agreement Secured Parties shall be (i) valid, binding, perfected, enforceable, Liens and security interests in the personal and real property described in such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization or subordination under any applicable law.  In addition to the foregoing, the relative priorities and rights in such property as among the Pre-Petition |

US_ACTIVE-102769680.4

| Class | Claim | Plan Treatment of Class |
|-------|-------|-------------------------|
| | | Revolver Lenders and the Pre-Petition Term Lenders shall be governed by the Restructured Credit Agreement.<br><br>The Restructured Credit Agreement shall be executed, delivered and performed by the Reorganized Debtors in accordance with its terms, and all fees and expenses and other amounts provided for thereunder shall be paid promptly when due. **Class 2 is impaired and is entitled to vote.** |
| 3 | Other Secured Claims | Class 3 Claims are not impaired. Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 3 Claims are not entitled to vote to accept or reject the Plan<br><br>Class 3 consists of Other Secured Claims against the applicable Debtor. With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.<br><br>On the Effective Date, each Allowed Claim in Class 3 shall be, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 3 Claim, at the Debtors' option, (1) Reinstated, (2) satisfied by the Debtors' surrender of the collateral securing such Allowed Claim, (3) offset against, and to the extent of, the Debtors' claims against the holder of such Allowed Claim or (4) otherwise rendered not impaired, except to the extent that the Reorganized Debtors and such holder agree to a different treatment. **Class 3 is unimpaired and is not entitled to vote.** |
| 4 | Other Priority Claims | Class 4 Claims are not impaired. Holders of Class 4 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 4 Claims are not entitled to vote to accept or reject the Plan.<br><br>Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment of such Allowed Other Priority Claim, each such holder will receive, in full and |

- 16 -

| Class | Claim | Plan Treatment of Class |
|---|---|---|
| | | final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 4 Claim, one of the following treatments, as determined by the Debtors and upon the consent of the Requisite Supporting Revolving Lenders and after consultation with the Requisite Supporting Term Lenders, when such Claim becomes Allowed:<br><br>a.    the Debtors will pay the Allowed Class 4 Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable; provided that, Allowed Class 4 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Allowed Class 4 Claims become due and owing in the ordinary course of business; or<br><br>b.    each such Allowed Class 4 Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code.<br><br>**Class 4 is unimpaired and is not entitled to vote.** |
| 5 | Pre-Petition Subordinated Note Claims | On the Effective Date, the Pre-Petition Subordinated Note Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in the aggregate amount of (i) $74,815,909.98 (consisting of all principal plus interest accrued prior to the Petition Date) plus (ii) all reasonable pre-petition and post-petition attorneys' fees and expenses payable in connection therewith in accordance with the terms of the Pre-Petition Subordinated Notes and the Note Purchase Agreement dated December 7, 2007, plus (iii) all reasonable pre- and post-petition fees and expenses of CRG Partners as the financial advisor for the holders of the Pre-Petition Subordinated Note Claims, which fees and expenses of CRG Partners shall not exceed $100,000 in the aggregate.<br><br>On the Effective Date, holders of Allowed Class 5 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 5 Claim, (a) a Pro Rata share of the New TWI-Holding Equity representing 7% in the aggregate of the equity of Reorganized TWI-Holding, subject to dilution for New TWI-Holding Equity (in an aggregate amount not to exceed 16.5%, on a fully diluted basis, of such New TWI-Holding Equity) to be issued to employees, officers and directors of the Reorganized Debtors, (b) a Pro Rata Share of the right to purchase one-half of |

- 17 -

US_ACTIVE-102769680.4

| Class | Claim | Plan Treatment of Class |
|---|---|---|
| | | final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 4 Claim, one of the following treatments, as determined by the Debtors and upon the consent of the Requisite Supporting Revolving Lenders and after consultation with the Requisite Supporting Term Lenders, when such Claim becomes Allowed:<br><br>a.    the Debtors will pay the Allowed Class 4 Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable; provided that, Allowed Class 4 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Allowed Class 4 Claims become due and owing in the ordinary course of business; or<br><br>b.    each such Allowed Class 4 Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code.<br><br>**Class 4 is unimpaired and is not entitled to vote.** |
| 5 | Pre-Petition Subordinated Note Claims | On the Effective Date, the Pre-Petition Subordinated Note Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in the aggregate amount of (i) $74,815,909.98 (consisting of all principal plus interest accrued prior to the Petition Date) plus (ii) all reasonable pre-petition and post-petition attorneys' fees and expenses payable in connection therewith in accordance with the terms of the Pre-Petition Subordinated Notes and the Note Purchase Agreement dated December 7, 2007, plus (iii) all reasonable pre- and post-petition fees and expenses of CRG Partners as the financial advisor for the holders of the Pre-Petition Subordinated Note Claims, which fees and expenses of CRG Partners shall not exceed $100,000 in the aggregate.<br><br>On the Effective Date, holders of Allowed Class 5 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 5 Claim, (a) a Pro Rata share of the New TWI-Holding Equity representing 7% in the aggregate of the equity of Reorganized TWI-Holding, subject to dilution for New TWI-Holding Equity (in an aggregate amount not to exceed 16.5%, on a fully diluted basis, of such New TWI-Holding Equity) to be issued to employees, officers and directors of the Reorganized Debtors, (b) a Pro Rata Share of the right to purchase one-half of |

- 17 -

US_ACTIVE-102769680.4

| Class | Claim | Plan Treatment of Class |
|-------|-------|-------------------------|
|       |       | the principal amount of the Investor PIK Notes pursuant to the terms of the Investor PIK Documents, and (c) Cash as payment for and in an amount equal to (i) all reasonable pre-petition and post-petition attorneys' fees and expenses payable in connection with the Plan and the Debtors' Reorganization Cases in accordance with the terms of the Pre-Petition Subordinated Notes and the Note Purchase Agreement dated December 7, 2007, plus (ii) all reasonable pre-petition and post-petition fees and expenses of CRG Partners as the financial advisor for the holders of the Pre-Petition Subordinated Note Claims, which fees and expenses of CRG Partners shall not exceed $100,000 in the aggregate. The holders of Allowed Class 5 Claims will be required to execute the Operating Agreement prior to receiving any distribution of New TWI-Holding Equity under the Plan. **Class 5 is impaired and is entitled to vote.** |
| 6 | General Unsecured Claims | If Class 6 Claims accept the Plan in accordance with Section 4.3 of the Plan, then the holders of Allowed Class 6 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 6 Claim, a Pro Rata share of the Class 6 Recovery.  If Class 6 Claims do not accept the Plan in accordance with Section 4.3 of the Plan, then the holders of Class 6 Claims shall not be entitled to receive or retain any property or distribution under the Plan on account of any Class 6 Claims.  **Class 6 is impaired and is entitled to vote.** |
| 7 | Holdco PIK Note Claims | On the Effective Date, the Holdco PIK Note shall be cancelled and be of no further force or effect.  Holders of Holdco PIK Note Claims are not entitled to receive or retain any property or distribution under the Plan on account of any Class 7 Claims.  Therefore, holders of Class 7 Claims are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.  **Class 7 is impaired, is not entitled to vote to accept or reject the Plan and is deemed to reject the Plan.** |
| 8 | Intercompany Claims | Class 8 Claims are not impaired.  Holders of Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 8 Claims are not entitled to vote to accept or reject the Plan. |

US_ACTIVE-102769680.4

| Class | Claim | Plan Treatment of Class |
|-------|-------|-------------------------|
| | | The legal, equitable and contractual rights of the holders of Intercompany Claims are unimpaired by the Plan.  On or as soon as practicable after the Effective Date, and after consultation with and approval by the Pre-Petition Agent, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.  **Class 8 is unimpaired and is not entitled to vote.** |
| 9 | Equity Interests in TWI-Holding | On the Effective Date, the Equity Interests in TWI-Holding shall be cancelled and be of no further force and effect.  Holders of such Equity Interests are not entitled to receive or retain any property or distribution under the Plan on account of any Class 9 Claims.  Therefore, holders of Class 9 Equity Interests are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Class 9 Equity Interests are not entitled to vote to accept or reject the Plan.  **Class 9 is impaired and deemed to reject the Plan.** |
| 10 | Equity Interests in all Debtors Other than TWI-Holding | Class 10 Equity Interests are not impaired.  The holders of Class 10 Equity Interests are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.<br><br>The legal, equitable and contractual rights of the holders of Equity Interests in any Debtor other than TWI-Holding are unimpaired the Plan.  On the Effective Date, such Equity Interests shall be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.  **Class 10 is unimpaired and is not entitled to vote.** |

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CLAIM AND EQUITY INTEREST HOLDERS.**

US_ACTIVE-102769680.4

4. Executory Contracts and Unexpired Leases

As of the Effective Date, all executory contracts or unexpired leases listed on Exhibit 9 to the Plan shall be and shall be deemed to be rejected in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. All executory contracts or unexpired leases of the Reorganized Debtors not listed on Exhibit 9 to the Plan, and not otherwise the subject of a pending objection or pleading seeking to reject or otherwise contesting the executory contract or unexpired lease, are hereby assumed as of the Effective Date in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

C. Voting and Confirmation

Each Holder of a Claim in Classes 1,2,5 and 6 shall be entitled to vote either to accept or reject the Plan. Classes 7 and 9 are deemed to reject the Plan. Classes 1,2,5 and 6 shall have accepted the Plan if: (i) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled to commence on _____ , 2010 before the Bankruptcy Court.

Article II of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating ballots. The Bankruptcy Court has established _____, 2010 (the "Voting Record Date") as the date for determining which holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with your ballot, if necessary. Beneficial holders of Claims who receive a return envelope addressed to their bank, brokerage firm or other Nominee, or any agent thereof, (each, a "Nominee") should allow sufficient time for the Nominee to receive their votes, process them on a master ballot and forward them to the Solicitation Agent before the Voting Deadline, as defined below.

The Debtors have engaged the Solicitation Agent to assist in the voting process. The Solicitation Agent will answer questions, provide additional copies of all materials and oversee the voting tabulation. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

D. Risk Factors and Disclaimer

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, in

US_ACTIVE-102769680.4

order to formulate an informed opinion as to the manner in which the Plan affects their Claim(s) against the Debtors and to determine whether to vote to accept the Plan. Holders of Claims should particularly consider the risk factors described in Article XIX below.

Holders of Claims should also read the Plan carefully and in its entirety. The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan, itself, supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records. The Debtors therefore represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this Disclosure Statement. The liquidation analyses, distribution projections and other information described herein are estimates only, and the timing and amounts of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors and other professionals employed by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors and other professionals employed by the Debtors shall have no liability for the information in this Disclosure Statement.**

**The Debtors and their professionals also have made a diligent effort to identify in this Disclosure Statement and in the Plan pending litigation claims and projected Causes of Action and objections to Claims. However, no reliance should be placed on the fact that a particular litigation Claim or projected Cause of Action or objection to Claim is, or is not, identified in this Disclosure Statement or the Plan. The Debtors or Reorganized Debtors, as applicable, may seek to investigate, file and prosecute litigation Claims and projected Causes of Action and objections to Claims after the Confirmation Date or Effective Date of**

US_ACTIVE-102769680.4

**the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action or objections to Claims.**

## II.   VOTING ON AND CONFIRMATION OF THE PLAN

A.   Deadline for Voting For or Against the Plan

If one or more of your Claims is in a voting Class, the Debtors have sent you one or more individual ballots, with return envelopes (WITHOUT POSTAGE ATTACHED) for voting to accept or reject the Plan.  The Debtors urge you to accept the Plan by completing, signing and returning the enclosed ballot(s) in the return envelope(s) (WITH POSTAGE AFFIXED BY YOU) to the Solicitation Agent as follows:

If sent by U.S. Mail:

The Garden City Group, Inc.
Attn: Taylor-Wharton Balloting Agent
P.O. Box 9527
Dublin, OH 43017-4827

If sent by courier service, overnight or hand delivery:

The Garden City Group, Inc.
Attn: Taylor-Wharton Balloting Agent
5151 Blazer Pkwy., Suite A
Dublin, OH 43017

TO BE COUNTED, THE DEBTORS MUST RECEIVE YOUR BALLOT (OR MASTER BALLOT OF YOUR NOMINEE HOLDER) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON         , 2010** (THE "VOTING DEADLINE"), UNLESS THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.  ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS OR SUBCLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED AT THE DISCRETION OF THE DEBTORS.

Detailed voting instructions are printed on and/or accompany each ballot.  Any ballot and master ballot sent by mail must be received by the Debtors at the appropriate address set forth above by no later than 5:00 p.m. Eastern Time on the Voting Deadline.  Any ballot or master ballot sent by any other means must be physically received by the Debtors or a Nominee, as the case may be, by the Voting Deadline or it shall not be counted.  Any unsigned ballot or any ballot that has no original signature, including any ballot received by facsimile or other electronic means, or any ballot with only a photocopy of a signature shall not be counted.  Any ballot that is not clearly marked as voting for or against the Plan, or marked as both voting for and against the Plan, shall not be counted.  Any ballot that is properly completed and timely received shall not be counted if such ballot was sent in error to, or by, the voting party, because

US_ACTIVE-102769680.4

the voting party did not have a Claim that was entitled to be voted in the relevant voting class as of the Voting Record Date.  A Beneficial Holder (but not an entity voting acting in a fiduciary capacity and on behalf of more than one Beneficial Holder, such as a Nominee) that is voting more than one Claim or Equity Interest in a voting class must vote all of its Claims or Equity Interests within a particular voting class either to accept or to reject the Plan and may not split its vote in the same voting class, and thus, any ballot (or ballots in the same voting class) of a Beneficial Holder that partially rejects and partially accepts the Plan shall be deemed as accepting the Plan.  Whenever a Holder of a Claim in a voting class casts more than one ballot voting the same Claim prior to the Voting Deadline, the last ballot physically <u>received</u> by the Solicitation Agent or a Nominee, as the case may be, prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast ballot(s), and any prior cast ballot(s), shall <u>not</u> be counted.  The Debtors, without notice, subject to contrary order of the Court, may waive any defect in any ballot or master ballot at any time, either before or after the close of voting.  Such determinations will be disclosed in the voting report and any such determination by the Debtors  shall be subject to de-novo review by the Court.

On December 4, 2009, the Debtors filed their Plan and Disclosure Statement and their Motion [_____.]  The Bankruptcy Court has entered the Solicitation Order requested by that motion, which, among other things, approved the voting procedures addressed herein.  You should carefully read the Solicitation Order, which is annexed hereto as Exhibit 2.  It establishes, among other things:  (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the Voting Record Date, which is _____, 2010; (c) the applicable standards for tabulating ballots; (d) the deadline for filing objections to confirmation of the Plan; and (e) the date and time of the Confirmation Hearing (as defined below).

The Solicitation Order should be referred to if you have any questions concerning the procedures described herein.  If there are any inconsistencies or ambiguities between this Disclosure Statement and the Solicitation Order, the Solicitation Order will control.

B.      Confirmation Hearing for the Plan

The Bankruptcy Court has set a hearing on the confirmation of the Plan (the "Confirmation Hearing") to consider objections to confirmation, if any.  The Confirmation Hearing shall commence at _____ _.m., Prevailing Eastern Time on _____, 2010, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time, without notice, other than an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Court's docket.

C.      Any Objections to Confirmation of the Plan

Any responses or objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtors and the Office of United States Trustee **ON OR BEFORE _____, 2010** at **5:00 PM, Prevailing Eastern Time**.  Bankruptcy Rule 3020 governs the form of any such objection.

US_ACTIVE-102769680.4

**Counsel on whom objections must be served are:**

Counsel for the Debtors
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Attn:  J. Andrew Rahl, Jr.
         Mark D. Silverschotz

Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Attn:  Mark W. Eckard

Counsel for the United States Trustee
Office of the United States Trustee
844 N. King Street, Second Floor
Wilmington, DE 19801
Attn:  Mark Kenney.

Counsel for the Pre-Petition Subordinated
Noteholders

Proskauer
1585 Broadway
New York, NY 10036
Attn:  Scott K. Rutsky
         Craig A. Damast

Counsel for Holders of DIP Facility Claims,
Holders of Pre-Petition Secured Revolver
Claims and Holders of Pre-Petition Secured
Term Claims

Latham & Watkins LLP
233 South Wacker Drive, Suite 5800
Chicago, Il 60606
Attn: Richard Levy

D.     Recommendations for Voting

The Debtors strongly recommend that you vote in favor of the Plan.  Nonacceptance of the Plan may result in protracted delays, a Chapter 7 liquidation or the confirmation of another less favorable Chapter 11 plan.  These alternatives may not provide for distribution of as much value to holders of Allowed Claims as does the Plan.  The Debtors believe that unsecured creditors will receive a greater distribution under the Plan than they would in a Chapter 7 liquidation, as more fully discussed in Article XXII below.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE.  THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.**

**III.     ORGANIZATION AND ACTIVITIES OF THE DEBTORS**

A.     The Debtors' Business

The Debtors, through their operating companies, are a leading global manufacturer and provider of propane and cryogenic tanks, high and low pressure cylinders, valves and pressure

- 24 -

US_ACTIVE-102769680.4

gauges for gas applications. The Debtors benefit from a broad product line and strong brand recognition.

Geographically, the bulk of the Debtors' and their affiliates sales are in North America (75%), with additional sales in Europe and Asia (25% combined). As of the Petition Date, the Debtors owned, leased and/or operated eleven operating facilities in the United States and six foreign facilities located in China, Malaysia (2), Slovakia, Australia and Germany. Two of the eleven operating facilities in the United States are currently idled. The Debtors also lease two properties for corporate administrative functions, one of which is idled. The following is a list of facilities, their locations, and the businesses they operate.

| | LLC Division | Location | Address |
|---|---|---|---|
| **US** | | | |
| | TWI Cylinders, LLC | Harrisburg, PA | 1001 Herr St, Harrisburg, PA 17103[2] |
| | | Huntsville, PA | 521 Green Cove Rd, Huntsville, AL 35803 |
| | TW Cryogenics, LLC | Theodore, AL | 4075 Hamilton Blvd, Theodore, AL 36582 |
| | American Welding & Tank LLC | Fremont, OH | 721 Graham Drive, Fremont OH 43420 |
| | | West Jordan, UT | 5601 Axel Park Road, West Jordan, UT 84088 |
| | | Bloomfield, IA | 510 W. 230th St, Bloomfield, IA 52537[3] |
| | | Jesup, GA | 201 Tank Road, Jesup, GA 31545 |
| | | Crossville, TN | 3415 Highway 70 E., Crossville TN[4], 38557 |
| | Sherwood Valve, LLC | Washington, PA | 2200 North Main Street, Washington, PA 15301 |
| | | Cleveland, OH | 1201 W. 65th Street, Cleveland, OH 44102 |
| | | Niagara Falls, NY | 2111 Liberty Drive, Wheatfield NY 14304[5] |
| | Taylor-Wharton International LLC | Mechanicsburg, PA | 4718 Old Gettysburg Road, Suite 300, Mechanicsburg, PA 17055[6] |
| | | Allentown, PA | 7535 Windsor Drive, Suite A208, Allentown, PA 18195[7] |
| **International** | | | |
| | TW-Cryogenics, LLC | Slovakia | Vstupny areal U.S. Steel Kosice 044 54 |

---

[2] Leased facility.
[3] Idled facility.
[4] Leased facility.
[5] Idled facility.
[6] Leased facility and corporate headquarters.
[7] Leased and idled facility.

US_ACTIVE-102769680.4

| TW-Cryogenics, LLC | Malaysia #1 | P.O. Box 7193<br>Pejabat Pos Besar<br>40706 Shaah Alam<br>Selangor Darul Ehsan |
|---|---|---|
| TW-Cryogenics, LLC | Malaysia #2 | P.O. Box 7193<br>Pejabat Pos Besar<br>40706 Shaah Alam<br>Selangor Darul Ehsan |
| TW-Cryogenics, LLC | China | East End of Ping An Street<br>Xiahghe Economic Development Zone<br>Xianghe City, Longfang Prefecture<br>Hebei Province, PRC 065402 |
| TW-Cryogenics, LLC | Australia | Unit 1/882 Leslie Drive, Albury, NSW 2640 |
| TW-Cryogenics, LLC | Germany | Mildstedter Landstr. 1<br>25866 Mildstedt<br>Germany |

As of Petition Date, the Debtors employed approximately 750 employees in the United States (collectively referred to as the "Employees").  The Debtors have the following general categories of Employees: (1) corporate support personnel that primarily work out of the Debtors' corporate office; and (2) personnel who support the Debtors' manufacturing businesses at the Debtors' plants.  Debtors TW Cylinders LLC, TW Cryogenics LLC, Sherwood Valve LLC, American Welding & Tank LLC, and Taylor-Wharton International LLC are the employers of all of the Employees.  Approximately 380 Employees are represented by labor unions ("Unionized Employees").  The terms of employment for the Unionized Employees are governed by 4 separate collective bargaining agreements.

1.      Corporate Structure and the Harsco Acquisition

TWI is a Delaware limited liability holding company that wholly owns five distinct subsidiary limited liability companies, each of which is engaged in specific manufacturing operations generally engaged in the field of gas technology (the "Operating Companies").

TWI acquired its various businesses on December 7, 2007 from Harsco Corporation ("Harsco") pursuant to an Asset and Stock Purchase Agreement dated as of November 27, 2007 (the "Purchase Agreement"), pursuant to which TWI paid Harsco $300 million in cash and agreed to pay up to an additional $40 million on a contingent "earnout" basis, subject to various adjustments, including a traditional post-closing working capital adjustment.

Thereafter TWI, through the Operating Companies, commenced operations within its current corporate structure. Certain managerial and related financial functions are centralized at the TWI level, although each Operating Company has a distinct business operation.  More specifically, the former Harsco businesses are now organized among the TWI Operating Companies as follows:

US_ACTIVE-102769680.4

i. **TW Cryogenics LLC** ("Cryogenics"). Cryogenics has operations in Theodore, Alabama and Jesup, Georgia, and its wholly-owned subsidiaries have operations in China, Malaysia, Slovakia, Germany and Australia. Cryogenics is engaged principally in the manufacturing of cryogenic portable and bulk storage tanks. The products are used for storing cryogenic liquids, providing economical solutions for transporting, storing and dispensing liquefied gasses, medical applications, beverage carbonation applications and other related storage and delivery solutions. Customers for these products include liquid gas distribution and production companies, cryoscience equipment distributors, carbonation system retailers and distributors, and others engaged in the cryogenics business.

ii. **Sherwood Valve LLC** ("Sherwood"). Sherwood has manufacturing facilities in Washington, Pennsylvania, Niagara Falls, New York and Cleveland, Ohio and is the leading valve producer for the industrial gas industry. Sherwood supplies valves to other Operating Companies, with significant inter-affiliate sales. Among its products are industrial gas valves, propane tank valves and regulators, air conditioning and refrigeration products and SCBA, life support, SCUBA and oxygen valves. Customers include multiple tank and cylinder manufacturers (including the affiliated Operating Companies), gas packages, refrigeration rack manufacturers, air conditioning manufacturers, SCBA, SCUBA and medical industry manufacturers.

iii. **American Welding & Tank LLC** ("AWT"). AWT has manufacturing facilities in Jesup, Georgia, Fremont, Ohio, Bloomfield, Iowa, Crossville, Tennessee and West Jordan, Utah and is a world leader in the design, manufacturing, repair, refurbishment and conversion of propane tanks for residential commercial, industrial and agricultural applications. AWT's products include bulk steel above-ground and underground propane storage tanks as well as tanks designed for anhydrous ammonia. Customers for manufactured and refurbished products include nationwide and regional propane distributors.

iv. **TW Express LLC** ("TW Express"). TW Express is a distribution company which primarily serves AWT and holds the transportation assets and leases of TWI.

TWI also has a fifth operating business, TWI Cylinders LLC ("Cylinders"), which has operations in Harrisburg, Pennsylvania and Huntsville, Alabama and is engaged in the manufacturing of high and low pressure compressed gas and acetylene cylinders. The Debtors have been marketing the Cylinders business for sale and expect to complete a sale of this business pursuant to Section 363 of the Bankruptcy Code during the pendency of these Chapter 11 cases.

Shortly after the closing of the transactions pursuant to which the Debtors acquired their assets from Harsco, the Debtors determined that they had significant indemnification claims against Harsco (the "Disputed Items") for breaches of representations and warranties which Harsco made under the Purchase Agreement. The Debtors thereafter commenced an arbitration proceeding against Harsco on such claims. On October 7, 2009, TWI entered into a Settlement

US_ACTIVE-102769680.4

Agreement and Release (the "Settlement Agreement") with Harsco. Pursuant to the Settlement Agreement, (a) Harsco made a cash payment to TWI in the amount of $11,500,000, and (b) TWI and Harsco released each other from any claims relating to the Disputed Items.

    2.      <u>Pre-Petition Capitalization</u>

As of the Petition Date, two levels of secured debt encumbered the Debtors' assets. The Credit Parties have an aggregate principal amount of approximately $83 million of currently outstanding Pre-Petition Secured Loans, which consist of $73.9 million of funded debt and $7.1 million of undrawn letters of credit, plus accrued and unpaid interest, costs, expenses and fees under the Pre-Petition Credit Agreement. The Credit Parties also have an aggregate principal amount of approximately $73.3 million of outstanding secured Pre-Petition Subordinated Notes plus accrued and unpaid interest, costs, expenses and fees.

The Pre-Petition Credit Agreement required the Credit Parties to maintain interest rate protection for at least three years with a notional amount of at least $64 million. On December 24, 2007, the Credit Parties entered into an interest rate swap agreement with a notional amount of $75 million and a term of three years. On January 17, 2008, the Credit Parties entered into an interest rate cap and collar agreement with a notional amount of $25 million and a term of three years. The unrealized loss related to these instruments as of the Petition Date is approximately $3.9 million.

Currently, the Pre-Petition Agent has retained $5.4 million of the Credit Parties' cash from recent asset divestitures made by the Credit Parties to collateralize portions of the letters of credit outstanding under the Pre-Petition Secured Loans as well as the exposure to the interest rate protection described above. $4.2 million is collateralizing the approximately $7.1 million balance of letters of credit outstanding under the Pre-Petition Secured Loans and $1.2 million is collateralizing the approximately $3.9 million of market exposure on the aforementioned interest rate protection.

During the existence of an Event of Default (as defined in the Pre-Petition Credit Agreement), the Pre-Petition Agent may terminate all loan facilities under the Pre-Petition Credit Agreement and may accelerate all unpaid principal and all accrued and unpaid interest thereunder All of the Credit Parties' obligations to the Pre-Petition Secured Lenders under the Pre-Petition Credit Agreement are secured by liens on and security interests in substantially all of the now existing and hereafter acquired real and personal property of the Credit Parties.

All of the Credit Parties' obligations to the Pre-Petition Subordinated Noteholders are secured by junior liens on and security interests in substantially all of the now existing and hereafter acquired real and personal property of the Credit Parties. The relationship between the Pre-Petition Secured Lenders and the Pre-Petition Subordinated Noteholders is governed by a Subordination and Intercreditor Agreement, dated as of December 7, 2007 (the "Intercreditor Agreement"). The Intercreditor Agreement provides, among other things, that the Pre-Petition Secured Loans must be repaid in full before any and all of the Pre-Petition Subordinated Notes can be repaid.

US_ACTIVE-102769680.4

As of the Petition Date, the Debtors had incurred an estimated $13.5 million in unpaid trade debt to their suppliers and other vendors. One of the Credit Parties, Taylor-Wharton Intermediate, also has approximately $55 million of outstanding obligations, plus accrued and unpaid interest and expenses pursuant to the Holdco PIK Note, which is contractually subordinated in right of payment to the Pre-Petition Secured Loans and the Pre-Petition Subordinated Notes and structurally subordinated to most of the Debtors' other creditors.

3.    Debtor-in-Possession Financing and Use of Cash Collateral

On November 20, 2009, the Bankruptcy Court approved the DIP Facilities by and among the Credit Parties and the DIP Lenders of up to $20 million in debt financing, and granted the Credit Parties the ability to borrow $11 million immediately from the DIP Lenders, pending entry of a Final Order on the DIP Facility (the "Interim DIP Order") (D.I. 46). The DIP Facility is secured by virtually all of the Credit Parties' assets on a superpriority basis. On _____, 2010, the Bankruptcy Court entered a Final Order [(D.I. ___)] approving the DIP Facilities which:

i.      authorized the Credit Parties to obtain or guarantee obligations in respect of a senior secured, super priority, non-amortizing revolving credit facility of up to $20 million in aggregate principal amount (which includes a letter of credit subfacility in an amount not to exceed $11 million and a swingline loan subfacility, as set forth in the DIP Loan Documents);

ii.     authorized a roll-up of all of the Prepetition First Lien Indebtedness, including without limitation any amounts owing by the Credit Parties upon termination of any outstanding swap agreements, but excluding letters of credit, which are assumed and become part of the DIP Facilities;

iii.    authorized the Borrowers at any time prior to the entry of the Final Order to borrow under the Revolving DIP Facility in an aggregate outstanding principal amount not to exceed $11 million;

iv.    approved the terms of, and authorized the Credit Parties to execute and deliver, and perform under, the DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

v.     authorized the Credit Parties to grant Liens to the DIP Administrative Agent for the benefit of itself and the DIP Secured Parties on substantially all of their assets which shall be senior to certain of the Liens which secure the Pre-Petition Secured Loans and Pre-Petition Subordinated Notes and also authorized super-priority administrative claims having recourse to all pre-petition and post-petition property of the Credit Parties' estates;

vi.    authorized the use of cash collateral;

vii.   granted certain adequate protection to the holders of the Pre-Petition Subordinated Notes;

US_ACTIVE-102769680.4

viii.      vacated the automatic stay under the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility loan documents and the Final Order.

4.      <u>Management</u>

i.      Board of Directors

The TWI board of directors ("<u>Board</u>") oversees the Debtors' management, reviews their long-term strategic plans and exercises direct decision-making authority in key areas. TWI's current Board is:

- Nathan A. Brown
- William Corbin
- Richard R. Kracum
- Sam Licavoli

Pursuant to certain agreements, the current directors were appointed to the Board by Wind Point Partners and certain of its affiliates.

The members of the Board of the Reorganized Debtors will be disclosed in the Plan Supplement. The Operating Agreement provides that a majority of the Board of the Reorganized Debtors will be appointed by affiliates of Wind Point Partners.

ii.      Existing Executive Officers

The following are TWI's current senior executive officers:

- William Corbin      Interim CEO and Chief Restructuring Officer
- Leonard York      Chief Financial Officer
- Roland Wright      Senior Vice President – Manufacturing
- Denise MacIvor      Treasurer

The senior executives of the Reorganized Debtors will be disclosed in the Plan Supplement.

iii.      Compensation and Benefits

The Debtors historically have provided a competitive compensation and benefit package to their employees consistent with their belief that the success of their businesses is dependent to a significant extent upon the efforts and abilities of its employees.

a.      Severance Practices

Certain of TWI's management and key employees described above are subject to employment agreements containing fixed severance terms. With respect to employees who do not have an employment agreement, the Debtors historically have awarded an employee severance pay if employment is terminated for reasons such as a reduction in the work force or job elimination.

US_ACTIVE-102769680.4

b.    Compensation and Benefits

Upon completion of the Debtors' financial statements in February of the year following the year in which the Debtors' and the individual's performance is reviewed, the Board reviews the Debtors' and each eligible bonus participant's performance to determine the incentive bonus amounts, if any, to be paid to each eligible employee.

In addition, certain members of senior management described above are subject to employment agreements that provide for base salary and discretionary bonus compensation.

Under the Plan, except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan, but only to the extent that rights under such programs are held by the debtors or Persons who are employees of the debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.  Notwithstanding any other provision of the Plan, any entitlement to acquire Interests held as of the Effective Date by any officer, director or employee of any of the Debtors, whether automatic or contained in a compensation and benefit program, shall be terminated and any resulting claims shall be disallowed.  Further, future compensation and benefit decisions will be made by the Board of the Reorganized Debtors.  Depending upon such decisions, there is no assurance that key employees will continue in the employ of the Reorganized Debtors.

The compensation and benefits of the members of the Board and the senior executives of the Reorganized Debtors will be disclosed in the Plan Supplement.

5.    SCI Sale

On September 3, 2009, TWI sold 100% of the issued and outstanding equity interests (the "SCI Sale") of Structural Composites Industries LLC ("SCI") to Worthington Cylinder Corporation ("WOR"), a wholly owned subsidiary of Worthington Industries, Inc.  The purchase price was $25 million, subject to adjustment based on the closing date working capital of SCI.  A total of $2 million of such purchase price was placed in a third-party escrow account to secure TWI's indemnification obligations to WOR.  Subject to claims against such escrow account, $1 million of such escrow funds will be released to TWI on the 6-month anniversary of the closing and the remaining $1 million of such funds will be released on December 31, 2010.  As part of the transaction, TWI has agreed not to compete with SCI for a period of 2 years after the closing.  Moreover, TWI has agreed to provide certain transition services to WOR and SCI for a period of approximately 12 months after the closing.  In addition to the foregoing, the agreements relating to the purchase and sale of SCI contain standard representations, warranties and covenants.

US_ACTIVE-102769680.4

6.     Management Changes

Robert Gadomski resigned as Chairman and Chief Executive Officer of the Debtor entities effective as of June 12, 2009.  At that time, Mr. Gadomski remained a member of the Board of the Debtor entities and he thereafter resigned as a director effective as of October 27, 2009.

Joseph Folger resigned as Chief Financial Officer of the Debtor entities effective as of November 2, 2009.  TWI subsequently entered into a Consulting Agreement with JHF Consulting, LLC ("JHF Consulting"), effective November 2, 2009, pursuant to which TWI engaged JHF Consulting to provide financial consulting services to the Debtor entities for a period of 90 days.  TWI agreed to pay JHF Consulting $35,600 for its services during such 90 day term.  Joseph Folger is a principal of JHF Consulting.

In connection with the SCI Sale, Ken Miller, the division president of SCI, was released from his employment by TWI.  Mr. Miller was retained by WOR to continue as a senior executive with SCI.

7.     Operational Restructuring Efforts

Operational restructuring efforts have been under way for some time in order to increase profitability.  Activities have included:  (i) closing and consolidating major redundant facilities (Niagra Sherwood, Jesup AWT, and Bloomfield AWT): (ii) outsourcing products that could be made more economically by third parties; (iii)  the SCI Sale; (iv) a distribution review in AWT that reallocated production to plants closer to customers to achieve significant freight savings; (v).  reducing inventories throughout the supply chain, including consignment inventories; and (v) the acquisition of a new company, Certified Cylinders, to expand the AWT product offering and to take advantage of cost synergies; (vi) all employee benefit plans are being reviewed and restructured; and (vii) a review of all foreign cash repatriation was conducted, entities in Malaysia were consolidated, steps were begun to eliminate several Dutch holding companies and intercompany license agreements were also modified.

Numerous lean manufacturing and Kaizen events with outside consultants also were conducted to execute other cost saving opportunities.  Product offerings were standardized throughout the world.  Purchase contracts were reviewed and a new Purchasing Director was hired to initiate strategic purchasing initiatives.  Several other key employees were hired from outside the company to strengthen the organization and to replace under performing employees.  More recently, some staff positions have been eliminated to reduce administrative costs and a process to sell or close the unprofitable Cylinders division has also been initiated.

IV.     THE CASES

A.     Events Leading to the Debtors' Bankruptcy Filing

A number of macroeconomic factors related to the global economic downturn are the primary cause of a steep decline in the Debtors' operating revenues and their attendant need to restructure.  The Debtors' revenues declined from approximately $404 million in 2008 to a forecasted amount of approximately $237 million for 2009; revenues were $183 million for the

US_ACTIVE-102769680.4

first nine months of fiscal year 2009.  As a result, the Debtors no longer have the financial ability to service their non-trade related debt.

As of April 1, 2009, the Credit Parties were in covenant default with respect to the Pre-Petition Credit Agreement and also were in payment default with respect to the Pre-Petition Subordinated Notes for having missed an interest payment.  On April 24, 2009, the Pre-Petition Agent advised TWI that it had exercised its right under the Pre-Petition Credit Agreement to sweep excess cash and block the transfer of additional funds from the Debtors' accounts.  Thereafter, TWI repaid approximately $21 million of the Pre-Petition Revolving Loans which had been drawn under the Pre-Petition Credit Agreement and the Pre-Petition Agent released the blockage of TWI's accounts to the extent necessary to allow TWI to operate under a budget which the Debtors prepared and which reflected all projected operating expenses.  The Debtors and the Pre-Petition Secured Lenders entered into a Forbearance Agreement and, during the months that followed the Debtors and the holders of the Pre-Petition Secured Loans and the Pre-Petition Subordinated Notes negotiated the terms of the financial restructuring which is summarized below.

B.      The Debtors' Financial Restructuring

The Debtors diligently evaluated a number of options to address their financial issues.  Those efforts included sharing information with and engaging in discussions with a variety of the Debtors' stakeholders with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities.  These discussions resulted in an agreement on the terms of a financial restructuring between the Credit Parties and the holders of all of their Pre-Petition Obligations and Pre-Petition Subordinated Notes and a majority of their equity interests.

The terms of the Debtors' financial restructuring provide for the cancellation of an aggregate of approximately $128.3 million in debt and the investment of $12 million of new capital as subordinated PIK debt as follows:

i.      the Pre-Petition Credit Facility will be restructured into: (a) an approximately $25 million revolving credit facility, (b) an approximately $30 million Senior Term A Facility (the "Term A Loan"); and (c) an approximately $41 million Term B Facility (the "Term B Loan") (or such lesser amount as may be remaining under the Pre-Petition Credit Agreement after prepayments and the application of proceeds of any asset sales and/or other events);

ii.     pursuant to the Investor PIK Documents, certain Investor PIK Note Purchasers will invest an aggregate of $12 million in immediately available funds in the Reorganized Debtors.  Investor PIK Note Purchasers will receive (a) Investor PIK Notes; and (b) 93% of the New TWI-Holding Equity, subject to dilution for New TWI-Holding Equity (in an aggregate amount not to exceed 16.5%, on a fully diluted basis, of such New TWI-Holding Equity) to be issued to employees, officers and directors of the Reorganized Debtors, and otherwise to be allocated among the Investor PIK Note Purchasers pursuant to the Plan and according to the Investor PIK Documents.  The Investor PIK Notes shall be junior in right of

- 33 -

US_ACTIVE-102769680.4

payment to the Revolving Loan (as defined in the Restructured Credit Agreement) and Term Loan A, and except in certain circumstances set forth in the Intercreditor Agreement (where the Investor PIK Notes shall be junior in right of payment to the Term Loan B), the Investor PIK Notes shall be *pari passu* with Term Loan B.

iii.    the Pre-Petition Subordinated Notes will be exchanged for: (a) a Pro Rata share of the New TWI-Holding Equity representing 7% in the aggregate of the equity of Reorganized TWI-Holding, subject to dilution for New TWI-Holding Equity (in an aggregate amount not to exceed 16.5%, on a fully diluted basis, of such New TWI-Holding Equity) to be issued to employees, officers and directors of the Reorganized Debtors; and (b) a Pro Rata Share of the right to purchase up to one-half of the principal amount of the Investor PIK Notes and up to 46.5% of the New TWI-Holding Equity pursuant to the terms of the Investor PIK Documents.

iv.    all obligations of the Debtors under the Pre-Petition Subordinated Notes and the Holdco PIK Note will be extinguished;

v.    substantially all of the Debtors' trade and other unsecured creditors with fixed, noncontingent claims as of the Petition Date which the Debtors do not dispute will be paid or otherwise satisfied in full; and

vi.    other unsecured creditors, if any, will receive a Pro Rata share of the Class 6 Recovery.

The terms of this restructuring have been documented in the Restructuring Support Agreement between the Debtors and all of the Pre-Petition Secured Lenders and Pre-Petition Subordinated Noteholders, and will be implemented by the Plan.   The Restructuring Support Agreement provides that the parties thereto have agreed to and will support the Debtors' proposed Plan.  It further provides for the specific terms of the DIP Facility Exit Credit Documents, Investor PIK Documents and Operating Agreement to be entered into upon confirmation of the Plan, all as reflected in the agreements and other documents attached as exhibits to the Restructuring Support Agreement.

C.    <u>Significant Events</u>

1.    <u>Summary of "First Day" Motions and Orders</u>

Below is a summary of significant first day motions.

a.    Post-Petition Financing.

*Motion of Debtors for Entry of Orders (I) Authorizing Debtors (A)  To Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 AND 364, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and (IV) Granting Related Relief* (D.I. 15).  On November 20, 2009, the

US_ACTIVE-102769680.4

Bankruptcy Court approved the DIP Facility by and among the Credit Parties and the DIP Lenders of up to $20 million in debt financing, and granted the Credit Parties the ability to borrow $11 million immediately from the DIP Lenders, pending entry of a Final Order on the DIP Facility (the "Interim DIP Order") (D.I. 46). On [_____] , 2010, the Court entered the Final Order which approved the DIP Facility.

Pursuant to the terms and conditions of the DIP Facility, all of the obligations under the DIP Obligations are accorded superpriority status, having priority over any and all administrative expenses of any kind and nature, subject to certain exceptions. The Debtors' obligations under the DIP Facility are also secured by first priority liens on substantially all of the Debtors' pre-petition and post-petition assets.

As of the date hereof, the Debtors are indebted to the DIP Lenders under the DIP Facility in the aggregate principal amount of $_____.

> b.      Cash Management Motion.

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed.R.Bankr.P. 2015 and Del.Bankr.L.R. 2015-2 for an Order (I) Authorizing and Approving Continued use of Cash Management System, (II) Authorizing Use of Pre-Petition Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions and (IV) Waiving the Requirements of 11 U.S.C. 345(b) on an Interim Basis* (the "Cash Management Motion") (D.I. 14). In an effort to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates, the Debtors requested authorization from the Bankruptcy Court to continue to utilize the centralized cash management system, bank accounts and investment practices, among other things, that had been in place prior to the Petition Date, as more particularly set forth in the Cash Management Motion. On November 20, 2009, the Court granted the Debtors' request pursuant to the Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed.R.Bankr.P. 2015 and Del. Bankr. 2015-2 (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Pre-Petition Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions and (IV) Waiving the Requirements of 11 U.S.C. 345(b) on an Interim Basis (D.I. 36).

> c.      Joint Administration Motion.

*Debtors' Motion Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 for Order Authorizing Joint Administration* (D.I. 3). The Court granted the Debtors' request to authorize the joint administration, for procedural purposes only, of the Debtors' Chapter 11 cases as set forth in the Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 Authorizing Joint Administration. (D.I. 35)

> d.      Employee Wages and Benefits Motion.

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 507(a) for an Order (I) Authorizing the Debtors, in Their Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor and Pay Certain Checks Presented for*

US_ACTIVE-102769680.4

*Payment and to Honor Certain Fund Transfer Requests* (the "Employee Motion") (D.I. 11). Pursuant to the Employee Motion, the Debtors requested authorization to pay certain obligations to employees that arose prior to the Petition Date. Specifically, the Debtors requested permission to pay earned, but unpaid pre-petition wages and salaries, inclusive of withholding for payroll taxes, in an aggregate amount not to exceed $8.5 million with no single employee receiving more than $10,950. Additionally, the Debtors requested authorization to reimburse employees for pre-petition business expenses in the maximum aggregate amount of $125,000 and pay and/or remit applicable accrued and outstanding tax obligations, other withholdings, employee benefit obligations, and medical, dental and prescription drug plan obligations, 401k contributions, and other miscellaneous benefits. On November 20, 2009, the Court granted the relief requested in the Employee Motion upon the terms and conditions set forth in the Order Pursuant to 11 U.S.C. §§105(a), 363 and 507(a) Authorizing the Debtors, in Their Discretion, to (I) Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests (D.I. 39).

> e.     Motion Confirming Priority of Section 503(b)(9) Administrative Claims.

*Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 503(b)(9), and 507(a) for an Order Authorizing Debtors to Pay Certain Pre-Petition Claims of Suppliers and Vendors of Goods Entitled to Administrative Priority* (D.I. 13) (the "Motion to Pay Section 503(b)(9) Claims"). Pursuant to the Motion to Pay Section 503(b)(9) Claims, the Debtors requested an Order confirming the administrative expense priority of claims of certain vendors for outstanding pre-petition claims that were undisputed obligations arising from goods received by the Debtors in the ordinary course of business within the 20 days prior to the Petition Date and entitled to administrative priority under §§ 503(b)(9) and 507(a)(2) of the Bankruptcy Code. The Debtors sought authorization to pay such Section 503(b)(9) claims up to a limit of $7.4 million. On November 20, 2009, the Bankruptcy Court granted the relief requested in the Motion to Pay Section 503(b)(9) Claims as set forth in the Order Pursuant to 11 U.S.C. §§ 105(a), 503(b)(9), and 507(a) for an Order Authorizing Debtors to Pay Certain Pre-Petition Claims of Suppliers and Vendors of Goods Entitled to Administrative Priority (D.I. 37).

> f.     Pre-Petition Tax Motion.

*Debtors' Motion for Order Pursuant to Sections 105(a), 363(b), 541 and 507(a)(8) of the Bankruptcy Code Authorizing (a) Payment of Certain Prepetition Taxes and (b) Financial Institutions to Process and Cash Checks and Transfers Related Thereto* (the "Pre-Petition Tax Motion") (D.I. 9). Pursuant to the Pre-Petition Tax Motion, the Debtors requested approval to pay up to $100,000 on account of sales/use, excise, business and occupation taxes arising before the Petition Date. On November 20, 2009, the Court granted the relief requested in the Pre-Petition Tax Motion as set forth in the Order Pursuant to Sections 105(a), 363(b), 541 and 507(a)(8) of the Bankruptcy Code Authorizing (a) Payment of Certain Prepetition Taxes and (b) Financial Institutions to Process and Cash Checks and Transfers Related Thereto (D.I. 41).

US_ACTIVE-102769680.4

g.      Critical Vendor Motion

*Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for an Order Authorizing the Payment of Certain Pre-Petition Claims of Certain Critical Vendors* (the "Critical Vendor Motion") (D.I. 12).  Pursuant to the Critical Vendor Motion, the Debtors requested authority to pay outstanding pre-petition claims, in an aggregate amount not to exceed $600,000, to certain vendors and freight carriers deemed critical to the Debtors' operations (the "Critical Vendor Claims").  The Critical Vendor Motion contemplated that any critical vendor or supplier receiving payment of its Section 503(b)(9) Claim, could be required, at the Debtors' discretion, to execute a trade agreement obligating such vendor or supplier to extend customary trade terms (consistent with the parties' pre-petition dealings) to the Debtors post-petition.  On November 20, 2009, the Court authorized the relief requested as set forth in the Order Pursuant to Sections 105 and 363 of the Bankruptcy Code for an Order Authorizing the Payment of Certain Pre-Petition Claims of Certain Critical Vendors (D.I. 38).

h.      Motion to Extend Time to File Schedules

*Debtors' Motion for order Extending the Time to File Schedules and Statements of Financial Affairs* (D.I. 5).  The Court granted the Debtors' request for an extension through and including January 18, 2010 to file their schedules and statements as set forth in the Order Granting Debtors an Extension of Time to File Schedules and Statements of Financial Affairs. (D.I. 44).

i.      Customer Programs Motion

*Debtors' Motion for Authorization to (A) Maintain Certain Customer and (B) Honor or Pay Related Prepetition Obligations to Their Customers* (the "Customer Program Motion") (D.I. 8).  Pursuant to the Customer Program Motion the Debtors requested authorization to maintain, in current effect, rebate and other customer programs and to make refund payments to customers for any credit balances in customer accounts caused by credit issued for damaged products, duplicate payments, misdirected lockbox payments, and similar circumstances in order to sustain the loyalty and confidence of the Debtors' customers and avoid irreparable harm to the Debtors' estates.  On November 20, 2009, the Bankruptcy Court granted the Debtors' request as set forth in the Order Granting Debtors' Motion for Authorization to (A) Maintain Certain Customer and (B) Honor or Pay Related Prepetition Obligations to Their Customers (D.I. 42).

j.      Motion for Consolidated List of Creditors

*Debtors' Motion For Order Authorizing The Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Debtors' Top Thirty Creditors* (D.I. 4).  The Court granted the Debtors' request to file a consolidated list of creditors and the Consolidated Top 30 List as set forth in the Order Authorizing The Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Debtors' Top Thirty Creditors (D.I. 45).

k.      Claims, Noticing and Balloting Agent Motion

US_ACTIVE-102769680.4

*Debtors' Application Pursuant to 28 U.S.C 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L. R. 2002-1(f) For Entry of an Order Authorizing the Employment and Retention of The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent for the Clerk of the Court* (D.I. 7).  The Court granted the Debtors' request authorizing them to appoint The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent in these Chapter 11 cases as set forth in the Order Pursuant to 28 U.S.C 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L. R. 2002-1(f) Authorizing the Employment and Retention of The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent for the Clerk of the Court (D.I. 43).

l.      Utilities Motion

*Debtors' Motion Pursuant to 11 U.S.C §§ 105(a) and 366 for Interim and Final Order Finding Utilities Adequately Assured of Payment and Establishing Further Procedures* (the "Utilities Motion")  (D.I. 10).  Pursuant to the Utilities Motion, the Debtors requested that the Court enter an order (i) prohibiting Debtors' utility providers (the "Utility Providers") from altering, refusing, or discontinuing services; (ii) approving the Debtors' establishment of a deposit account to be held by Wachovia Bank in an amount up to $1.2 million, but in any event not less than $700,000 (the "Deposit") as affording the Utility Providers with adequate assurance of payment, and deeming the Utility Providers to have received adequate assurance of payment pursuant to Section 366(b) of the Bankruptcy Code; (iii) establishing procedures and mechanisms under which the parties may determine adequate assurance of future payment; and (iv) authorizing the Debtors to supplement, as necessary, the utility service list of Utility Providers and providing that any newly added Utility Provider will be subject to the terms of the Utility Order.  On November 20, 2009, the Court granted the Debtors' request as set forth in the Interim Order *Pursuant to 11 U.S.C §§ 105(a) and 366 for Interim and Final Order Finding Utilities Adequately Assured of Payment and Establishing Further Procedures* (D.I. 40).

[Describe future motions]

2.      Schedules and Statements of Financial Affairs

The Debtors filed their respective schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs") with the Bankruptcy Court on _____, 2010. (D.I. _____).  The Schedules and SOFAs can be reviewed at the office of the Clerk of the Bankruptcy Court for the District of Delaware or can be obtained on the _____.

3.      Execution of Trade Agreements

Pursuant to the authority granted by the Orders approving the Motion to Pay Section 503(b)(9) Claims and the Critical Vendor Motion, the Debtors have entered into certain trade agreements (the "Trade Agreements") with approximately _____ vendors and suppliers (the "Priority Vendors").  Generally, the Trade Agreements provide for:

i.      the Priority Vendor's agreement to be bound by the customary trade terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and

availability and other applicable terms and programs), which were favorable to the Debtors and in effect between the Priority Vendor and the Debtors on a historical basis at any time during the period within one hundred twenty (120) days of the Petition Date (the "Customary Trade Terms"), or such other trade terms as mutually agreed to by the Debtors and such Priority Vendor;

ii.      the Priority Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Priority Vendor in accordance with such terms;

iii.     the Priority Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien related in any way to any remaining pre-petition amounts allegedly owed to the Priority Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Priority Vendor has previously obtained such a Lien, the Priority Vendor shall immediately take all necessary actions to release such Lien;

iv.     the Priority Vendor's acknowledgment that it has reviewed the terms and provisions of the applicable court Order authorizing the Debtors to enter into Trade Agreements and consents to be bound thereby;

v.      the Priority Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

vi.     the Priority Vendor's agreement that to the extent that it has received payment of a pre-petition claim but subsequently refuses to supply goods to the Debtors on Customary Trade Terms, any payments received by the Priority Vendor on account of its Priority Vendor Claim will be deemed to have been in payment of then outstanding undisputed post-petition obligations owed to such Priority Vendor, and that such Priority Vendor shall immediately repay to the Debtors any payments received on account of its Priority Vendor Claim to the extent that the aggregate amount of such payments exceed the undisputed post-petition obligations then outstanding, without the right of setoff or reclamation.

4.     Retention of Professionals

To date, the Debtors have filed applications to retain the following professionals: (i) Alvarez & Marsal Securities, LLC as Financial Advisor (D.I. 30); (ii) Reed Smith LLP as bankruptcy counsel (D.I. 48); (iii) Sitrick and Company as Corporate Communications Consultant (D.I. 49); and (iv) The Boathouse Group LLC as Bankruptcy Consultant (D.I. 50).

[update as appropriate]

5.     Summary of Litigation

a.     Pending Pre-Petition Litigation

US_ACTIVE-102769680.4

As of the Petition Date, the Debtors were subject to approximately 40 pending and threatened lawsuits and administrative proceedings. Of these, approximately 35 pertained to product liability, property damage and related matters, and the Debtors believe that the liability for approximately 15 of those is attributable to Harsco.

b.      Material Post-Petition Litigation

[None]

6.      Debtor-in-Possession Operating Reports

Consistent with the operating guidelines and reporting requirements established by the United States Trustee (the "Guidelines") in these Chapter 11 cases, the Debtors have satisfied their initial reporting requirements (D.I. ____), have filed their first ____ Monthly Operating Reports and will continue to file such Monthly Operating Reports as required by the Guidelines. Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtors' post-petition taxes and (e) statement regarding the status of accounts receivable reconciliation and aging.

7.      Claims Bar Date and Review Process

a.      Claims Bar Date

On _____, 2010, the Bankruptcy Court entered an order (the "Bar Date Order") (D.I. ____) establishing _____ as the bar date (the "Non-Governmental Claims Bar Date") for all non-governmental Persons and Entities to file pre-petition Claims in these Chapter 11 cases and _____, 2010 as the bar date (the "Governmental Bar Date") for all governmental Persons and Entities to file pre-petition Claims, including claims arising under Section 503(b)(9) of the Bankruptcy Code, in these Chapter 11 cases. The Bar Date Order further provides that, among other things, any Person or Entity that is required to file a Proof of Claim in these Chapter 11 cases but fails to do so in a timely manner shall not be treated as a creditor with respect to such Claim for purposes of voting and distribution in these Chapter 11 cases, and such Person or Entity shall not be permitted to vote to accept or reject any Chapter 11 plan or participate in any distribution in the Debtors' Chapter 11 cases on account of such claim.

b.      Claims Review Process

The Debtors are in the beginning stages of evaluating the numerous Claims filed in these Cases to determine, among other things, whether it is necessary and appropriate to file objections seeking to disallow, reduce and/or reclassify such Claims. The Debtors expect to also reconcile the Claims against their Schedules in an effort to (a) eliminate duplicative or erroneous Claims and (b) ensure that the Bankruptcy Court allows only valid Claims. As provided in Article __ of the Plan, after the Effective Date, the Reorganized Debtors shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims on behalf of the Debtors and Reorganized Debtors. If the Debtors or Reorganized

US_ACTIVE-102769680.4

Debtors, as applicable, object to a Claim, a hearing regarding such objection will be held and notice of such objection and notice of the related hearing will be provided to affected Claim Holders as well as to other parties entitled to receive notice. To the extent necessary, the Bankruptcy Court will rule on the objection and ultimately determine whether, and in what amount and priority, to allow the applicable Claim. If the Debtors or Reorganized Debtors, as applicable, do not object to a Claim by the Objection Deadline, such Claim will be deemed Allowed and will receive the treatment accorded such Claim under the Plan. As appropriate, the Debtors or Reorganized Debtors, as applicable, may seek to negotiate and/or settle disputes regarding a Claim or Claims as an alternative to filing objections to the allowance or treatment of such Claims.

## V. SUMMARY OF THE PLAN OF REORGANIZATION

### A. <u>Overview of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

US_ACTIVE-102769680.4

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Equity Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required under Section 1122 of the Bankruptcy Code to classify Claims and Equity Interests into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Classes. The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The Debtors (and each of their respective agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

ARTICLES VI-XVII HEREOF PROVIDE A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS TO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS INCORPORATED INTO THE PLAN CONTROL THE ACTUAL, TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER

US_ACTIVE-102769680.4

PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS
DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER
OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN
AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

      B.     <u>Purpose of the Plan</u>

The Plan provides for the final reorganization of the Debtors' businesses.  The Debtors
believe that the Plan provides the best and most prompt possible recovery to holders of Claims
by maximizing the Debtors' value as a going concern.  For purposes of this Disclosure
Statement, the term Holder refers to the holder of a Claim or Equity Interest in a particular Class
under the Plan.  If the Plan is confirmed by the Bankruptcy Court and consummated, on the
Effective Date or as soon as practicable thereafter, the Debtors will make distributions in respect
of certain Classes of Claims as provided in the Plan.  The Classes of Claims against, and Equity
Interests in, the Debtors created under the Plan, the treatment of those Classes under the Plan and
distributions to be made under the Plan are described below.

## VI.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

      A.     <u>Introduction</u>

The classification and treatment of Claims and Equity Interests for purposes of the Plan is
set forth below.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, DIP Facility
Claims, Administrative Expense Claims and Priority Tax Claims have not been classified.  Other
Claims and Equity Interests shall be included in a particular Class only to the extent such Claims
or Equity Interests qualify for inclusion in such Class.

      B.     <u>Classification Of Claims And Equity Interests</u>

      1.     <u>Unimpaired and Unclassified Claims.</u>

          a.     DIP Facility Claims

          b.     Administrative Expense Claims

          c.     Priority Tax Claims

      2.     <u>Description of the Classes.</u>

          a.     Class 1:  Pre-Petition Secured Revolver Claims (Impaired)

          b.     Class 2:  Pre-Petition Secured Term Loan Claims (Impaired)

          c.     Class 3:  Other Secured Claims (Unimpaired)

          d.     Class 4:  Other Priority Claims (Unimpaired)

          e.     Class 5:  Pre-Petition Subordinated Note Claims (Impaired)

US_ACTIVE-102769680.4

f.      Class 6:  General Unsecured Claims (Impaired)

g.      Class 7:  Holdco PIK Note Claims (Impaired)

h.      Class 8:  Intercompany Claims (Unimpaired)

i.      Class 9:  Equity Interests in TWI-Holding (Impaired)

j.      Class 10:  Equity Interests in the Debtors other than TWI-Holding
         (Unimpaired)


## VII.      TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Other than as specifically set forth herein, the treatment of and consideration to be received by holders of Claims or Equity Interests pursuant to this Article III shall be in full satisfaction, settlement, release and discharge of such holder's respective Claim or Equity Interest.  Except as expressly set forth herein or in the Confirmation Order, such discharge shall not affect the liability of any other person or entity on, or the property of any other person or entity encumbered to secure payment of, any such Claim or Equity Interest; nor shall it affect the Reorganized Debtors' obligations pursuant to the Plan.

A.      <u>DIP Facility Claims</u>

DIP Facility Claims are unimpaired and unclassified claims.

The DIP Facility Claims shall be Allowed in full, including without limitation, (i) all Claims for unpaid principal, interest and other charges outstanding on the Effective Date and (ii) all Claims for fees and expenses and other charges provided for under the DIP Facility.  Except to the extent that a holder of an Allowed DIP Facility Claim and the Debtors, or the Reorganized Debtors, as the case may be, agree to a different treatment, each Allowed DIP Facility Claim shall be paid in full in Cash on the Effective Date from the proceeds of the revolving credit facility under the Restructured Credit Documents; *provided*, *however*, that the (a) DIP Facility Claims in respect of letters of credit issued (or deemed issued) pursuant to the DIP Facility and (b) DIP Roll-Up Loan Claims shall be assumed by the Reorganized Debtors in full on the Effective Date in accordance with the terms of the Restructured Credit Documents.

B.      <u>Administrative Expense Claims</u>

Administrative Expense Claims are unimpaired and unclassified claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive a distribution of Cash in an amount equal to such Allowed Administrative Expense Claim, without interest, on or as soon as practicable after (but in no event more than ninety (90) days after, unless extended by the Bankruptcy Court) the later of (i) the Effective Date; and (ii) the first Business Day after the date that is ten (10) Business Days after the date such Administrative Expense Claim becomes an

US_ACTIVE-102769680.4

Allowed Administrative Expense Claim; provided that (y) Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (these Claims may include, without limitation, post-Petition Date salaries and other post-Petition Date benefits for employees, post-Petition Date rent for facilities and offices, amounts owed to vendors providing goods and services during the Debtors' Reorganization Cases and tax obligations incurred by the Debtors all in the ordinary course of business and after the Petition Date), as debtors or debtors in possession, may be paid in full and performed by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions and (z) Professional Fee Claims shall be paid in accordance with the applicable order of the Bankruptcy Court after filing a fee application, notice and a hearing pursuant to the procedures set forth in Section XVII.D hereof.

C.    Priority Tax Claims

Priority Tax Claims are unimpaired and unclassified claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, on account of such Claim, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code and at the option of the Debtors, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to Section 511 of the Bankruptcy Code; (iii) over a period ending not later than 5 years after the Petition Date; and (iv) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan (other than payments in Cash made to a Class of Creditors under Section 1122(b) of the Bankruptcy Code).  Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided herein, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes.

D.    Class 1:  Pre-Petition Secured Revolver Claims

Class 1 Claims are impaired.  Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

The Pre-Petition Secured Revolver Claims are Allowed in an amount equal to all principal plus all interest (including interest accrued after the Petition Date) at the Allowed Interest Rate (compounded on each interest payment date to the extent not timely paid), and all fees and expenses payable in connection therewith in accordance with the terms of the Existing Senior Loan Agreements.

On the Effective Date, the Reorganized Debtors shall assume the Pre-Petition Credit Agreement and the Pre-Petition Security Documents, in each case, if applicable, as amended or

US_ACTIVE-102769680.4

amended and restated pursuant to the Restructured Credit Documents, and without limiting the foregoing, the Reorganized Debtors shall assume the Pre-Petition Secured Revolver Claims on the terms and conditions set forth in the Restructured Credit Documents.

All Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents, shall remain in full force and effect on and after the Effective Date, and all Liens, rights, interests, duties and obligations thereunder shall survive the Effective Date and shall continue to secure all Pre-Petition Secured Revolver Claims assumed by the Reorganized Debtors and all other obligations under the Restructured Credit Documents. Without limiting the generality of the foregoing, all Liens and security interests granted pursuant to the Restructured Credit Documents (including, without limitation, the Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents) to the Pre-Petition Agent and the Pre-Petition Credit Agreement Secured Parties shall be (i) valid, binding, perfected, enforceable, Liens and security interests in the personal and real property described in such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization or subordination under any applicable law. In addition to the foregoing, the relative priorities and rights in such property as among the Pre-Petition Revolver Lenders and the Pre-Petition Term Lenders shall be governed by the Restructured Credit Agreement.

The Restructured Credit Agreement shall be executed, delivered and performed by the Reorganized Debtors in accordance with its terms, and all fees and expenses and other amounts provided for thereunder shall be paid promptly when due.

E.    Class 2:  Pre-Petition Secured Term Loan Claims

Class 2 Claims are impaired. Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

The Pre-Petition Secured Term Loan Claims are Allowed in an amount equal to all principal plus all interest accrued at the non-default rate prior to the Petition Date, and all fees and expenses payable in connection therewith in accordance with the terms of the Existing Senior Loan Agreements.

On the Effective Date, the Reorganized Debtors shall assume the Pre-Petition Credit Agreement and the Pre-Petition Security Documents, in each case, if applicable, as amended or amended and restated pursuant to the Restructured Credit Documents. Without limiting the foregoing, on the Effective Date, the Reorganized Debtors shall assume the Pre-Petition Secured Term Loan Claims on the terms and conditions set forth in the Restructured Credit Documents, and as set forth therein, $30 million of Pre-Petition Secured Term Loan Claims shall be restructured into a first-priority first-lien term loan ("Term Loan A"), and the remainder of the Pre-Petition Secured Term Loan Claims shall be restructured pursuant to the Restructured Credit Agreement into a second-priority first-lien term loan ("Term Loan B").

All Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents, shall remain in full force and effect on and

US_ACTIVE-102769680.4

after the Effective Date, and all Liens, rights, interests, duties and obligations thereunder shall survive the Effective Date and shall continue to secure all Pre-Petition Secured Term Loan Claims assumed by the Reorganized Debtors and all other obligations under the Restructured Credit Documents. Without limiting the generality of the foregoing, all Liens and security interests granted pursuant to the Restructured Credit Documents (including, without limitation, the Pre-Petition Security Documents, if applicable, as amended or amended and restated by the applicable Restructured Credit Documents) to the Pre-Petition Agent and the Pre-Petition Credit Agreement Secured Parties shall be (i) valid, binding, perfected, enforceable, Liens and security interests in the personal and real property described in such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization or subordination under any applicable law. In addition to the foregoing, the relative priorities and rights in such property as among the Pre-Petition Revolver Lenders and the Pre-Petition Term Lenders shall be governed by the Restructured Credit Agreement.

The Restructured Credit Agreement shall be executed, delivered and performed by the Reorganized Debtors in accordance with its terms, and all fees and expenses and other amounts provided for thereunder shall be paid promptly when due.

F.      Class 3, et seq.:  Other Secured Claims

Class 3 Claims are not impaired. Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 3 Claims are not entitled to vote to accept or reject the Plan

Class 3 consists of Other Secured Claims against the applicable Debtor. With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

On the Effective Date, each Allowed Claim in Class 3 shall be, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 3 Claim, at the Debtors' option, (1) Reinstated, (2) satisfied by the Debtors' surrender of the collateral securing such Allowed Claim, (3) offset against, and to the extent of, the Debtors' claims against the holder of such Allowed Claim or (4) otherwise rendered not impaired, except to the extent that the Reorganized Debtors and such holder agree to a different treatment.

G.      Class 4:  Other Priority Claims

Class 4 Claims are not impaired. Holders of Class 4 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 4 Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment of such Allowed Other Priority Claim, each such holder will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 4

US_ACTIVE-102769680.4

Claim, one of the following treatments, as determined by the Debtors and upon the consent of the Requisite Supporting Revolving Lenders and after consultation with the Requisite Supporting Term Lenders, when such Claim becomes Allowed:

a.      the Debtors will pay the Allowed Class 4 Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable; provided that, Allowed Class 4 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Allowed Class 4 Claims become due and owing in the ordinary course of business; or

b.      each such Allowed Class 4 Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code.

H.      Class 5:  Pre-Petition Subordinated Note Claims

Class 5 Claims are impaired.  Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

On the Effective Date, the Pre-Petition Subordinated Note Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in the aggregate amount of (i) $74,815,909.98 (consisting of all principal plus interest accrued prior to the Petition Date) plus (ii) all reasonable pre-petition and post-petition attorneys' fees and expenses payable in connection therewith in accordance with the terms of the Pre-Petition Subordinated Notes and the Note Purchase Agreement dated December 7, 2007, plus (iii) all reasonable pre- and post-petition fees and expenses of CRG Partners as the financial advisor for the holders of the Pre-Petition Subordinated Note Claims, which fees and expenses of CRG Partners shall not exceed $100,000 in the aggregate.

On the Effective Date, holders of Allowed Class 5 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 5 Claim, (a) a Pro Rata share of the New TWI-Holding Equity representing 7% in the aggregate of the equity of Reorganized TWI-Holding, subject to dilution for New TWI-Holding Equity (in an aggregate amount not to exceed 16.5%, on a fully diluted basis, of such New TWI-Holding Equity) to be issued to employees, officers and directors of the Reorganized Debtors, (b) a Pro Rata Share of the right to purchase up to one-half of the principal amount of the Investor PIK Notes and up to 46.5% of the New TWI-Holding Equity pursuant to the terms of the Investor PIK Documents, and (c) Cash as payment for and in an amount equal to (i) all reasonable pre-petition and post-petition attorneys' fees and expenses payable in connection with the Plan and the Debtors' Reorganization Cases in accordance with the terms of the Pre-Petition Subordinated Notes and the Note Purchase Agreement dated December 7, 2007, plus (ii) all reasonable pre-petition and post-petition fees and expenses of CRG Partners as the financial advisor for the holders of the Pre-Petition Subordinated Note Claims, which fees and expenses of CRG Partners shall not exceed $100,000 in the aggregate. The holders of Allowed Class 5 Claims will be required to execute the Operating Agreement prior to receiving any distribution of New TWI-Holding Equity under the Plan.

US_ACTIVE-102769680.4

I.      Class 6:  General Unsecured Claims

Class 6 Claims are impaired.  Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

If Class 6 Claims accept the Plan in accordance with Section 4.3 of the Plan, then the holders of Allowed Class 6 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 6 Claim, a Pro Rata share of the Class 6 Recovery.  If Class 6 Claims do not accept the Plan in accordance with Section 4.3 of the Plan, then the holders of Class 6 Claims shall not be entitled to receive or retain any property or distribution under the Plan on account of any Class 6 Claims.

J.      Class 7:  Holdco PIK Note Claims

Class 7 Claims are impaired.

On the Effective Date, the Holdco PIK Note shall be cancelled and be of no further force or effect.  Holders of Holdco PIK Note Claims are not entitled to receive or retain any property or distribution under the Plan on account of any Class 7 Claims.  Therefore, holders of Class 7 Claims are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

K.      Class 8:  Intercompany Claims

Class 8 Claims are not impaired.  Holders of Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 8 Claims are not entitled to vote to accept or reject the Plan.

The legal, equitable and contractual rights of the holders of Intercompany Claims are unimpaired by the Plan.  On or as soon as practicable after the Effective Date, and after consultation with and approval by the Pre-Petition Agent, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

L.      Class 9:  Equity Interests in TWI-Holding

Class 9 Equity Interests are impaired.

On the Effective Date, the Equity Interests in TWI-Holding shall be cancelled and be of no further force and effect.  Holders of such Equity Interests are not entitled to receive or retain any property or distribution under the Plan on account of any Class 9 Claims.  Therefore, holders of Class 9 Equity Interests are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Class 9 Equity Interests are not entitled to vote to accept or reject the Plan.

US_ACTIVE-102769680.4

M.     Class 10:  Equity Interests in all Debtors other than TWI-Holding.

Class 10 Equity Interests are not impaired.  The holders of Class 10 Equity Interests are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.

The legal, equitable and contractual rights of the holders of Equity Interests in any Debtor other than TWI-Holding are unimpaired the Plan.  On the Effective Date, such Equity Interests shall be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors.

## VIII.   MEANS FOR IMPLEMENTATION OF THE PLAN

A.     Presumed Acceptance of Plan

Classes 3, 4, 8 and 10 are not impaired under the Plan, and are, therefore, conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

B.     Voting Classes

Classes 1, 2, 5, and 6 are impaired under the Plan, and holders of Class 1, 2, 5 and 6 Claims as of the Record Date shall be entitled to vote to accept or reject the Plan.

C.     Acceptance by Impaired Classes of Claims

Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an impaired Class of Claims entitled to vote to accept or reject the Plan has accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

D.     Deemed Rejection of Plan

Classes 7 and 9 are impaired and shall receive no property or distribution under the Plan on account of their Claims or Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

E.     Cramdown

The Debtors request Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Section 13.5 of the Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

F.     Substantive Consolidation of the Debtors for Voting and Distribution Purposes Only

On and after the Effective Date, except for Class 3 Claims, each and every Claim in the Debtors' Reorganization Cases against any of the Debtors shall be deemed filed against the

US_ACTIVE-102769680.4

consolidated Debtors, and shall be deemed a single consolidated Claim against and obligation of all of the consolidated Debtors. Such limited consolidation shall not affect (other than for Plan voting and distribution purposes) (i) the legal and corporate structures of the Reorganized Debtors, or (ii) pre- and post-Petition Date Liens, guarantees and security interests that are required to be maintained (x) in connection with contracts that were entered into during the Debtors' Reorganization Cases or that have been or will be assumed pursuant to Section 365 of the Bankruptcy Code, (y) in connection with the terms of the Restructured Credit Documents, the Investor PIK Documents, the New TWI-Holding Equity and (z) pursuant to the terms and conditions contained in the Plan. From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under the Plan.

G.    Continued Organizational Existence

The Reorganized Debtors will continue to exist as separate corporate or limited liability company entities, as applicable, following confirmation and consummation of the Plan in accordance with the laws of their respective states of incorporation or organization, as applicable, and pursuant to their respective certificates or articles of incorporation or organization and bylaws or limited liability company agreements, as applicable, in effect prior to the Effective Date, except to the extent that the Debtors' certificates or articles of incorporation and bylaws are amended pursuant to the Plan. On or as soon as practicable after the Effective Date, the Reorganized Debtors will issue new equity interests pursuant to Section 4.9 of the Plan.

H.    Cancellation of Existing Securities and Agreements

Except for purposes of evidencing a right to distributions under the Plan or as otherwise provided herein, on the Effective Date, (a) all agreements and other documents (other than the assumed executory contracts and the Existing Senior Loan Agreements, if applicable, as amended or amended and restated by the Restructured Credit Documents) evidencing Claims or Equity Interests or rights of any holder of a Claim or Equity Interest against any of the Debtors or Reorganized Debtors, and (b) all notes and share certificates and other documents evidencing such Claims and Equity Interests and any agreements or guarantees related thereto will be canceled and terminated and deemed null and void, satisfied and discharged and of no force and effect as against any of the Debtors or the Reorganized Debtors without further act or action under any applicable agreement, law, regulation, order or rule except to the extent specifically provided otherwise herein. Except as otherwise provided herein, all obligations of the Debtors and Reorganized Debtors under such agreements and other documents governing such Claims and Equity Interests, as the case may be, will be discharged.

I.    Issuance of New Equity Interests

On or as soon as practicable after the Effective Date, the Reorganized Debtors shall issue all securities to be issued in accordance with the Plan, including without limitation, the New TWI-Holding Equity, each of which shall be distributed as referenced in the Plan.

US_ACTIVE-102769680.4

J.       Revesting of Assets

Pursuant to Section 1141(b) of the Bankruptcy Code, all property of the respective estate of each Debtor, together with any property of each Debtor that is not property of its estate and that is not specifically disposed of pursuant to the Plan, or by order of the Bankruptcy Court, will revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Liens, Claims and Equity Interests except as specifically provided pursuant to the Plan, the Confirmation Order, the Restructured Credit Documents and the Investor PIK Documents.

K.       Rights of Action; Reservation of Rights

Except as otherwise provided pursuant to the Plan or the Confirmation Order, or any other order of the Bankruptcy Court, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and except with respect to the Released Parties to the extent set forth herein, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will reserve and retain and may enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) all rights, claims, causes of action, rights of set off, suits, proceedings or other legal or equitable defenses accruing to the Debtors or their estates pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including without limitation, any avoidance or recovery actions and, to the extent permissible under applicable non-bankruptcy law, any suits or proceedings for recovery under any policies of insurance issued to or on behalf of the Debtors or any judgment obtained on behalf of any of the Debtors. Except as otherwise expressly set forth in the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or the relinquishment of any right or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Debtors or the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including without limitation, (i) any and all Claims against any Person, to the extent such Person asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Reorganized Debtors, their officers, directors, managers or representatives and (ii) the turnover of any property of any of the Debtors' or the Reorganized Debtors' estates. The Plan provides that the Reorganized Debtors will be deemed the appointed representative to, and may pursue, litigate, compromise, settle, transfer or assign any such rights, claims, causes of action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successors who hold such rights. Any person or entity defending against a Potentially Insured Claim, the Debtors, the Reorganized Debtors, and any Insurer shall have the right to assert all rights and defenses of the Debtors, both legal and equitable (including setoff or recoupment), with respect to any Potentially Insured Claims.

L.       Effectuating Documents; Further Transactions

The chief executive officer, chief financial officer or any other appropriate officer of TWI or any applicable Debtor, as the case may be, shall be authorized to execute, deliver, file or

US_ACTIVE-102769680.4

record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions herein. The secretary or assistant secretary of TWI or any applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

M.   Sources of Liquidity

1.   Restructured Credit Documents

On or prior to the Effective Date, the Restructured Credit Documents, in the forms attached to the Plan or as otherwise approved by the Debtors and the Pre-Petition Agent, shall become effective. The Restructured Credit Documents shall be binding on all holders of Class 1 Claims and Class 2 Claims.

2.   Sale of Investor PIK Notes and New TWI-Holding Equity

Pursuant to the Investor PIK Documents, the Investor PIK Note Purchasers have agreed on the terms and conditions set forth in the Investor PIK Documents and as set forth herein to invest an aggregate of $12,000,000 (U.S. twelve million dollars) in immediately available funds in the Reorganized Debtors on the Effective Date, which funds shall be used as additional working capital for the Reorganized Debtors.

In consideration for the amount to be paid by the Investor PIK Note Purchasers under the Investor PIK Documents, the Investor PIK Note Purchasers will receive, on the Effective Date, pursuant to the Plan and the Investor PIK Documents, (a) paid-in-kind interest bearing notes in the principal amount of $12,000,000 (U.S. twelve million dollars), in the form included in the Investor PIK Documents attached to the Plan as Exhibit 3 thereto or otherwise in form and substance satisfactory to (i) the Debtors and the Reorganized Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) the Requisite Supporting Noteholders (the "Investor PIK Notes"), and (b) 93% of the New TWI-Holding Equity, subject to dilution for New TWI-Holding Equity (in an aggregate amount not to exceed 16.5%, on a fully diluted basis, of such New TWI-Holding Equity) to be issued to employees, officers and directors of the Reorganized Debtors, and to be allocated among the Investor PIK Note Purchasers pursuant to the Plan and according to the Investor PIK Documents in the form attached to the Plan as Exhibit 3 thereto or otherwise acceptable in form and substance to (i) the Debtors and the Reorganized Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) the Requisite Supporting Noteholders. Subject to, and in accordance with the terms and conditions of, the Intercreditor Agreement and the Restructured Credit Agreement, the Investor PIK Notes shall be junior in right of payment to the Revolving Loan (as defined in the Restructured Credit Agreement) and Term Loan A, and except in certain circumstances set forth in the Intercreditor Agreement (where the Investor PIK Notes shall be junior in right of payment to the Term Loan B), the Investor PIK Notes shall be pari passu with Term Loan B.

In addition, the Investor PIK Note Purchasers shall receive on the Effective Date payment in Cash of all unpaid reasonable pre-petition and post-petition attorneys' fees and expenses.

US_ACTIVE-102769680.4

The Investor PIK Note Purchasers will be required to execute the Operating Agreement prior to receiving any distribution of New TWI-Holding Equity.

## IX.  RELEASES AND INJUNCTIONS RELATED TO RELEASES

### A.  Exculpation

The Debtors, the Reorganized Debtors, and the other Released Parties shall have no liability to any Person for any act or omission in connection with, or arising out of, the Debtors' Reorganization Cases, the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the formulation, preparation, implementation or consummation of the Plan or the transactions contemplated thereby, including the pre-petition and post-petition negotiations with respect thereto, the administration of the Plan or the property to be distributed under the Plan or the Debtors' Reorganization Cases or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan.  All Causes of Action based upon or arising out of all of the foregoing will be forever waived and released by any Person as of the Effective Date; provided, however, that nothing in this section shall affect the liability (if any) of any Person that otherwise would result from any action or omission to the extent that such action or omission is determined in a Final Order to have constituted (i) a breach of any of its obligations under the Plan or any contract, release or other agreement or document entered into in connection herewith or (ii) intentional acts that constitute fraud or willful misconduct.

### B.  Releases by Debtors

Pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors and their estates, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of the Debtors, the Reorganized Debtors or their estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the purchase, sale, or rescission of the purchase or sale of any of the Pre-Petition Subordinated Notes, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of

- 54 -

US_ACTIVE-102769680.4

competent jurisdiction to constitute willful misconduct or gross negligence by such Released Party.

C.    Releases by Holders of Claims and Equity Interests

As of the Effective Date of the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each holder of a Claim that votes to accept the Plan, solely in its capacity as the holder of such Claim, and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each person or entity (other than a Debtor), which has held, holds or may hold a Claim or Equity Interest in or relating to the Debtors and solely in its capacity as the holder of such Claim or Equity Interest, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Equity Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of any such holder, person or entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such holder, person or entity would have been legally entitled to assert in its own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the purchase, sale, or rescission of the purchase or sale of any of the Pre-Petition Subordinated Notes, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, any Plan Documents, or related agreements, instruments, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence of such Released Party.

Notwithstanding anything to the contrary contained in the Plan, the Disclosure Statement or the Confirmation Order, no Released Party shall be discharged, exculpated, or released on any claim, now existing or hereafter arising, under ERISA with respect to the Pension Plan, and there shall be no injunction against the assertion of any such claim.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in Sections 5.2 and 5.3 of the Plan do not release (i) any Claims or liabilities assumed by any Reorganized Debtor pursuant to the Plan or any other Plan Documents or otherwise arising on or after the Effective Date under any of the Plan Documents or (ii) any post-Effective Date obligations of any party under the Plan or any other Plan Document.

D.    Injunction Related to Releases

Except as provided in the Plan, the other Plan Documents or the Confirmation Order, as of the Confirmation Date, subject to the occurrence of the Effective Date, all Persons that have

US_ACTIVE-102769680.4

held, currently hold or may hold Claims or Equity Interests that (x) are subject to exculpation pursuant to Section 5.1, (y) of the Plan have been released pursuant to Sections 5.2 and 5.3 of the Plan, or (z) are discharged pursuant to Section 11.1 of the Plan, are permanently enjoined from taking any of the following actions against the Debtors or their property, or any of the Released Parties, on account of Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action, in each case in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section 5.4 of the Plan.

E.    No Waiver

The release set forth in the Plan does not limit, abridge, or otherwise affect the rights of the Reorganized Debtors to enforce, sue on, settle, or compromise the rights, claims and other matters retained by the Reorganized Debtors pursuant to the Plan.

F.    Deemed Consent

By voting to accept the Plan or accepting any distribution directly under the Plan, each holder of a Claim will be deemed to the fullest extent permitted by applicable law to have specifically consented to the releases and injunctions set forth in this Article V.

G.    Survival of Indemnification Obligations to Personnel

As to causes of action arising or relating to events taking place prior to, on and subsequent to the Petition Date, the Debtors shall defend, indemnify, reimburse or limit the liability of any of their respective directors, managers and officers who serve as directors, managers or officers on and after the Effective Date, including without limitation, those directors, officers and managers who are listed in the Disclosure Statement, to the fullest extent permitted under applicable state law (collectively, the "Indemnification Obligations") for any liabilities asserted against such persons by reason of their service as directors, managers or officers of the Debtors, other than in respect of any claims conclusively determined to have arisen by virtue of fraud or willful misconduct.  Such Indemnification Obligations will survive confirmation of the Plan, remain unaffected thereby, and will not be discharged and shall, on the Effective Date, become obligations of the Reorganized Debtors; provided, that such indemnification, defense, reimbursement or limitation will be limited to the extent such directors, mangers or officers have been released pursuant to the Plan as Released Parties under the Plan and provided further that the Debtors shall be required to indemnify a director, manager or officer in connection with a proceeding (or part thereof) initiated by such director, manager or officer only if such proceeding (or part thereof) was authorized by the board of directors or managers of the applicable Debtor.  Pursuant to the Plan and Bankruptcy Code Section 502(e),

US_ACTIVE-102769680.4

all contingent and unliquidated Claims of Debtors' respective current and former directors, managers, officers and employees for indemnification, defense or reimbursement of any liability shall be deemed expunged and withdrawn as of the Effective Date.

## X.  CORPORATE STRUCTURE OF THE REORGANIZED DEBTORS

### A.  Corporate Action

On the Effective Date, the adoption of each Amended Certificate and each of the Amended Bylaws and Operating Agreement will be deemed to have been authorized and approved in all respects to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order or rule, including without limitation, any action by the stockholders or shareholders or members of the Reorganized Debtors pursuant to § 303 of the General Corporation Law of the State of Delaware and other applicable corporation, limited liability company and limited partnership law of jurisdictions in which the Reorganized Affiliates are incorporated, organized or formed.

In addition, on the Effective Date, the cancellation of all Equity Interests in TWI-Holding, the authorization and issuance of the TWI-Holding Equity, the Reinstatement of the Equity Interests in all Debtors other than TWI-Holding, and all other matters provided herein involving the corporate and capital structure of the Debtors, or the Reorganized Debtors or corporate or other action by any of the Debtors or the Reorganized Debtors will be deemed to have occurred, be authorized, and will be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including without limitation, any action by the stockholders, shareholders, members, managers, officers or directors of any of the Debtors, any of the Reorganized Debtors pursuant to § 303 of the General Corporation Law of the State of Delaware and other applicable corporation, limited liability company and limited partnership law of jurisdictions in which the Reorganized Affiliates are incorporated, organized or formed.  Entry of the Confirmation Order will constitute approval of the Plan Documents and all such transactions subject to the occurrence of the Effective Date.

### B.  Corporate Structure of Reorganized Debtors

Each Amended Certificate will, among other things: (a) include, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, (b) to the extent necessary or appropriate, include such provisions as may be necessary to effectuate the Plan and (c) with respect to the TWI-Holding Amended Certificate, to the extent necessary or appropriate, include any restrictions on the transfer of the New TWI-Holding Equity if and to the extent approved by the holders of Pre-Petition Subordinated Note Claims.  The Amended Bylaws and Operating Agreement will provide for the corporate governance of the Reorganized Debtors.

US_ACTIVE-102769680.4

C.    Board of Directors/Managers and Officers of Reorganized Debtors

1.    Reorganized TWI-Holding's Board of Directors.

The Board of Directors of TWI-Holding in existence prior to the Effective Date shall continue in office until the designation of a new Board of Directors in accordance with the Operating Agreement.

2.    Reorganized TWI-Holding's Officers.

The officers of Reorganized TWI-Holding will be the same individuals who served as officers of TWI-Holding immediately prior to the Effective Date.

3.    Reorganized Affiliates.

The initial Boards of Directors or Managers, as appropriate, of the Reorganized Affiliates shall consist of such number of members as Reorganized TWI-Holding in its sole discretion shall determine. The members of such boards shall be appointed by Reorganized TWI-Holding and may include one or more executive officers or managers or directors of Reorganized TWI-Holding. Each of the members of these initial Boards of Directors or Managers will serve in accordance with the Reorganized Affiliates' respective certificates or articles of incorporation or organization or formation, as appropriate, and bylaws or operating agreements, as the same may be amended from time to time, and applicable non-bankruptcy laws.

The officers of the Reorganized Affiliates will be the individuals who serve as officers of such Debtors immediately prior to the Effective Date. Such officers will serve in accordance with the bylaws or limited liability company agreements of the Reorganized Affiliates, as applicable, any employment agreement with such Reorganized Affiliates and applicable non-bankruptcy law. After the Effective Date, the respective new boards of directors or managers of the Reorganized Affiliates, as appropriate, will determine the officers of the Reorganized Affiliates.

D.    Indemnification of Directors and Officers

The Operating Agreement and the certificates or articles of incorporation or organization or formation of the Reorganized Affiliates will authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors, managers and agents to the fullest extent permitted under applicable state law.

E.    Operating Agreement

The Operating Agreement will be in the form attached to the Plan as Exhibit 7 thereto or otherwise in form and substance satisfactory to the (i) the Debtors and the Reorganized Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) the Requisite Supporting Noteholders.

US_ACTIVE-102769680.4

# XI.   DISTRIBUTIONS UNDER THE PLAN

## A.   Distributions to Holders of Allowed Claims Only

Until a Disputed Claim becomes an Allowed Claim, distributions of Cash, securities and/or other instruments or property otherwise available to the holder of such Claim will not be made.

## B.   Distribution Record Date

As of the close of business on the date the Clerk of the Bankruptcy Court enters the Confirmation Order or such other date as may be designated in the Confirmation Order, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents (other than Classes 1 and 2) will be deemed closed, and there will be no further changes in the record holders of any of the Claims or Equity Interests (other than Classes 1 and 2).  The Debtors will have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date (other than Classes 1 and 2).  The Debtors or Reorganized Debtors, as applicable, will recognize only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.  The Distribution Record Date is the record date for purposes of making distributions under the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and if so completed will be deemed to have been completed as of the required date.

## C.   Disbursing Agent

Reorganized TWI-Holding, as Disbursing Agent, or such other entity designated by Reorganized TWI-Holding as a Disbursing Agent, will make all distributions under the Plan when required by the Plan.  A Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

## D.   Rights and Powers of the Disbursing Agent

The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated thereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

## E.   Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Equity Interest will be made at the address of such holder as set forth in the Debtors' books and records and/or on the Schedules filed with the Bankruptcy Court unless the Debtors or their

US_ACTIVE-102769680.4

Disbursing Agent have been notified in writing of a change of address, including without limitation, by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected on such books and records or Schedules for such holder; provided, however, that all distributions to the DIP Lenders under the Plan will be made by the Disbursing Agent to the DIP Agent for further disbursement to the DIP Lenders.

In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent will use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution will be made to such holder without interest or accruals of any kind. Such distributions will be deemed unclaimed property under Section 347(b) of the Bankruptcy Code on the one year anniversary of the Effective Date. After that date, all unclaimed property or interest in property will revert to the Reorganized Debtors and the Claim of any other holder to such property or interest in property will be discharged and forever barred.

F.      Time Bar to Cash Payments

Checks issued by the Reorganized Debtors on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Holders of Allowed Claims shall make all requests for reissuance of checks to the Reorganized Debtors. Any Claim in respect of a voided check must be made on or before the one year anniversary of the date of issuance. After such date, all Claims and respective voided checks will be discharged and forever barred and the Reorganized Debtors will retain all moneys related thereto.

G.      Fractional Shares

No fractional shares or units of New Equity will be issued or distributed under the Plan. The actual distribution of shares and units of New Equity will be rounded to the next higher or lower whole number as follows: (a) fractions of one-half (1/2) or less shall be rounded to the next lower whole number, and (b) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number. The total number of shares or units, as applicable, of New Equity to be distributed herein will be adjusted as necessary to account for such rounding. No consideration will be provided in lieu of fractional shares or units that are rounded down.

H.      Set-Offs

Other than with respect to the Claims of Pre-Petition Credit Agreement Secured Parties, the DIP Agent and DIP Lenders (as to which any and all rights of setoff or recoupment have been waived by the Debtors and the Reorganized Debtors), the Debtors or the Reorganized Debtors may, but are not required to, set off or recoup against any Allowed Claim, any claims, rights, or cause of action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim. Neither the failure to set-off nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim, right or cause of action.

US_ACTIVE-102769680.4

## XII.    PROCEDURES FOR DISPUTED CLAIMS

### A.    Resolution of Disputed Claims; Estimation of Claims

Except as set forth in any order of the Bankruptcy Court, any holder of a Claim against the Debtors shall file a Proof of Claim with the Bankruptcy Court or with the agent designated by the Debtors for this purpose on or before Claims Bar Date.  If any such holder of a Claim disagrees with the Debtors' determination with respect to the Allowed amount of such holder's Claim, the Claim will be a Disputed Claim.  The Debtors prior to the Effective Date, and thereafter the Reorganized Debtors, shall have the exclusive authority to file objections on or before the Claims Objection Bar Date, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  Notwithstanding the foregoing, the Reorganized Debtors must receive the prior written approval of the Requisite Supporting Revolving Lenders and the Requisite Supporting Term Lenders prior to entering into any settlement or compromise of any Disputed Claim if the face amount of the Disputed Claim is in excess of $100,000.

Any Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

### B.    No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, except as otherwise agreed by the Debtors or the Reorganized Debtors, no partial payments or distributions will be made with respect to a Disputed Claim or Equity Interest unless and until all objections to such Disputed Claim or Equity Interest have been settled or withdrawn or have been determined by Final Order.

### C.    Distributions After Allowance

To the extent a Disputed Claim or Equity Interest becomes an Allowed Claim or Equity Interest, the Disbursing Agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Any such distributions will be made in accordance with, and at the time mandated by the Plan.  No interest will be paid on any Disputed Claim or Equity Interest that later becomes an Allowed Claim or Equity Interest.

US_ACTIVE-102769680.4

## XIII. EXECUTORY CONTRACTS

### A. Assumption of Executory Contracts and Unexpired Leases

As of the Effective Date, all executory contracts or unexpired leases listed on Exhibit 9 to the Plan shall be and shall be deemed to be rejected in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. All executory contracts or unexpired leases of the Reorganized Debtors not listed on Exhibit 9 to the Plan, and not otherwise the subject of a pending objection or pleading seeking to reject or otherwise contesting the executory contract or unexpired lease, are hereby assumed as of the Effective Date in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

### B. Cure of Defaults of Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied by payment of the default amount in Cash on the Effective Date, or on such other terms as the parties to such executory contracts or unexpired leases may agree. The Debtors in their discretion may file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to any matter pertaining to the assumption. All such objections shall be litigated to Final Order, provided, however that the Debtors may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections. In the event of a dispute regarding: (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption of any executory contracts or unexpired leases; provided, however, that based on the Bankruptcy Court's resolution of any such dispute, the applicable Debtor or Reorganized Debtor shall have right, within 30 days after the entry of such Final Order and subject to approval of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, to reject the applicable executory contract or unexpired lease.

### C. Compensation and Benefit Programs

Except as otherwise expressly provided under the Plan, all employment and severance policies and all compensation, incentive and benefit plans, policies and programs of the Debtors applicable to their employees, retirees and non-employee directors or members of the boards of directors, including without limitation, collective bargaining agreements, the Employee Retirement Plans and all other savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance

- 62 -

plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code.

## XIV. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### A. Conditions Precedent to Confirmation

The Plan will not be confirmed and the Confirmation Order will not be entered until and unless each of the following conditions has occurred or has been waived in accordance with the terms of the Plan: (a) the Confirmation Order is acceptable in form and substance to (i) the Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders; (b) all of the Plan Documents are acceptable in form and substance to (i) the Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders; and (c) the Confirmation Order is entered no later than 45 days after the Petition Date or such later date to which the Requisite Supporting Revolving Lenders, the Requisite Supporting Term Lenders and, to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders agree.

### B. Conditions Precedent to the Effective Date

The Effective Date of the Plan will not occur unless and until each of the following conditions has occurred or will occur contemporaneously with the consummation of the Plan:

a. the Confirmation Order shall have been entered, shall have become a Final Order, and shall be acceptable to (i) the Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders and shall otherwise be in full force and effect;

b. all actions, documents and agreements (in form and substance satisfactory (i) the Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders) necessary to implement the Plan and the transactions contemplated by the Plan shall have been executed or become effective;

c. the commitments under the DIP Facility shall have terminated, and all of the obligations owing under or in respect of the DIP Facility (including without limitation, all principal, interest, fees and expenses owed thereunder) shall have been paid in full in Cash by wire transfer of immediately available funds or assumed by the Reorganized Debtors as contemplated by the Plan and in accordance with the DIP Facility and the Restructured Credit Documents, and the commitments thereunder terminated, satisfied or assumed as to the outstanding DIP Letters of Credit as contemplated by the Plan and the Restructured Credit Documents;

US_ACTIVE-102769680.4

d.     the Exit Credit Documents shall have been executed and delivered by all parties thereto, and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof;

e.     the New Equity to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding;

f.     any alteration of any term or provision of the Plan by the Bankruptcy Court shall be acceptable to (i) the Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) to the extent required pursuant to the Restructuring Support Agreement, the Requisite Supporting Noteholders;

g.     all fees, costs and expenses required to be paid under the DIP Facility, the Existing Senior Loan Agreements, the Exit Credit Documents or the Plan, including without limitation, those of the DIP Agent incurred under the DIP Facility and the Pre-Petition Agent incurred under the Pre-Petition Credit Agreement, shall have been paid on or prior to the Effective Date;

h.     all reasonable pre-petition and post-petition attorneys' fees, costs and expenses that are required to be paid under the Pre-Petition Subordinated Notes, the Note Purchase Agreement dated December 7, 2007, or the Investor PIK Documents, and up to $100,000 (but in no event more than $100,000) of the reasonable fees, costs and expenses of CRG Partners, as financial advisor to the Pre-Petition Subordinated Noteholders incurred prior to the Petition Date that are required to be paid under the Pre-Petition Subordinated Notes, the Note Purchase Agreement dated December 7, 2007, or the Investor PIK Documents, shall have been paid on or prior to the Effective Date;

i.     Each Reorganized Debtor shall have filed with the Secretary of State of Delaware its Amended Certificate; and

j.     Reorganized TWI-Holding and each of the other parties thereto shall have executed the Operating Agreement, the Restructured Credit Documents and the Investor PIK Documents.

C.     Waiver of Conditions to Confirmation and Effective Date

The Debtors, with the consent of (i) the Requisite Supporting Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders, may waive, in whole or in part, any of the conditions to the confirmation or effectiveness of the Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

D.     Effect of Failure of Conditions of the Effective Date

Unless extended by the mutual agreement of (w) the Debtors, (x) the Requisite Supporting Revolving Lenders, (y) the Requisite Supporting Term Lenders and (z) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders, in the

US_ACTIVE-102769680.4

event the conditions specified in Section 10.2 of the Plan have not been satisfied or waived in accordance with Section 10.3 of the Plan by the date that is thirty (30) days after entry of the Confirmation Order, (i) the Confirmation Order will be vacated; (ii) no distributions under the Plan will be made; (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all the Debtors' obligations with respect to the Claims and Equity Interests will remain unchanged and nothing contained in the Plan will be deemed to constitute a waiver or release of any Claims or claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any proceedings further involving the Debtors.

## XV. EFFECT OF CONFIRMATION

### A.  Discharge of Claims and Termination of Equity Interests

Except as otherwise provided herein or in the Plan Documents, the treatment of all Claims against, or Equity Interests in, the Debtors hereunder will be in exchange for and in complete satisfaction, discharge and release of all (a) Claims against, or Equity Interests in, the Debtors of any nature whatsoever, known or unknown, including without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, and (b) all Claims against and Equity Interests in the Debtors' estates or properties or interests in property.  Except as otherwise provided herein or in the Plan Documents, upon the Effective Date, all Claims against and Equity Interests in the Debtors will be satisfied, discharged and released in full exchange for the consideration provided hereunder and under the Plan.  Except as otherwise provided herein or in the Plan Documents, all entities will be precluded from asserting against the Debtors or the Reorganized Debtors or their respective properties or interests in property any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Nothing in the Plan or the Confirmation Order shall be construed as discharging or releasing any liability to the PBGC or the Pension Plans of the Debtors or the Debtors' successors, including the Reorganized Debtors, or any fiduciary to the Pension Plans, for any liabilities under any law or regulation governing the Pension Plans.  The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such liabilities as a result of any provision of the Plan or the Confirmation Order.  Additionally, nothing in the Confirmation Order or the Plan shall release, discharge, enjoin, or preclude any environmental Claim of any governmental unit against the Debtors (a) that had not arisen (and therefore could not have been asserted) as of the Effective Date or (b) under environmental statutes or regulations that any entity would be subject to subsequent to the Effective Date as the owner or operator of property after the Effective Date and cannot, as a matter of law, be discharged under the Bankruptcy Code.  Moreover, nothing in the Confirmation Order or the Plan releases, nullifies, enjoins, or precludes any liability of non-Debtors to governmental units arising exclusively under environmental statutes or regulations.

US_ACTIVE-102769680.4

B.    Binding Effect.

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests and their respective successors and assigns, including without limitation, the Reorganized Debtors.

C.    Preservation of Insurance.

The Debtors' discharge from all Claims and Equity Interests as provided herein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any Insurance Policy that may cover Claims against the Debtors, the Reorganized Debtors (including without limitation, such entities' officers, directors and managers) or any other person or entity. Notwithstanding the discharge of the Debtors from all Claims and Interests pursuant to the Plan, the Reorganized Debtors shall continue to cooperate with the Insurers in the defense, investigation, and settlement of Potentially Insured Claims to the extent such cooperation does not impose a significant cost or burden on the Reorganized Debtors; it being understood that nothing herein shall affect or impair the right of any Insurer to disclaim coverage with respect to a given claim based on a failure of the Reorganized Debtors to cooperate to the full extent required by the language of a relevant Insurance Policy with respect to that Claim.  Nothing in the Plan or the Confirmation Order shall affect or impair the right of any Insurer to disclaim coverage to the extent permissible under any Insurance Policy or applicable law. Notwithstanding the foregoing, the fact that the holder of an Insured Claim has received a distribution under the Plan in lieu of being paid in Cash with respect to any deductible or self insured retention amount shall not be a basis upon which an Insurer may disclaim coverage.

In no event may a holder of a Claim proceed against or recover from any Insurer on any Claim that has been either (a) released by the Plan or (b) Disallowed.  However, if a Claim has not been released or Disallowed, even though the Claim has been discharged, then to the extent the Claim is a Potentially Insured Claim, the holder of such Claim shall be entitled, solely to the extent allowed under applicable non-bankruptcy law, to commence and/or maintain an action, in the first instance, in the Bankruptcy Court against the Insurer or Insurers who issued such Insurance Policy or Insurance Policies and, for nominal purposes only, against such Debtor(s); provided, however, that any award granted in any such action shall be enforceable or recoverable only from the then-remaining applicable limits of any applicable Insurance Policy in an amount equal to (a) the lesser of (i) the amount of the award and (ii) the then-remaining applicable limits of any applicable Insurance Policy, minus (b) the amount of any deductible, self insured retention or similar contractual undertaking contained or incorporated in such Insurance Policy or Insurance Policies.  As to all Claims, including all Potentially Insured Claims, the Bankruptcy Court shall determine, in the first instance pursuant to applicable bankruptcy law, in what forum such Claim shall be determined.  Moreover, none of the Insurers shall advance or pay to any third party alleging a Potentially Insured Claim any amount representing or corresponding to any deductible, self insured retention or similar contractual undertaking, and the Insurers shall be required to pay, at most, to any third party alleging a Potentially Insured Claim, only those

US_ACTIVE-102769680.4

amounts that are in excess of any applicable deductible, self insured retention or similar contractual undertaking. The Insurance Company shall not draw on any Insurance Security to pay any Claim or obligation that is released under the Plan, released by operation of law, Disallowed, or discharged; provided, however, that to the extent that (a) the Debtors or Reorganized Debtors have an obligation to pay or reimburse defense costs up to the amount of a deductible or self insured retention under any applicable Insurance Policy and (b) such defense costs are properly secured by Insurance Security, then notwithstanding the entry of the Confirmation Order (and without waiving any rights to argue that neither (a) nor (b) is true and correct), the Reorganized Debtors shall have the right, but not the obligation, to reimburse the Insurance Company for such defense costs up to the amount of any applicable deductible or self insured retention; and provided further that if the Debtors or Reorganized Debtors have an obligation to pay or reimburse defense costs up to the amount of a deductible or self insured retention under any applicable Insurance Policy and such defense costs are properly secured by Insurance Security, but Debtors or Reorganized Debtors fail to make any such payment or reimbursement, the Insurance Company shall be entitled to access the Insurance Security in order to obtain the payment or reimbursement.

The Insurance Security shall be continued in full force and effect after the Effective Date and the Insurance Company is authorized, subject to the terms of the Insurance Security, the Insurance Company's Insurance-Related Contracts, and the Plan, and without seeking further order of the Court to use the applicable Insurance Security it holds to satisfy the Insurance Company's Claims to the extent permitted by the terms of the applicable agreements and the Plan, up to the amount of the Insurance Security (as it may hereinafter be modified by agreement of the parties thereto); it being understood that (a) unless Debtors agree, the Insurance Security shall not be increased or replenished in respect of any Potentially Insured Claims or on account of the payment of any deductible, self-insured retention or similar contractual undertaking related to any Potentially Insured Claim and (b) the Debtors shall have the right, but not the obligation, to increase or replenish the Insurance Security in respect of any claims asserted post-petition that are not Potentially Insured Claims but are covered or potentially covered by a pre-petition Insurance Policy issued by the Insurance Company and related contracts (nothing in this clause (b) affecting the Insurance Company's rights under its Insurance Policies or the Insurance Company's Insurance-Related Contract in respect of which the Insurance Security has been posted to disclaim coverage or contend the Debtors or Reorganized Debtors have failed to comply with such Insurance Policy or the Insurance Company's Insurance-Related Contract in respect of which the Insurance Security has been posted by not increasing or replenishing the Insurance Security in respect of such claims).

Nothing in the Plan or the Confirmation Order shall affect or impair the right of any Insurer who pays a Potentially Insured Claim, or who is the subject of an action by the holder of a Potentially Insured Claim brought pursuant to the preceding paragraph, to seek contribution or indemnification from another Insurer who issued one or more Insurance Policies. The Reorganized Debtors shall comply with all reasonable requests (not requiring a significant expenditure of funds) by an Insurer for information relating to other Insurers or Insurance Policies that do or may provide coverage for a particular Potentially Insured Claim to the extent such information is available.

US_ACTIVE-102769680.4

D.    Section 1146 Exemption.

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or issuance of debt or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or other similar tax.  Unless expressly provided otherwise, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including without limitation, the sales, if any, by the Debtors of owned property or assets pursuant to Section 363(b) of the Bankruptcy Code and the assumptions, assignments and sales, if any, by the Debtors of unexpired leases of non-residential real property pursuant to Section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, therefore, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or other similar tax law.

E.    Compliance with Tax Requirements.

In connection with the implementation and consummation of the Plan, the Debtors will comply with all withholding and reporting requirements imposed by any taxing authority, and all distributions thereunder will be subject to such withholding and reporting requirements.

F.    Severability of Plan Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

G.    Exemption from Securities Laws.

The issuance of New Equity and any other securities that may be deemed to be issued pursuant to the Plan including, without limitation, the Investor PIK Notes, shall be exempt from state and federal securities laws pursuant to Section 1145 of the Bankruptcy Code.

US_ACTIVE-102769680.4

H.   Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claims entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated, for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## XVI.   RETENTION OF JURISDICTION

A.   Post Effective-Date Jurisdiction

On and after the Effective Date, the Bankruptcy Court will retain and have jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Debtors' Reorganization Cases, or that relate to any of the following:

a.   To hear and determine all matters with respect to the assumption or rejection of executory contracts, resolution of disputes pertaining to Cure Payment amounts and the allowance of the Claims resulting therefrom.

b.   To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

c.   To hear and determine any application under Sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by professionals prior to the Effective Date, provided, however, that from and after the Effective Date, the payment of fees and expenses incurred from and after the Effective Date of the retained professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

d.   To hear and determine any dispute or reconcile any inconsistency arising in connection with the Plan, any of the Plan Documents or the Confirmation Order or the interpretation, implementation or enforcement of the Plan, any of the Plan Documents, the Confirmation Order, any transaction or payment contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing.

e.   To hear and determine any matter concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

f.   To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and Title 28 of the United States Code.

g.   To hear and determine any rights, claims or causes of action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code.

US_ACTIVE-102769680.4

h.       To hear and determine any dispute arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to Section 105(a) of the Bankruptcy Code.

i.       To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

j.       To take any action, and issue such orders as may be necessary or appropriate, to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation.

k.       To take any action to ensure that all distributions are accomplished as provided herein.

l.       To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, Administrative Expense Claim or Equity Interest.

m.       To enter, implement or enforce such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

n.       To take any action to recover all assets of the Debtors and property of the Debtors' estates wherever located.

o.       To enter a final decree closing the Debtors' Reorganization Cases.

p.       To hear and determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date.

q.       To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Debtors' Reorganization Cases with respect to any Person.

r.       To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge.

s.       To hear and determine any other matter that may arise in connection with or is related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan or the Disclosure Statement.

US_ACTIVE-102769680.4

B.    Jurisdiction Prior to the Effective Date

Prior to the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters over which it may exercise jurisdiction pursuant to 28 U.S.C. §1334.

## XVII.  MISCELLANEOUS PROVISIONS

A.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

B.    Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Reorganized Debtors shall pay all fees required to be paid pursuant to Section 1930 of Title 28 of the United States Code.

C.    Retiree Benefits

On and after the Effective Date, pursuant to Section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors for the duration of the period for which the Debtors have obligated themselves to provide such benefits.

D.    Professional Fee Claims

All final requests for Professional Fee Claims must be filed with the Court not later than forty-five (45) days after the Effective Date.  Objections to the applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Debtors and their counsel and the requesting professional or other entity not later than two (2) weeks prior to the hearing date of the applications.  The hearing date on any Professional Fee Claims will be set to allow a reasonable time for objections to be filed.

E.    Modifications and Amendments

Subject to the prior written consent of (i) the Requisite Supporting Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders, the Plan may be amended, modified or supplemented by the Debtors or Reorganized Debtors in the manner provided for by Section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to Section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors may institute proceedings in the Bankruptcy Court, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, provided, however, any material amendment or modification will require the consent of (i) the Requisite Supporting

US_ACTIVE-102769680.4

Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders.

F.    Corrective Action

Prior to the Effective Date, upon the prior written consent of (i) the Requisite Supporting Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims and Equity Interests.

G.    Plan Revocation, Withdrawal or Non-Consummation

Subject to the prior written consent of (i) the Requisite Supporting Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan and no acts taken in preparation for consummation of the Plan shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interest in, any Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by the Debtors or any other Person.  None of the filing of the Plan, the taking by the Debtors of any action with respect to the Plan or any statement or provision contained in the Plan or herein will be or be deemed to be an admission by any of the Debtors, the holders of any Claims or any other Person against interest, or be deemed to be a waiver of any rights, claims or remedies that the Debtors may have, and until the Effective Date all such rights and remedies are and will be specifically reserved.  In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan and the Plan Documents, and any statement contained herein or therein, may not be used by any Person, party or entity against any the Debtors.

H.    Modification of Exhibits

Subject to obtaining the consents of (i) the Requisite Supporting Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders, the Debtors explicitly reserve the right to modify or make additions to or subtractions from any schedule to the Plan or the Disclosure Statement and to modify any Exhibit to the Plan or the Disclosure Statement prior to the Objection Deadline.

US_ACTIVE-102769680.4

I.        Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit or Plan Document provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

J.        Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.  With regard to all dates and periods of time set forth or referred to in the Plan, time is of the essence.

K.        Section Headings

The section headings and other captions contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

L.        Effectuating Documents and Further Transactions

Each of the officers of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary, appropriate or desirable to effectuate and further evidence the terms and provisions of the Plan, the Plan Documents and any securities issued pursuant to the Plan.

M.        Successors and Assigns

The rights, benefits and obligations of any Person named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person; provided, however, that nothing in the Plan or the Confirmation Order shall be deemed to permit the assignment of an Insurance Policy that is non-assignable to any party other than the Reorganized Debtors without the Insurer's consent under applicable non-bankruptcy law.

N.        Notices

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

US_ACTIVE-102769680.4

- Taylor-Wharton International LLC
  4718 Old Gettysburg Road
  Mechanicsburg, PA 17055
  Attention:  Chief Financial Officer
- Telephone:
- Facsimile:
- Email:
- 

and copies to counsel for the Debtors and the Reorganized Debtors:

- Reed Smith LLP
- 599 Lexington Avenue
- 22nd Floor
- New York, NY  10022
- Attn:  J. Andrew Rahl, Jr.
- Tel: (212) 521 5400
- Fax: (212) 521 5450
- Email: arahl@reedsmith.com

  -and-

- Reed Smith LLP
- 1201 Market Street
- Suite 1500
- Wilmington, DE  19801
- Attn:  Mark W. Eckard
- Tel: (302) 778 7512
- Fax: (302) 778 7575
- Email: meckard@reedsmith.com

Any delivery after 5:00 p.m., prevailing Central time, on a Business Day, or on a day that is not a Business Day, shall be deemed to have been made on the immediately following Business Day.

## XVIII. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Court have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

US_ACTIVE-102769680.4

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be impaired under the Plan, or the Plan may be confirmed without the approval of each voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative, Allowed Priority Tax Claims and Allowed Other Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims or Equity Interests will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) they have complied, or will have complied, with all of the requirements of Chapter 11 and (c) the Plan has been proposed in good faith.

A.    <u>Feasibility of the Plan</u>

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is

US_ACTIVE-102769680.4

referred to as the "feasibility" requirement.  The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared and relied upon the financial projections, which are annexed to this Disclosure Statement as Exhibit 4, and the Liquidation Analysis, which is annexed hereto as Exhibit 5.  **EXHIBITS 4 and 5 AND THE NOTES THERETO ARE AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND THE PLAN.**

The projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.  As noted in the projections, however, the Debtors caution that no representations can be made as to the accuracy of the projections or as to the Reorganized Debtors' ability to achieve the protected results.  Many of the assumptions upon which the projections are based are subject to uncertainties outside the control of the Debtors.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtors' financial results.  As disclosed in the projections, these estimates have not been audited and may not comply with the requirements of Generally Accepted Accounting Principles ("GAAP").  The Debtors' management believes these estimates are reasonable and are the best estimate of the future operations of the Reorganized Debtors.  However, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY ANY INDEPENDENT ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.**

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995:  This Disclosure Statement and the financial projections contained herein and in the Projections include "forward-looking statements" within the meaning of

US_ACTIVE-102769680.4

Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, financial projections, the statements, and the underlying assumptions, regarding the timing of, completion of and scope of the current restructuring, the Plan, debt and equity market conditions, the cyclicality of the Debtors' industry, current and future industry conditions, the potential effects of such matters on the Debtors' business strategy, results of operations or financial position, the adequacy of the Debtors' liquidity and the market sensitivity of the Debtors' financial instruments. The forward-looking statements are based upon current information and expectations. Estimates, forecasts and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to evaluate and predict. Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, parties are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from the Debtors' expectation or what is expressed, implied or forecasted by or in the forward-looking statements include developments in the Chapter 11 Cases, adverse developments in the timing or results of the Debtors' business plan (including the time line to emerge from chapter 11), the timing and extent of changes in economic conditions, industry capacity and operating rates, the supply-demand balance for the Debtors' services, competitive products and pricing pressures, federal and state regulatory developments, the Debtors' financial leverage, motions filed or actions taken in connection with the bankruptcy proceedings, the availability of skilled personnel, the Debtors' ability to attract or retain high quality employee and operating hazards attendant to the industry. Additional factors that could cause actual results to differ materially from the Projections or what is expressed, implied or forecasted by or in he forward-looking statements are stated herein in cautionary statements made in conjunction with the forward looking statements or are included elsewhere in this Disclosure Statement.

B.     Best Interests Test

1.     Generally

        The Bankruptcy Code requires the bankruptcy court to determine that a plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

        To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.

US_ACTIVE-102769680.4

This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. A liquidation under Chapter 7 does not affect the priority of several holders of claims to be paid first. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the "best interests" of creditors and equity security holders.

2.    Best Interests of Creditors Test

For purposes of the best interests test and in order to determine the liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as Exhibit 5 (the "Liquidation Analysis"), which concludes that in a chapter 7 liquidation, other than the Pre-Petition Secured Lenders, no holders of prepetition Claims would receive any recovery whatsoever. The Plan, which proposes to pay the Class 6 Recovery in Cash to holders of General Unsecured Claims, and 7 percent (7%) of the New-TWI Holding Equity (subject to dilution) plus the right to purchase one half of the principal amount of the Investor PIK Notes to the Pre-Petition Subordinated Noteholders, thus proposes to distribute more to these classes than the Debtors believe they would receive in a chapter 7 liquidation. The Plan also proposes that the Reorganized Debtors will assume the Pre-Petition Secured Loans and thereby provide the Pre-Petition Secured lenders with consideration that materially exceeds what the Liquidation Analysis projects as a recovery to such creditors in a chapter 7 liquidation. Thus the Debtors believe that the Pre-Petition Secured Lenders too are materially better off under the Plan than in a chapter 7 liquidation. These conclusions are premised upon the assumptions set forth in Exhibit 5, which the Debtors and their financial advisors believe are reasonable.

US_ACTIVE-102769680.4

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimated are based solely upon the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of the Allowed Claims under the Plan.

      3.      <u>Application of the "Best Interests" of Creditors Test to the liquidation Analysis and the Valuation</u>

It is impossible to determine with certainty the value each holder of a Pre-Petition Secured Loan Claim or Pre-Petition Subordinated Note Claim will receive under the Plan as a percentage of any Allowed Claim.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater recovery to Holders of Claims in creditor classes that are impaired under the Plan than the recovery available to them in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

      C.      <u>Confirmation Without Acceptance by All Impaired Classes: The 'Cramdown' Alternative</u>

Section 1129(b) of the Bankruptcy Code provides that a plan may be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by impaired classes as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or

US_ACTIVE-102769680.4

(2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Claims and Equity Interests under Classes 7 and 9 are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Equity Interests. Such Classes therefore are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation of the Plan as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Classes, the Debtors believe that Classes 7 and 9 are being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by these Classes.

## XIX.   IMPORTANT CONSIDERATIONS AND RISK FACTORS

A.   <u>The Debtors Have No Duty To Update</u>

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

US_ACTIVE-102769680.4

B.     No Representations Outside The Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to Debtors' counsel and the Office of the United States Trustee.

C.     Information Presented Is Based On The Debtors' Books And Records, And No Audit Was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

D.     All Information Was Provided By Debtors And Was Relied Upon By Professionals

Reed Smith LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Petition Date as general bankruptcy counsel.  All counsel and other professionals for the Debtors have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement.  Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not verified independently the information contained herein.

E.     Projections And Other Forward Looking Statements Are Not Assured, And Actual Results Will Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

1.     Claims Could Be More Than Projected

The allowed amount of Claims in each Class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.  If Administrative Claims and/or Other Secured claims or Other Priority Claims exceed projections, it may impair the value of the New TWI-Holding Equity being distributed under the Plan.

2.     Projections

US_ACTIVE-102769680.4

While the Debtors believe that their projections are reasonable, there can be no assurance that they will be realized, resulting in recoveries that could be significantly less than projected.

F.    No Legal Or Tax Advice Is Provided To You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

G.    No Admissions Made

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtors) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Equity Interests.

H.    No Waiver Of Rights Except As Expressly Set Forth In The Plan

A creditor's vote for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or estate assets, regardless of whether any Claims of the Debtors or their respective estates are specifically or generally identified herein.

1.    Business Factors And Competitive Conditions

a.    General Economic Conditions

In their financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years.  An improvement of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There is no guarantee that economic conditions will improve in the near term.

b.    Business Factors

The Debtors believe that they will succeed in implementing and executing their operational restructuring for the benefit of all constituencies.  However, there are risks that the goals of the Debtors' going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Debtors may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.  Because the Claims of substantially all unsecured creditors will

US_ACTIVE-102769680.4

be extinguished under the Plan, in the event of further restructurings or insolvency proceedings of claims of such persons could be substantially diluted or even cancelled.

c.      Competitive Conditions

In addition to uncertain economic and business conditions, the Reorganized Debtors will likely face competitive pressures and other third party actions, including pressures from pricing and other promotional activities of competitors as well as new competition.  The Reorganized Debtors' anticipated operating performance will be impacted by these and other unpredictable activities by competitors.

d.      Other Factors

Other factors that Holders of Claims should consider are potential regulatory and legal developments that may impact the Reorganized Debtors' businesses. Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtors' operating performance.

2.      Access to Financing and Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support.  The Debtors' post-petition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility.  The Debtors believe that substantially all of their need for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, the DIP Facility, trade terms supplied by vendors, and collections related to Causes of Action.  However, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to (a) obtain other sources of financing or (b) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors.  The Debtors believe that it is important to their going-forward business plan that their performance meets projected results in order to ensure continued support from vendors and factors.  There are risks to the Reorganized Debtors in the event such support erodes after emergence from Chapter 11 that could be alleviated by remaining in Chapter 11.  Chapter 11 affords a debtor the opportunity to close facilities and liquidate assets relatively expeditiously, tools that will not be available to the Reorganized Debtors upon emergence.  However, the Debtors believe that the benefits of emergence from Chapter 11 at this time outweigh the potential costs of remaining in Chapter 11, and that emergence at this time is in the long-term operational best interests of the Debtors and their creditors.

3.      Market for New TWI-Holding Equity

There can be no assurance that an active market for the New TWI-Holding Equity to be distributed pursuant to the Plan will develop, and no assurance can be given as to the prices

US_ACTIVE-102769680.4

at which such securities might be traded. Moreover, the New TWI-Holding Equity will not be registered pursuant to the Securities Exchange Act of 1934, as amended, and therefore not listed on a public exchange or automated trading system. The liquidity of the New TWI-Holding Equity will also depend on, among other things, the number of holders of the New TWI-Holding Equity, the Reorganized Debtors' financial performance, and other factors beyond the Reorganized Debtors' control, including war, terrorist attacks, recession or further weakening of the economy, none of which can be determined or predicted with certainty. The Debtors do not expect the Reorganized Debtors to declare dividends in the foreseeable future with respect to the New TWI-Holding Equity, which may also adversely impact the market for and value of the New TWI-Holding Equity.

       4.      <u>Impact of Interest Rates</u>

      Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets.

       I.      <u>Bankruptcy Law Risks and Considerations</u>

       1.      <u>Confirmation of the Plan is Not Assured</u>

      Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

       2.      <u>The Plan May Be Confirmed Without the Approval of All Creditors Through So-Called "Cramdown"</u>

      If one or more Impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan at the Debtors' request if all other conditions for confirmation have been met and at least one impaired Class of Claims has accepted the Plan (without including the vote of any insider in that Class) and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable.

      The votes of holders of Claims and Equity Interests under Classes 7 and 9 are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Equity Interests. Such Classes therefore are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation of the Plan as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Classes, the Debtors believe that Classes 7 and 9 are being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by these Classes.

       3.      <u>The Effective Date Might Be Delayed or Never Occur</u>

US_ACTIVE-102769680.4

There can be no assurance as to the timing of the Effective Date or that it will occur. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order. In that event, no distributions would be made, and the Holders of Claims and Equity Interests would be restored to their previous position as of the moment before confirmation, and the Debtors' obligations for Claims and the Equity Interests would remain unchanged.

4.     <u>The Projected Value of Estate Assets Might Not Be Realized</u>

In the Financial Projections, the Debtors project the value of the estates' assets which would be available for payment of expenses and distributions to Holders of Allowed Claims, as set forth in the Plan. The Debtors have made certain assumptions, as described in the notes to the Financial Projections contained in Exhibit 4 attached hereto, and which should be read carefully.

5.     <u>Allowed Claims in the Various Classes May Exceed Projections</u>

The Debtors have also projected the allowed amount of Claims in each Class in the Financial Projections. Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

J.     <u>Tax Considerations</u>

There are significant tax consequences to the Debtors and Holders of Claims and Equity Interests. These are discussed below in the section entitled "Certain U.S. Federal Income Tax Consequences of the Plan." You should consult your own tax advisor about your particular circumstances.

## XX.     BINDING EFFECT OF CONFIRMATION

A.     <u>Binding Effect of Confirmation</u>

Confirmation will legally bind the Debtors, all creditors, Equity Interest Holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Equity Interest Holder is impaired under the Plan, and whether or not such creditor or Equity Interest Holder has accepted the Plan.

B.     <u>Vesting Of Assets Free And Clear Of Liens, Claims And Interests</u>

Pursuant to Section 1141(b) of the Bankruptcy Code, all property of the respective estate of each Debtor, together with any property of each Debtor that is not property of its estate and that is not specifically disposed of pursuant to the Plan, or by order of the Bankruptcy Court, will revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Liens, Claims and Equity Interests except as specifically provided pursuant to the Plan, this Disclosure

US_ACTIVE-102769680.4

Statement, the Confirmation Order, the Restructured Credit Documents and the Investor PIK Documents.

C.    Good Faith

Confirmation of the Plan shall constitute a finding that the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code.

D.    Discharge of Claims

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against any Debtor or any of its respective assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, any Debtor shall be satisfied, discharged and released in full and all Persons and Entities shall be precluded from asserting against any Reorganized Debtor, its successor or its assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

E.    Judicial Determination of Discharge

All Holders of Claims and Equity Interests are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against the Debtors, their estates, or the Reorganized Debtors; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, or the Reorganized Debtors; and (c) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of the Debtors, their estates, or the Reorganized Debtors. The Confirmation Order shall be a judicial determination of discharge of all Claims against the Debtors pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against Debtors at any time, to the extent the judgment relates to a discharged Claim.

With respect to the matters within the scope of Article XIII of the Plan, all Persons and entities shall be and are permanently enjoined from commencing or continuing any action with respect thereto except in the Bankruptcy Court and the Bankruptcy Court shall retain exclusive jurisdiction over such matters.

## XXI.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan which is for general information purposes only and does not purport to be a complete analysis or listing of all potential tax consequences. Moreover, such summary should not be relied upon for purposes of determining the specific tax consequences of the Plan to the Debtors or with respect to a particular holder of a Claim or Equity Interest. This summary assumes that the various indebtedness and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

US_ACTIVE-102769680.4

The following summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder ("Regulations"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"), as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the holders of Claims or Equity Interests with respect to the U.S. federal income tax consequences described herein. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan. Additionally, this summary does not purport to address the U.S. income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions thrifts, small business investment companies, regulated investment companies, tax exempt organizations, certain expatriates, non-Debtor pass-through entities or investors in non-Debtor pass-through entities).

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE, FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF THE U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (2) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT; AND (3) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    Federal Tax Consequences to the Debtors.

1.    Tax Classification of the Debtors and Certain Transactions Contemplated by the Plan.

US_ACTIVE-102769680.4

TWI-Holding is classified as a partnership for U.S. federal income tax purposes and owns all of the stock of Alpha One, Beta Two, Gamma Three, Delta Four and Epsilon Five (the "Corporate Partners"). Each of the Corporate Partners are 'C' corporations for U.S. federal income tax purposes, and constitute all of the partners in Taylor-Wharton Intermediate Holdings, LLC ("TWI-Intermediate"). TWI-Intermediate is classified as a partnership for U.S. federal income tax purposes and is the issuer of the Holdco PIK Note. The sole asset of each of the Corporate Partners is its respective interest in TWI-Intermediate. TWI-Intermediate is the sole owner of TWI, a disregarded entity for U.S. federal income tax purposes. TWI is the sole owner of each of the Operating Companies. Each of the Operating Companies is a disregarded entity for U.S. federal income tax purposes.

TWI and the Operating Companies are the borrowers of the Pre-Petition Credit Facility and the Pre-Petition Subordinated Notes. Each of the Corporate Partners and TWI-Intermediate is a guarantor of the Pre-Petition Credit Facility and the Pre-Petition Subordinated Notes.

As discussed in Section IV.B above, the terms of the Credit Parties' financial restructuring provide for the investment of $12 million of new capital and the cancellation of an aggregate of approximately $128.3 million of indebtedness.

The Corporate Partners have collectively generated approximately $8 million of NOLS in the 2008 taxable year, the entire amount of which was carried forward to the 2009 taxable year. The Corporate Partners believe that they will collectively generate approximately $[52] million of additional NOLS in the 2009 taxable year. As such, the Corporate Partners believe that the cumulative amount of available NOLS at the close of the 2009 tax year, will equal approximately $[60] million. However, the amount of the Corporate Partner's 2009 NOLS will not be determined until the U.S. federal income tax return for the 2009 taxable year is prepared. Accordingly, the amount of the Corporate Partner's 2009 NOLS ultimately may vary from the estimate set forth above. As discussed below, and in connection with the implementation of the Plan, the amount of the Corporate Partners' NOLS and any other applicable Tax Attributes may be eliminated or significantly reduced.

2.      Cancellation of Indebtedness Income Generally.

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from the cancellation of indebtedness ("COD Income") to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (i) the adjusted issue price of the discharged indebtedness less (ii) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness including cash, property and the issue price of any new indebtedness. If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either Section 1273 or Section 1274 of the Tax Code. Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for adequate stated interest. A non publicly-traded debt instrument debt instrument has adequate stated interest if the interest

- 88 -

exceeds the applicable IRS federal rate.  The elimination of a guarantee should not result in the recognition of COD Income.

### 3.    Bankruptcy Exception and the Reduction of Tax Attributes Generally.

Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD Income, however, where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant to a plan approved, by a U.S. Bankruptcy Court (the "Bankruptcy Exception").  Under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) of the Tax Code, to reduce certain of that taxpayer's tax attributes to the extent thereof by the amount of COD Income.  The attributes of the taxpayer are generally reduced in the following order: net operating losses ("NOLS"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes").  If the amount of the COD Income is sufficiently large, it can eliminate these favorable Tax Attributes.  To the extent the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, such excess is excluded from income.  Pursuant to Section 108(b)(4)(A) of the Tax Code, the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized.

Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.  Unlike Section 108(b) of the Tax Code, Section 108(e)(2) does not require a reduction in the taxpayer's Tax Attributes as a result of the non-recognition of COD Income.  Thus, the effect of Section 108(e)(2) of the Tax Code, where applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and without reducing its Tax Attributes.

### 4.    Disregarded and Pass-through Entities Discharging Indebtedness Generally.

i.    Disregarded Entities.

Pursuant to Section 301.7701-2(a) of the Regulations, an entity that is treated as a disregarded entity for U.S. federal income tax purposes is treated in the same manner as a sole proprietorship, branch or division of such entity's owner.  Thus, assets and liabilities owned, or owed, by a disregarded entity should generally be treated as owned by, or liabilities of, the disregarded entity's owner.  Pursuant to Section 301.7701-1 of the Regulations, a classification as a disregarded entity applies for all U.S. federal tax purposes.  Accordingly, a discharge of a disregarded entity's indebtedness should generally be treated as the discharge of debt owed by such disregarded entity's owner.

ii.    Partnerships.

US_ACTIVE-102769680.4

COD Income realized by a partnership generally should be allocated to such partnership's partners as an item of income pursuant Section 702(b) of the Tax Code. Generally, COD Income should be allocated to a partner in accordance with the partner's allocable share of the indebtedness discharged, determined pursuant to Section 752 of the Tax Code. Pursuant to Section 108(d)(6) of the Tax Code, the exceptions described in Section 108(a) of the Tax Code (including the Bankruptcy Exception) are applied at the partner level (and not the partnership level).

As a result, the Bankruptcy Exception will be applied to the Corporate Partners with respect to COD Income realized by TWI-Intermediate (a partnership for U.S. federal income tax purposes) or TWI or any of the Operating Companies (each, a disregarded entity for U.S. federal income tax purposes and therefore a division of TWI-Intermediate) and allocated to the Corporate Partners in accordance with the Corporate Partner's respective interest in TWI-Intermediate.

     5.    <u>Debtors' COD Income Attributable to the Plan.</u>

As discussed above, any COD Income attributable to the transactions contemplated by the Plan should be allocated to the Corporate Partners in accordance with the Corporate Partner's respective interest in TWI-Intermediate. As a result of the Bankruptcy Exception, any COD Income allocated to, and realized by, the Corporate Partners will not be recognized. However, as discussed above, the Tax Attributes of the Corporate Partners will be reduced or eliminated as of the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized if COD Income is realized but not recognized on implementation of the Plan. If COD Income that may be realized on implementation of the Plan exceeds the amount of the Corporate Partners' NOLS as of the end of the year in which the plan is implemented, the Corporate Partners would not have any NOLS to carryforward to the year following the year in which the Plan is implemented. In addition, if the realized COD Income exceeds the amount of the Corporate Partners' NOLS, the Corporate Partners will be required to reduce additional Tax Attributes pursuant to Section 108(b) of the Tax Code to the extent of such excess in the manner described above.

The Debtors expect that the realized COD Income that is allocated to, and realized by, each Corporate Partner that will not be recognized by such Corporate Partner pursuant to the Bankruptcy Exception will be substantially in excess of such Corporate Partners' NOLS. Accordingly, the Debtors expect that the Corporate Partners will not have NOLS to carry forward to the year following the year in which the Plan is implemented, and will be required to reduce additional Tax Attributes pursuant to Section 108(b) of the Tax Code to the extent of such excess in the manner described above. Any such reduction may include a reduction in the tax basis of each of the Corporate Partner's interest in TWI-Intermediate.

     6.    <u>Accrued Interest.</u>

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the applicable Debtor should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the applicable Debtor

US_ACTIVE-102769680.4

has not already deducted such amount. The Corporate Partners should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code, as discussed above.

7.      Alternative Minimum Tax.

Generally, a corporation may incur alternative minimum tax liability even where NOLS carryovers and other Tax Attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  It is possible that the Corporate Partners will be liable for the alternative minimum tax.

B.      Federal Tax Consequences to the Claims and Equity Interests.

Generally, a holder of a Claim or Equity Interest should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim or Equity Interest and such holder's adjusted tax basis in the Claim or Equity Interest.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a holder's Claim or Equity Interest.  The tax basis of a holder in a Claim or Equity Interest will generally be equal to the holder's cost therefore.

To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim or Equity Interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim or Equity Interest, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim or Equity Interest.  Generally, if the Claim or Equity Interest is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim or Equity Interest for more than one year.

C.      Information Reporting and Backup Withholding.

Certain distributions and exchanges made with respect to Claims and Equity Interests pursuant to the Plan may be subject to information reporting by the relevant Debtor-payor to the IRS.  Moreover, such reportable distributions and exchanges may be subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL

US_ACTIVE-102769680.4

AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XXII. ALTERNATIVES TO THE PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) the conversion to a Chapter 7 case and accompanying liquidation of the Debtors' assets on a "forced sale" basis; (b) dismissal of the case(s); or (c) an alternative plan of reorganization.

A. <u>Liquidation Under Chapter 7</u>

If no plan can be confirmed, the Chapter 11 cases may be converted to Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that confirmation of the Plan will provide each Holder of an Unsecured Claim entitled to receive a distribution under the Plan with a recovery that is expected to be substantially more than it would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

B. <u>Dismissal</u>

Dismissal of the Chapter 11 Case(s) would leave the secured creditors in a position to exercise their state law rights under their existing securities interest, including foreclosure of such liens. The Debtors believe that in a dismissal scenario the unsecured creditors would not receive any distribution.

C. <u>Alternative Plan</u>

The Debtors believe that any alternative plan would not result in as favorable treatment of Claims as proposed under the Plan.

## XXIII. DEFINITIONS AND INTERPRETATION

A. <u>Scope of Definitions</u>. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires defined terms shall include the plural as well as the singular and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and neutral.

B. <u>Definitions</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article I of the Plan:

**"Administrative Expense Claim"** means a Claim for payment of an administrative expense of a kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, other than a Priority Tax Claim, a DIP Facility Claim or Other Priority Claim.

- 92 -

US_ACTIVE-102769680.4

**"Allowed"** means, with respect to any Claim or Equity Interest, except as otherwise provided herein, any of the following: (a) the amount set forth on the Debtors' books and records, that is not otherwise the subject of a pending objection or dispute; (b) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which (i) the Debtors or any other party in interest have not filed an objection and (ii) no contrary Proof of Claim has been filed; (c) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation with the Debtors of the amount and nature of such Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with the Debtors of the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (f) a Claim or Equity Interest that is allowed pursuant to the terms of the Plan.

**"Allowed Interest Rate"** means, with respect to Pre-Petition Secured Loans, all accrued interest thereon at the applicable non-default contract rate (including LIBOR pricing options available in accordance with the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement.

**"Amended Bylaws"** means the amended and restated bylaws or operating agreement, as appropriate, of each of the Reorganized Debtors other than TWI-Holding in the form attached as Exhibit 4 to the Plan.

**"Amended Certificate"** means the amended and restated certificate of incorporation or organization or formation of each of the Reorganized Debtors, as appropriate, in the form attached as Exhibit 5 to the Plan.

**"AWT"** has the meaning given to such term in Section III.A.1.iii of this Disclosure Statement.

**"Bankruptcy Code"** means Title 11 of the United States Code, as amended from time to time, as applicable to the Debtors' Reorganization Cases.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Debtors' Reorganization Cases.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Debtors' Reorganization Cases, and any Local Rules of the Bankruptcy Court, as applicable to the Debtors' Reorganization Cases.

**"Board"** has the meaning given to such term in Section III.A.4.i of this Disclosure Statement.

US_ACTIVE-102769680.4

**"Business Day"** means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in New York, NY are required or authorized to close by law or executive order.

**"Cash"** means legal tender of the United States of America and cash equivalents, including but not limited to bank deposits, checks and other similar items.

**"Causes of Action"** means, without limitation, any and all claims, causes of action, demands, rights, actions, suits, damages, injuries, remedies, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses and franchises of any kind or character whatsoever, known, unknown, accrued or to accrue, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or under any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise.

**"Claim"** has the meaning set forth in Section 101(5) of the Bankruptcy Code.

**"Claims Bar Date"** means _____, 2010.

**"Claims Objection Bar Date"** means the bar date for objecting to proofs of claim, which date shall be set by order of the Bankruptcy Court, provided that the Debtors and/or the Reorganized Debtors may seek additional extensions of this date from the Bankruptcy Court.

**"Class"** means a group of substantially similar Claims or Equity Interests classified by the Plan pursuant to Section 1122(a)(1) of the Bankruptcy Code.

**"Class 6 Recovery"** means $100,000 in Cash to be set aside by the Debtors for the payment of the aggregate of Allowed Class 6 Claims.

**"COD Income"** has the meaning given to such term in Section XXI.1.b of this Disclosure Statement.

**"Collateral"** means any property or interest in property of the estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**"Confirmation Date"** means that date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Debtors' Reorganization Cases.

**"Confirmation Hearing"** has the meaning given to such term in Section II B of this Disclosure Statement.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

US_ACTIVE-102769680.4

**"Corporate Partner"** has the meaning given to such term in Section XXI.1.A of this Disclosure Statement.

**"Credit Parties"** means a subset of the Debtors that includes: Taylor-Wharton International LLC, Taylor-Wharton Intermediate Holdings LLC, Alpha One Inc., Beta Two Inc., Gamma Three Inc., Delta Four Inc., Epsilon Five Inc., TW Cryogenics LLC, TW Cylinders LLC. Sherwood Valve LLC, American Welding & Tank LLC and TW Express LLC.

**"Cryogenics"** has the meaning given to such term in Section III.A.i of this Disclosure Statement.

**"Cure Payment"** means payment on an Allowed Claim arising in connection with the Debtors' obligation under Section 365(b)(1)(A) or (B) of the Bankruptcy Code relating to an assumed executory contract.

**"Debtors"** means TWI and its affiliated debtors.

**"Debtors' Reorganization Cases"** means the Chapter 11 cases commenced by the Debtors in the Bankruptcy Court.

**"DIP Agent"** means GECC, in its capacity as administrative agent under the DIP Facility.

**"DIP Event of Default"** shall have the meaning ascribed to the term "Event of Default" in the DIP Facility.

**"DIP Facility"** means the Senior Secured Priming and Superpriority Debtor-In-Possession Revolving Credit Agreement (as amended, supplemented or otherwise modified from time to time) to be entered into by and among the Debtors, GECC as the issuing bank and administrative agent, and the financial institutions from time to time parties thereto, in the form attached as Exhibit 12 to the Plan.

**"DIP Facility Claim"** means any Claim against any of the Debtors arising under, in connection with, or related to, the DIP Facility or the DIP Order, including all principal, interest, fees, expenses and other amounts payable thereon.

**"DIP Lenders"** means, collectively, the financial institutions from time to time party to the DIP Facility as "Lenders" thereunder, including any predecessors or successors and assigns, in each case, in their respective capacities as such.

**"DIP Letter of Credit"** means any letter of credit issued pursuant to the DIP Facility.

**"DIP Obligations"** means any "Obligations" (as defined in the DIP Facility), including credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by GECC or its affiliates.

**"DIP Order"** means any interim order or final order approving the DIP Facility.

US_ACTIVE-102769680.4

**"DIP Roll-Up Loan"** means that portion of the DIP Facility consisting of a debtor-in-possession term loan into which the Pre-Petition Secured Term Loan Claims and Pre-Petition Secured Revolving Loan Claims (other than Pre-Petition Secured Revolving Loan Claims in respect of the Pre-Petition Letters of Credit) were rolled up in full pursuant to the DIP Order.

**"DIP Roll-Up Loan Claim"** means a Claim arising under the DIP Facility in respect of the DIP Roll-Up Loan.

**"Disbursing Agent"** means any entity (including any Debtor) that acts in the capacity as a Disbursing Agent under the Plan.

**"Disclosure Statement"** means the disclosure statement filed in connection with the Plan, including without limitation, all exhibits and schedules thereto.

**"Disputed Claim or Equity Interest"** means a Claim or Equity Interest, or any portion thereof: (a) listed on the Schedules, as unliquidated, disputed or contingent; (b) that is the subject of an objection or request for estimation filed or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (c) that is in excess of the amount scheduled as other than disputed, contingent or unliquidated or (d) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by Final Order.

**"Distribution Record Date"** means the record date for purposes of making any distribution under the Plan on account of Allowed Claims and Equity Interests, which shall be the Confirmation Date or other such date prior to the Effective Date as may be designated in the Confirmation Order.

**"Effective Date"** means the first Business Day on or after the Confirmation Date on which all the conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the provisions of the Plan.

**"Employees"** has the meaning given to such term in Section III.A of this Disclosure Statement.

**"Equity Interest"** means any equity interest in any of the Debtors, including, but not limited to, all issued, unissued, authorized or outstanding limited liability company interests, membership interests, units, shares or stock (including common stock or preferred stock), together with any warrants, options or contract rights to purchase or acquire such interest at any time.

**"Existing Equity"** means, as applicable, the stock, membership interests or limited liability company interest of the Debtors in existence on the Petition Date.

**"Existing Equity Interests"** means (i) the Existing Equity, (ii) securities convertible into or exchangeable for the Existing Equity and (iii) options, warrants or other rights to acquire the Existing Equity.

US_ACTIVE-102769680.4

**"Existing Senior Loan Agreements"** means the Pre-Petition Credit Agreement, the Pre-Petition Lenders Security Agreement, all other Pre-Petition Security Documents, all other Loan Documents (as defined in the Pre-Petition Credit Agreement), and all other documentation executed in connection with any of the foregoing, as such documents may have been amended, supplemented or otherwise modified.

**"Exit Credit Documents"** means the Restructured Credit Agreement, the Intercreditor Agreement, and Guaranty and Security Agreement, together with the exhibits, schedules and annexes attached thereto, in the forms attached as Exhibit 11 to the Plan (or in the case of the Intercreditor Agreement in the form attached as Exhibit 6 to the Plan) or otherwise in form and substance satisfactory to (i) the Debtors, (ii) the Requisite Supporting Revolving Lenders, (iii) the Requisite Supporting Term Lenders and (iv) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders.

**"Final Order"** means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Debtors' Reorganization Cases or the docket of such other court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

**"GAAP"** has the meaning given to such term in Section XVIII.A of this Disclosure Statement.

**"GECC"** means General Electric Capital Corporation.

**"General Unsecured Claim"** means any Claim against any of the Debtors that is not an Administrative Expense Claim, an Other Priority Claim, a Priority Tax Claim, a Pre-Petition Secured Revolver Claim, a Pre-Petition Secured Term Loan Claim, a DIP Facility Claim, an Other Secured Claim, a Holdco PIK Note Claim, or a Pre-Petition Subordinated Note Claim.

**"Harsco"** means Harsco Corporation.

**"Holdco PIK Note"** means the note issued by Taylor-Wharton Intermediate Holdings LLC, dated as of December 7, 2007, as amended, supplemented, or otherwise modified.

**"Holdco PIK Note Claim"** means any Claim held by a holder of an interest in the Holdco PIK Note and all interest, fees, and other charges thereon or related thereto. The Holdco

US_ACTIVE-102769680.4

PIK Note Claims shall include all Claims in respect of, in connection with or related to obligations related to the Holdco PIK Note.

**"Indemnification Obligations"** shall have the meaning set forth in Section 5.7 of the Plan.

"**Insurance Company**" means Ace American Insurance Company.

**"Insurance Policy"** means any liability insurance policy or other insurance policy that was issued to a Debtor or Debtors or under which the Debtor(s) has or claims a right to insurance coverage.

**"Insurance Security"** means the collateral held by the Insurance Company securing, in whole or in part, obligations of the Debtors to the Insurance Company, consisting of a $7,034,188 letter of credit provided by Wachovia Bank, N.A., for the benefit of the Insurance Company.

**"Insurer"** means any insurance company or insurance carrier that issued an Insurance Policy.

**"Intercompany Claim"** means any Claim held by a Debtor against another Debtor, including without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor. For the avoidance of doubt, the term Intercompany Claim does not include any Claim held by any foreign Subsidiaries against the Debtors or any Claim held by the Debtors against any foreign Subsidiaries.

**"Intercreditor Agreement"** means the Subordination and Intercreditor Agreement in the form attached as Exhibit 6 to the Plan.

**"Investor PIK Documents"** means the Investor PIK Notes, the Note Purchase Agreement, and any and all other documents in connection therewith.

**"Investor PIK Notes"** shall have the definition set forth in Section 4.13.2 of this Disclosure Statement.

**"Investor PIK Note Purchasers"** shall mean Wind Point Partners VI, L.P., Wind Point VI Executive Advisor Partners, L.P., Audax Mezzanine Fund II, L.P., Audax Trust Co-Invest, L.P., Audax Co-Invest, L.P., Partners Group Access 55, L.P., Carlyle Mezzanine Partners, L.P., and all other Purchasers under the Note Purchase Agreement.

**"IRS"** means the United States Internal Revenue Service.

**"Lien"** has the meaning set forth in Section 101(37) of the Bankruptcy Code.

**"New Equity"** means, as applicable, the new stock, new membership interests or new limited liability company interests of each of the Reorganized Debtors.

US_ACTIVE-102769680.4

**"New TWI-Holding Equity"** means the limited liability company interests of Reorganized TWI-Holding.

**"NOL"** has the meaning given to such term in Section XXI.I.C of this Disclosure Statement.

**"Nominee"** has the meaning given to such term in Section I.C of this Disclosure Statement.

**"Note Purchase Agreement"** means the Note Purchase Agreement, together with all exhibits, schedules and annexes thereto, in the form attached as Exhibit 8 to the Plan.

**"Objection Deadline"** means the date and time to be set forth in an order of the Bankruptcy Court by which a creditor or interest holder or other party in interest must file an objection to confirmation of the Plan.

**"Operating Agreement"** means the operating agreement, to be dated as of the Effective Date, among Reorganized TWI-Holding and each of the persons receiving any portion of the New TWI-Holding Equity on or after the Effective Date, substantially in the form attached as Exhibit 7 to the Plan.

**"Operating Company"** has the meaning given to such term in Section III.A of this Disclosure Statement.

**"Other Existing Equity Interests"** means any options, warrants or rights, contractual or otherwise, to acquire any Equity Interest in TWI.

**"Other Priority Claim"** means any Claim (other than an Administrative Expense Claim, Priority Tax Claim, or DIP Facility Claim) entitled to priority of payment under Section 507(a) of the Bankruptcy Code.

**"Other Secured Claim"** means a Secured Claim other than a DIP Facility Claim, a Pre-Petition Secured Revolver Claim, a Pre-Petition Secured Term Loan Claim, or a Pre-Petition Subordinated Note Claim.

**"PBGC"** means the Pension Benefit Guaranty Corporation.

**"Pension Plans"** means the Debtors' defined benefits plans together with the Debtors' multi-employer plan.

**"Person"** means an individual, partnership, corporation, business trust, estate, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or any government, governmental agency or any subdivision, department or other instrumentality thereof.

**"Petition Date"** means the date on which the Debtors filed voluntary petitions with the Bankruptcy Court commencing the Debtors' Reorganization Cases.

**"PIK"** means 'payment in kind'.

**"Plan"** means the joint Chapter 11 plan of the Debtors, including all exhibits, supplements, appendices and schedules thereto, either in its or their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan.

**"Plan Documents"** means the agreements, instruments and documents to be executed, delivered and/or performed in conjunction with the consummation of the Plan, including without limitation, (a) the Plan, (b) the Plan Supplement, (c) the Amended Certificates, (d) the Amended Bylaws, (e) the Restructured Credit Documents, (f) the Operating Agreement and (g) the Investor PIK Documents.

**"Plan Supplement"** means the compilation of documents that the Debtors shall file with the Bankruptcy Court in support of the Plan on or before the date that is five days prior to the Confirmation Hearing.

**"Potentially Insured Claim"** means a Claim against a Debtor or Debtors that was or could have been asserted in, and is therefore subject to discharge in, the Debtors' Reorganization Cases and that is alleged to be covered, in whole or in part, by an Insurance Policy. "Potentially Insured Claims" are within the class of General Unsecured Claims. Claims for workers' compensation benefits are not included in the term "Potentially Insured Claims."

**"Pre-Petition Agent"** means GECC, in its capacity as administrative agent under the Pre-Petition Credit Agreement.

**"Pre-Petition Credit Agreement"** means that certain Amended and Restated Credit Agreement, dated as of December 7, 2007, by and among TWI and the other Borrowers thereto, the Pre-Petition Revolver Lenders, the Pre-Petition Term Lenders, and the Pre-Petition Agent, as amended, supplemented or otherwise modified.

**"Pre-Petition Credit Agreement Secured Parties"** means the Pre-Petition Secured Lenders and the other "Secured Parties" (as defined in the Pre-Petition Credit Agreement) and their respective successors and assigns, in each case, in their respective capacities as such.

**"Pre-Petition Letter of Credit"** means any letter of credit issued pursuant to the Pre-Petition Credit Agreement.

**"Pre-Petition Obligations"** means the "Obligations" as defined in the Pre-Petition Credit Agreement.

**"Pre-Petition Revolver Lenders"** means the Lenders making one or more Pre-Petition Revolving Loans, including any Swingline Lenders and any L/C Issuers (each as defined in the Pre-Petition Credit Agreement), and their respective successors and assigns, in each case in their respective capacities as such.

**"Pre-Petition Revolving Loans"** means the "Revolving Loans" as defined in the Pre-Petition Credit Agreement, including the Swing Loans (as defined in the Pre-Petition Credit

US_ACTIVE-102769680.4

Agreement) made pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Letters of Credit issued, under the Pre-Petition Credit Agreement, and all other Pre-Petition Obligations other than the Pre-Petition Term Loans and accrued interest in respect thereof.

**"Pre-Petition Lenders Security Agreement"** means the Guaranty and Security Agreement, dated as of December 7, 2007, among TWI, certain affiliates of TWI, and the Pre-Petition Agent for the benefit of the Pre-Petition Secured Lenders, as amended, supplemented or otherwise modified.

**"Pre-Petition Secured Lenders"** means, collectively, the Pre-Petition Revolver Lenders, the Pre-Petition Term Lenders, and the Secured Swap Providers under the Pre-Petition Credit Agreement, and the respective successors and assigns of each of the foregoing, in each case in their respective capacities as such.

**"Pre-Petition Secured Loans"** means, collectively, the Pre-Petition Revolving Loans and the Pre-Petition Term Loans.

**"Pre-Petition Secured Revolver Claims"** means the Claims of the Pre-Petition Revolver Lenders and the Pre-Petition Agent in respect of Revolving Loans made or incurred pursuant to the Pre-Petition Credit Agreement, and all interest, fees and other charges thereon or related thereto. The Pre-Petition Secured Revolver Claims shall include all Claims in respect of, in connection with or related to Pre-Petition Obligations other than the Pre-Petition Obligations in respect of the Pre-Petition Term Loans.

**"Pre-Petition Secured Term Loan Claims"** means the Claims of the Pre-Petition Term Lenders and the Pre-Petition Agent in respect of Term Loans made pursuant to the Pre-Petition Credit Agreement, and all interest, fees and other charges thereon or related thereto. The Pre-Petition Secured Term Loan Claims shall include all Claims in respect of, in connection with or related to Pre-Petition Obligations related to Pre-Petition Term Loans.

**"Pre-Petition Security Documents"** means the Pre-Petition Lenders Security Agreement and all related documents granting security for any or all of the Pre-Petition Obligations, and all ancillary documents, in each case, as the same may be amended, supplemented, or otherwise modified.

**"Pre-Petition Subordinated Notes"** means the notes issued pursuant to the Note Purchase Agreement, dated December 7, 2007, by and among TWI and certain of its affiliates, as Borrowers, and other parties thereto as Credit Parties and Purchasers, as amended, supplemented, or otherwise modified.

**"Pre-Petition Subordinated Note Claim"** means any Claim held by a holder of an interest in the Pre-Petition Subordinated Notes and all interest, fees and other charges thereon or related thereto. The Pre-Petition Subordinated Note Claims shall include all Claims in respect of, in connection with or related to obligations related to the Pre-Petition Subordinated Notes.

**"Pre-Petition Subordinated Noteholders"** means the "Purchasers," as defined in the Pre-Petition Subordinated Notes, and their respective successors and assigns, in each case in their respective capacities as such.

US_ACTIVE-102769680.4

**"Pre-Petition Term Lenders"** means the Lenders making one or more Pre-Petition Term Loans, and their successors and assigns, in each case, in their respective capacities as such.

**"Pre-Petition Term Loans"** means the "Term Loans" as defined in the Pre-Petition Credit Agreement.

**"Priority Tax Claim"** means any Claim of a governmental unit of the kind entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code, including a Secured Tax Claim.

**"Professional Fee Claims"** means any Claim of a professional person retained or otherwise entitled to be paid pursuant to Sections 327, 503(b) or 1103 of the Bankruptcy Code, for compensation, indemnification or reimbursement of costs and expenses relating to services performed on and after the Petition Date through and including the Effective Date.

**"Proof of Claim"** means any proof of claim that is filed by a holder of a Claim.

**"Pro Rata"** means (a) with respect to an Allowed Claim in any Class, the ratio of (i) the amount of such Allowed Claim to (ii) the aggregate amount of all Allowed Claims in such Class and (b) with respect to an Allowed Equity Interest in any Class, the ratio of (i) the shares or units of such Equity Interest to (ii) the aggregate number of shares or units of all Equity Interests in such Class.

**"Regulations"** has the meaning given to such term in Article XXI of this Disclosure Statement.

**"Reinstate"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the holder of such Claim.

**"Related Persons"** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective present and former members, partners, equity-holders, officers, directors, managers, employees, representatives, advisors (whether engaged prior to or subsequent to the Petition Date), attorneys (whether engaged prior to, on or subsequent to the Petition Date), agents and professionals, acting in such capacity, and any Person claiming by or through any of them; provided, however, that no insurers of the Debtors, including without limitation, any Insurance Carrier, shall constitute a Related Person.

**"Released Actions"** means all claims, cross-claims, counterclaims, third-party claims, obligations, suits, judgments, damages, debts, rights, causes of action and liabilities, and all Equity Interests and rights of any equity security holder, whatsoever, whether liquidated or

US_ACTIVE-102769680.4

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, facts, transaction, event or other circumstance that occurred, arose, took place, existed or exists on or prior to the Effective Date in connection with or related to the Debtors and their respective estates, or their business operations (including without limitation, the organization or capitalization of the Debtors or extensions of credit and other financial services and accommodations made or not made to the Debtors), the Reorganized Debtors and their respective estates (including without limitation, any and all alter ego or derivative claims accruing to the Debtors and their estates), or the Debtors' Reorganization Cases; provided, however, that the term "Released Actions" shall not include any claims of the Pre-Petition Secured Lenders under any of the Existing Senior Loan Agreements, if applicable, as amended or amended and restated by the Restructured Credit Documents or any claims of any person or entity under the Plan or the Plan Documents.

"**Released Parties**" means (i) the Debtors, (ii) the Pre-Petition Agent, the Pre-Petition Credit Agreement Secured Parties, the DIP Agent, the DIP Lenders, the Pre-Petition Subordinated Noteholders, and the Investor PIK Note Purchasers, in each case, solely in their respective capacities as such, and (iii) the respective Related Persons of each of the foregoing persons and entities referenced in clauses (i) and (ii) above.

"**Reorganized TWI**" means TWI from and after the Effective Date or a newly created corporation to which all of the assets or the equity of TWI shall be transferred on the Effective Date.

"**Reorganized TWI-Holding**" means TWI-Holding from and after the Effective Date or a newly created corporation to which all of the assets or the equity of TWI-Holding shall be transferred on the Effective Date.

"**Reorganized Debtors**" means the Debtors from and after the Effective Date, or the newly created corporations to which all the assets or equity of the Debtors shall be transferred on the Effective Date.

"**Reorganized Affiliates**" means the Reorganized Debtors, other than Reorganized TWI-Holding.

"**Requisite Supporting Noteholders**" means one or more Pre-Petition Subordinated Noteholders holding at least two-thirds in amount and more than one-half in number of all Pre-Petition Subordinated Note Claims.

"**Requisite Supporting Revolving Lenders**" means one or more Pre-Petition Revolver Lenders holding at least two-thirds in amount and more than one-half in number of all Pre-Petition Secured Revolver Claims.

"**Requisite Supporting Term Lenders**" means one or more Pre-Petition Term Lenders holding at least two-thirds in amount and more than one-half in number of all Pre-Petition Secured Term Loan Claims.

US_ACTIVE-102769680.4

**"Restructured Credit Agreement"** means an Amended and Restated Credit Agreement, in the form attached as Exhibit 2 to the Plan or otherwise in form and substance satisfactory to the Debtors, the Pre-Petition Agent, the Requisite Supporting Revolving Lenders, the Requisite Supporting Term Lenders and, to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders.

**"Restructured Credit Documents"** means the Restructured Credit Agreement and the Intercreditor Agreement and any and all other "Loan Documents" as defined in the Restructured Credit Agreement. For avoidance of doubt, the term "Restructured Credit Documents" shall include the Pre-Petition Credit Agreement, as amended and restated by the Restructured Credit Agreement, and the Pre-Petition Security Documents, if applicable, as amended or amended and restated by Loan Documents executed in connection with the Restructured Credit Agreement.

**"Restructuring Support Agreement"** means the Restructuring Lock-Up Agreement dated as of November 18, 2009, a copy of which is attached as Exhibit 10 to the Plan, and a copy of which also has been filed with Court as D.I. 24. The Restructuring Support Agreement and each of the Exhibits thereto is hereby incorporated by reference into this Disclosure Statement

**"Schedules"** means the schedules of assets and liabilities, the list of holders of Equity Interests and the statement of financial affairs, as amended, to be filed by the Debtors, on the first day of the Debtors' Reorganization Cases or as soon thereafter as practicable under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

**"Secured Claim"** means any Claim secured by a Lien on Collateral, which is not void or voidable under the Bankruptcy Code or any other applicable law, to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under Section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**"Secured Tax Claim"** means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under Section 507(a)(8) of the Bankruptcy Code.

**"Sherwood"** has the meaning given to such term in Section III.A.1 ii of this Disclosure Statement.

**"Solicitation Agent"** means The Garden City Group, Inc.

**"Tax Attributes"** has the meaning given to such term in XXI.1.C of this Disclosure Statement.

**"Tax Code"** has the meaning given to such term in Section XXI of this Disclosure Statement.

**"TW Express"** has the meaning given to such term in Section III.A.1 iv of this Disclosure Statement.

**"TWI"** means Taylor-Wharton International LLC, a Delaware limited liability company.

US_ACTIVE-102769680.4

**"TWI-Holding"** means TWI-Holding LLC.

**"TWI Intermediate"** has the meaning given to such term in Section XXI.1.A of this Disclosure Statement.

**"Voting Deadline"** has the meaning given to such term in Section I.C of this Disclosure Statement.

**"Voting Record Date"** has the meaning given to such term in Section II.A of this Disclosure Statement.

## C.     Rules of Interpretation.

1.     In the event of an inconsistency, the provisions of the Plan shall control over the contents of this Disclosure Statement.  In the event of any conflict between the terms and provisions of the Plan and the terms and provisions in the Restructured Credit Documents, the Operating Agreement or the Investor PIK Documents, the terms and provisions of the Restructured Credit Documents, the Operating Agreement or the Investor PIK Documents, as applicable, shall control and govern.  The provisions of the Confirmation Order shall control over the contents of the Plan and all Plan Documents.

2.     For the purposes of the Plan:

(a)     any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; provided, however, that any change to such form, terms or conditions that is material to a party to such document shall require the consent of (i) the Requisite Supporting Revolving Lenders, (ii) the Requisite Supporting Term Lenders and (iii) to the extent required in the Restructuring Support Agreement, the Requisite Supporting Noteholders;

(b)     any reference in the Plan to an existing document, exhibit or schedule filed or to be filed means such document, exhibit or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)     unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to Sections, Articles, Exhibits and Schedules of or to the Plan, as the same they be amended, waived, supplemented or modified from time to time;

(d)     the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)     captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

US_ACTIVE-102769680.4

(f)     the rules of construction set forth in Bankruptcy Code Section 102 shall apply, except to the extent inconsistent with the provisions of Article I of the Plan; and

(g)     the word "including" means "including without limitation."

3.      Except with respect to claims required to be paid pursuant to Section VII.A or XIV.B.c of this Disclosure Statement or Section 10.2(g) of the Plan (which shall be paid when due), whenever a distribution of property is required to be made on a particular date, the distribution shall be made on such date or as soon as promptly as practicable thereafter.

4.      All Exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are filed.

5.      Subject to the provisions of any contract, certificate, bylaws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

6.      The Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Pre-Petition Agent for the Pre-Petition Secured Lenders, holders of the Pre-Petition Subordinated Notes, and certain other creditors and constituencies. Each of the foregoing was represented by counsel who either (a) participated in the formulation and documentation of or (b) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" shall not apply to the construction or interpretation of any provision of the Plan, the Disclosure Statement, any of the Plan Documents, or any contract, instrument, release, indenture, or other agreement or document generated in connection herewith.

## XXIV. CONCLUSION

The Debtors believe that the Plan maximizes recoveries to all creditors and, thus, is in their best interests. The Plan as structured, among other things, allows creditors to participate in distributions in excess of those that would be available if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to all creditors.

**THE DEBTORS THEREFORE URGE CREDITORS TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR PROPERLY COMPLETED BALLOT(S) SO THAT THEY WILL BE ACTUALLY RECEIVED, AS INSTRUCTED ABOVE, BY THE SOLICITATION AGENT PRIOR TO THE VOTING DEADLINE.**

/s/ _____

US_ACTIVE-102769680.4