## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TAYLOR-WHARTON INTERNATIONAL LLC[1], et al., | Case No. 09-14089 (BLS) Jointly Administered |
| Debtors. | *Requested* Hearing Date: May 12, 2010 at 11:00 a.m. *Requested* Objection Deadline: May 7, 2010 |

**MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363, 365 AND FED. R. BANKR. P. 2002, 6004, 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF THE DEBTORS' CYLINDERS BUSINESS AND RELATED ACQUIRED ASSETS; (B) APPROVING BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF THE DEBTORS' ACQUIRED ASSETS; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS; (E) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS; AND (F) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' CYLINDERS BUSINESS AND RELATED ACQUIRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") hereby move (this "<u>Motion</u>") this Court for entry of an order (the "<u>Bidding Procedures Order</u>") (A) establishing bidding and auction procedures (the "<u>Bidding Procedures</u>") in connection with the sale of the Debtors' cylinders business and related purchased property (as defined in greater detail below, the "<u>Acquired Assets</u>"), free and clear of all claims (as defined in section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Taylor-Wharton International LLC (1577); TWI-Holding LLC (8154); Taylor-Wharton Intermediate Holdings LLC (6890); Alpha One Inc. (1392); Beta Two Inc. (1408); Gamma Three Inc. (1367); Delta Four Inc. (1320); Epsilon Five Inc. (1344); TW Cryogenics LLC (1713); TW Cylinders LLC (1665); Sherwood Valve LLC (1781); American Welding & Tank LLC (1945); and TW Express LLC (6414). Each of the Debtors has a principal place of business at 4817 Old Gettysburg Road, Mechanicsburg, Pennsylvania 17055.

US_ACTIVE-102822801.5

"Interests"), except to the extent identified in a Successful Bidder's (defined below) Purchase Agreement; (B) approving the proposed bid protections to Norris Cylinder Company ("Purchaser") in accordance with that certain Asset Purchase Agreement dated April 30, 2010, (the "Purchase Agreement") for the purchase of the Acquired Assets; (C) scheduling an auction (the "Auction") and setting a date and time for a sale hearing (the "Sale Hearing") for the sale of the Acquired Assets[2]; (D) establishing procedures for noticing and determining cure amounts (the "Assumption and Assignment Procedures"); (E) approving the form and manner of notice of all procedures, protections, schedules and agreements; and (F) granting certain related relief. The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter one or more orders (each a "Sale Order") (A) approving and authorizing the sale of the Acquired Assets (the "Sale"), free and clear of all Interests, except to the extent set forth in a Successful Bidder's Purchase Agreement; and (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases. In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## I.    **JURISDICTION AND VENUE**

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and sections 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[2]   Capitalized terms not herein defined are defined in the Purchase Agreement.

## II.    <u>FACTUAL BACKGROUND</u>

3.      On November 18, 2009 (the "<u>Petition Date</u>"), the Debtors filed Voluntary Petitions for relief under chapter 11 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in these Cases and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no official committee of unsecured creditors has been appointed in the above-captioned bankruptcy cases (these "<u>Cases</u>").

4.      TWI is a Delaware limited liability holding company that owns and operates five related businesses, each of which is engaged in specific manufacturing operations in the field of gas services and technology. One of those businesses is owned by TWI Cylinders LLC, which operates in Harrisburg, Pennsylvania and Huntsville, Alabama and is engaged in the manufacturing of high and low pressure gas cylinders ("<u>TWI Cylinders</u>").

5.      The Debtors diligently evaluated a number of options to address their financial issues. Those efforts included sharing information with and engaging in discussions with a variety of the Debtors' stakeholders with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities. These discussions resulted in an agreement on the terms of a financial restructuring between the Debtors and the holders of all of their funded debt and a majority of their equity interests.

6.      The terms of the Debtors' restructuring have been documented in a Restructuring Lock-Up Agreement between the Debtors and the holders of all of the Senior Debt and Mezzanine Debt (the "<u>Lock-Up Agreement</u>"), which was filed with the Court on November 19, 2009 [D.I. 24]. The Lock-Up Agreement provides that the parties have agreed to and will support the Debtors' proposed Plan of Reorganization, which was filed with the Court on December 4, 2009 [D.I. 77]. In furtherance of this restructuring, the Debtors have agreed,

subject to this Court's approval, to sell substantially all of the assets of TWI Cylinders as provided herein.

## III.  SUMMARY OF THE SALE PROCESS

### A.  The Debtors' Marketing and Sales Efforts

7.    The Debtors extensively marketed the Acquired Assets beginning in August 2009. As part of this process, the Debtors' agent contacted numerous parties who were likely to be interested in the Acquired Assets for strategic or financial purposes.  This process included distribution of a 10 page marketing package and resulted in indications of interest by at least eight parties, some of whom were engaged in businesses related to that of TWI Cylinders.  The Debtors' bankruptcy cases and the fact that the Acquired Assets were for sale was also general knowledge in that industry.  Upon execution of a confidentiality agreement, each interested party was given access to a data room established by the Debtors to facilitate due diligence.  In addition to the Purchaser, there remain two or three other parties who potentially may be interested in purchasing all or some of the Acquired Assets.

8.    The Debtors have proposed the following timeline for the Sale of the Acquired Assets:[3]

- Bid Procedures Hearing:  Not later than May 12, 2010

- Submission Deadline for Qualified Bids (defined below):  Not later than June 1, 2010 at 5:00 p.m. (EST)

- Auction (if an Auction is to be held):  Not later than June 3, 2010

- Proposed Sale Hearing:  Not later than June 7, 2010

---

[3]    The Debtors, in the exercise of their business judgment, reserve their right to change these sale-related dates in order to achieve the maximum value for the Acquired Assets.

### B. **Summary of the Stalking Horse Purchase Agreement**

9.      Purchaser and the Debtors have entered into a Purchase Agreement, subject to the process set forth in this Motion.  A copy of the Purchase Agreement among Purchaser and the Debtors is attached hereto and marked as "**Exhibit A**".  A summary of the principal terms of the Purchase Agreement is as follows:[4]

#### Purchase Price

- _Cash Purchase Price:_  $11,000,000, subject to adjustment as set forth in Section 2.4 of the Purchase Agreement.

- _Assignment and Assumption of Certain Liabilities._  Subject to the terms and conditions set forth in the Purchase Agreement, Purchaser shall assume from the Debtors and thereafter be responsible for the payment, performance or discharge of the following Liabilities and obligations of the Debtors:

  (a)      all Liabilities to be performed under the Sold Contracts after the Closing Date (but not (A) any Liability thereunder arising out of or in connection with any breach of any such Sold Contract occurring on or prior to the Closing Date or (B) any Liability relating to any product sold by the Business, the Seller or any Affiliate of the Seller on or prior to the Closing Date);

  (b)      all Liabilities of the Seller with respect to the Huntsville Business for accounts payable and other current liabilities incurred in the ordinary course of business but only to the extent included in the Final Net Working Capital;

  (c)      all Liabilities arising out of or relating to accidents, occurrences and other incidents (including all Proceedings relating thereto) occurring after the Closing that result in (A) personal injury, (B) property damage or (C) any other Losses but only to the extent, in each case, such Liabilities result from, are caused by or arise out of, or are alleged to have resulted from, been caused by or arisen out of, directly or indirectly, use of, exposure to or otherwise on account of, any Product that is both (x) manufactured by Seller or any of its Affiliates at the Seller Owned Real Property prior to the Closing Date and (y) sold, shipped or distributed by

---

[4]     The following summary is qualified in its entirety by reference to the provisions of the Purchase Agreement.  In the event of any inconsistencies between the provisions of the Purchase Agreement and the terms herein, the terms of the Purchase Agreement shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Purchase Agreement.

or on behalf of Buyer or any of its Affiliates on or after the Closing Date; and

(d)     all Liabilities relating to recalls, product liability claims or warranty claims with respect to any Product that is both (A) manufactured by Seller or any of its Affiliates at the Seller Owned Real Property prior to the Closing Date and (B) sold, shipped or distributed by or on behalf of the Buyer or any of its Affiliates on or after the Closing Date.

- Acquired Assets:  The Harrisburg Assets and all properties, assets and rights used in or held for use by Seller in connection with, or related to the Huntsville Business, or arising out of the Huntsville Business, or located at the Seller Owned Real Property as more fully described in Section 2.1 of the Purchase Agreement.

- Termination to Pursue Higher or Better Offer.  The Debtors may, upon paying Purchaser a break-up fee of $352,500 (the "Break-Up Fee"), terminate the Purchase Agreement to consummate an Alternate Transaction entered into in accordance with the Bidding Procedures Order.

  Alternatively, if the Purchase Agreement is terminated pursuant to Section 8.1(b), 8.1(e), 8.1(g) or 8.1(h), then the Debtors shall pay the Purchaser an amount equal to the actual costs and expenses reasonably incurred by the Purchaser in connection with the negotiation, execution and performance of the Purchase Agreement, provided that such amount shall in no event exceed $250,000 (the "Expense Reimbursement")

- Excluded Liabilities.  Purchaser shall not assume those liabilities set forth in Section 2.3(b) of the Purchase Agreement.

- Relief from Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), the Sale Order shall be effective immediately upon entry and the Debtors and Purchaser are authorized to close the Sale immediately upon entry of the Sale Order.

10.     Terms of the Bid Procedures are set forth in full in "**Exhibit B"**, and incorporated herein by reference.

## IV.     RELIEF REQUESTED

11.     The Debtors seek entry of the Bidding Procedures Order (A) approving procedures for (i) submitting bids for the Acquired Assets, (ii) conducting the Auction in the event that the Debtors receive more than one Bid (each, a "Competing Bid"); (B) approving the Break-Up Fee and Expense Reimbursement; (C) scheduling the Auction and a Sale Hearing with

respect to any Bid accepted by the Debtors; (D) establishing Notice and Assumption and Assignment Procedures; and (E) approving form and manner of notice of all procedures, protections, schedules and agreements.

12.     The Debtors also request the Court to schedule the Sale Hearing no later than June 7, 2010.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of an order (the "Sale Order"), approving the Sale of the Acquired Assets free and clear of all interests and authorizing the assumption and assignment of certain executory contracts and unexpired leases.  A form of Sale Order is attached hereto, marked as "**Exhibit C**".

## V.     BASIS FOR RELIEF

### A.     Necessity for Sale

13.     The Debtors have been marketing the Acquired Assets since before the inception of these cases.  They have engaged in a thorough marketing process and all potential purchasers have had an opportunity to make an offer on the Acquired Assets – and will have yet another opportunity should they wish to bid at the Auction.  At this time the Debtors are moving forward with confirmation of a Plan of Reorganization.  Sale at this time is necessary so as to take advantage of any tax benefits that may be available to the Debtors and their estates pursuant to Section 1146 of the Bankruptcy Code.

### B.     The Bidding Procedures[5]

14.     In order to maximize the value of the Acquired Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery.  As described more fully in the

---

[5]     Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached hereto.

Bidding Procedures attached hereto as "**Exhibit B**", the Debtors seek authority to sell the Acquired Assets to any bidder that makes the highest or otherwise best offer for the Acquired Assets.

15.     A summary of the Bidding Procedures contained in detail in Exhibit B for which the Debtors herein seek approval is set forth below.[6]

a.      **The Bidding Process**.  The Debtors and their advisors shall (i) determine whether any bid for all or substantially all of the Acquired Assets is a Qualified Bid (defined below), (ii) coordinate the efforts of Qualified Bidders (defined below) in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate in good faith any offers made to purchase the Acquired Assets (collectively, the "Bidding Process").  Any person that wishes to participate in the Bidding Process must be a Qualified Bidder.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Qualified Bidder.  In the event any due diligence material has not previously been provided to any Qualified Bidder, Debtors shall simultaneously provide such material to all Qualified Bidders.  The Debtors shall have the right to adopt such additional rules for the Bidding Process that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions of the Bidding Procedures or of any Bankruptcy Court order.

b.      **"As Is, Where Is"**.  The sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estate except to the extent set forth in the Purchase Agreement

---

[6]     The following description of the Bidding Procedures is a summary of the terms set forth in Exhibit B attached hereto. To the extent that this summary differs in any way from terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

or the purchase agreement of another Successful Bidder. By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or, (i) as to the proposed Purchaser, as expressly stated in the terms of the sale of the Acquired Assets set forth in the Purchase Agreement and ancillary documents, or (ii) as to another Successful Bidder, as expressly stated in the terms of the sale of the Acquired Assets as set forth in the applicable agreement and ancillary documents.

c. **Free Of Any And All Interests**. Except as otherwise provided in the Purchase Agreement or another Successful Bidder's purchase agreement, all of the Debtors' right, title and interest in and to the Acquired Assets, subject to the Sale Transaction, shall be sold free and clear of Interests to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Acquired Assets subject to the Sale Transaction with the same validity and priority as such Interests applied against such assets. Nothing herein shall prevent any party in interest from objecting to the Bankruptcy Court's approval of such purchase agreement, except with respect to the Break-Up Fee and the Expense Reimbursement which are being approved in connection with approval of the Bidding Procedures.

d. **Auction**. If a Qualified Bid other than that submitted by the proposed Purchaser has been received by the Debtors prior to the Bid Deadline, the Debtors shall conduct

an auction (the "Auction") with respect to the Acquired Assets. The time and date of the Auction shall be as set forth in the Bid Procedures Order as approved by the Court. The Debtors shall notify the Qualified Bidders that have submitted Qualified Bids of the time and place of the Auction. Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the highest Qualified Bid as determined by the Debtors and subsequently continue in minimum increments of at least $100,000 in cash. Except as otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer(s) for the Acquired Assets.

e. **Successful Bid.** Prior to closing the Auction, the Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) identify the highest, best or otherwise financially superior offer(s) for the Acquired Assets (the "Successful Bid(s)" and the entity or entities submitting such Successful Bid, the "Successful Bidder(s)"), which highest, best or otherwise financially superior offer(s) will provide the greatest amount of net value to the Debtors, and advise the Qualified Bidders of such determination.

f. **Acceptance of Qualified Bids**. Subject to the limitations set forth above, the Debtors shall sell the Acquired Assets to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Bankruptcy Court at the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder(s).

g.    **The Bidding Protections**.  Pursuant to sections 105, 363, 503 and 507 of the Bankruptcy Code, the Debtors are authorized to pay the greater of the Break-Up Fee or the Expense Reimbursement to the Purchaser pursuant to the terms and conditions set forth in the Purchase Agreement.  If the Debtors are required pursuant to the terms of the Purchase Agreement to pay the Break-up Fee or the Expense Reimbursement, the Debtors are authorized and empowered to pay such amounts, which shall be deemed to be an allowed superpriority administrative expense claim in each of the Debtors' chapter 11 cases with priority over any and all administrative expense claims (other than claims based on the DIP Obligations and the Carve-Out (each as defined in the Final Order (I) Authorizing Debtors (A) To Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. §363, And (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364)) pursuant to section 503(b) of the Bankruptcy Code, without further order of the Court.

**C.**    **The Sale Hearing, Closing and Return of Deposits**

16.    The Debtors seek approval for the Sale Hearing to be conducted by the Bankruptcy Court no later than June 7, 2010 or on such date and time as may be established by the Bankruptcy Court.  The Debtors seek approval of the Notice of the Sale Hearing, attached hereto and marked as "**Exhibit D**."[7]

17.    Furthermore, the Debtors seek approval of the following terms of the Sale:

a.    Following the approval of the sale of the Acquired Assets to the Successful Bidder(s) at the Sale Hearing, if such Successful Bidder(s) fails to consummate an

---

[7]    Exhibit D will be supplied once the Sale Hearing Date is set.

approved sale within the date which is five (5) business days from the Sale Hearing, the Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors (after consultation with the DIP Agent) shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

b.      On the earlier of (i) two (2) business days after the Acquired Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court, and (ii) sixty (60) days after the conclusion of the Sale Hearing, the Debtors shall return all deposits to the issuing parties who did not become Successful Bidders.  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the deposit as its damages resulting from the breach or failure to perform by the Successful Bidder.

### D.      The Cure Procedures

18.      The Debtors seek approval of the following procedures with respect to cure obligations:

a.      No later than five (5) business days after entry of the Bid Procedures Order, the Debtors shall prepare and distribute to non-Debtor parties (the "Notice Parties") to any executory contracts and unexpired non-residential real property leases anticipated to be assumed by the Purchaser in connection with the Sale (the "Anticipated Assumed Contracts") a notice (a "Notice of Assignment"), substantially in the form annexed to this Motion as **Exhibit E**, listing (i) the Anticipated Assumed Contracts, and (ii) the Cure Amounts, if any.

b.      If additional executory contracts and/or unexpired non-residential real property leases other than the Anticipated Assumed Contracts are to be assumed in connection with the Sale, no later than two (2) business days after the Auction, the Debtors shall send a

subsequent Notice of Assignment, by overnight mail or facsimile, to all non-Debtor counterparties to such additional executory contracts and unexpired non-residential real property leases to be assigned to the Successful Bidder (the "Additional Assumed Contracts") that were not Anticipated Assumed Contracts. The Anticipated Assumed Contracts and the Additional Assumed Contracts shall collectively be referred to as the "Assumed Contracts."

c.       The non-Debtor parties to the Anticipated Assumed Contracts shall have until five (5) calendar days before the Sale Hearing (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object (a "Contract Objection") to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and assignment of the Anticipated Assumed Contracts in connection with the Sale; provided, however, if the Purchaser is not the Successful Bidder at the Auction, and the Debtors send the Notice of Assignment to a non-Debtor party to Additional Assumed Contracts, or if the Debtors otherwise amend the Notice of Assignment to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties thereto shall have an additional three (3) business days after service of such notice or amendment to object thereto or to propose an alternative Cure Amount (the "Amended Contract Objection Deadline").

d.       Any party objecting to the Cure Amounts, whether or not such party previously has filed a proof of claim with respect to amounts due under the applicable agreement, or objecting to the potential assumption and assignment of Assumed Contracts, shall be required to file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assumed Contracts and/or any and all objections to the potential assumption and assignment of such agreements, together with all documentation supporting such cure claim or objection, (i)

counsel for the Debtors, (ii) counsel for the Purchaser, and (iii) the United States Trustee so that the Contract Objection is received no later than 4:00 p.m. on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. If a Contract Objection is timely filed, the Bankruptcy Court shall hear any such Contract Objection and determine the amount of any disputed cure amount or objection to assumption and assignment not settled by the parties at the Sale Hearing or such later date as the Court may deem appropriate.

e. In the event that no Contract Objection is timely filed, the applicable party shall be deemed to have consented to the Cure Amount proposed by the Debtors and shall be forever enjoined and barred from seeking any additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtors, their estates or the Successful Bidders on account of the assumption and assignment of such executory contract or unexpired non-residential real property lease and deemed to have consented to the proposed assignment and assumption. In addition, if no timely Contract Objection is filed, the Successful Bidder shall enjoy all of the rights and benefits under all Anticipated Assumed Contracts and Additional Assumed Contracts, as applicable, without the necessity of obtaining any party's written consent to the Debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, consent to, condition or otherwise restrict any such assumption and assignment.

## VI. <u>APPLICABLE AUTHORITY</u>

### E. <u>Approval of the Sale is Warranted Under Bankruptcy Code 363(b).</u>

19. Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Debtors have been permitted to conduct pre-confirmation sales of their property provided that a "sound business purpose" exists for the sale. <u>See</u>, <u>e.g.</u>, <u>In re</u>

Montgomery Ward Holdings Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); see also In re Lionel Corp., 722 F. 2d 1063, 1069 (2d Cir. 1983) ("Section 363(b) of the Code seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale, or lease, other than in the ordinary course of business, of property of the estate"); In re Frezzo, 217 B.R. 985, 988 (Bankr. E.D.Pa. 1998) ("In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated in various ways, represent essentially a business judgment test.").

20.     Once the Debtors articulate a valid business justification for a sale outside of the ordinary course of business, the Court should not second-guess the Debtors' business judgment. The business judgment rule "is a presumption that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation."  Brehm v. Eisner, 746 A.2d 244, 264, n. 66 (Del. 2000) (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)); Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988); In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005); Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008); Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F.Supp.2d 449, 462 (D. Del. 2004); see also In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

21.     The Debtors have a sound business justification for selling the Acquired Assets at this time.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all or some of their Acquired Assets in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries to the estates.  Maximization of the

value of the Acquired Assets is a sound business purpose warranting authorization of any proposed Sale.

22.     The Sale of the Acquired Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Acquired Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[8]

23.     In addition, all creditors and parties in interest will receive adequate notice reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Cases, those parties potentially interested in bidding on the Acquired Assets and others whose interests are potentially implicated by a proposed Sale of the Bidding Procedures and Sale Hearing as set forth above. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and its creditors and parties in interest.

**F.      The Bidding Procedures are Fair and Are Designed to Maximize the Value Received for the Acquired Assets.**

24.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Bidding Procedures are appropriate under Sections 105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the

---

[8]     The Debtors reserve all rights not to submit any bid that is not acceptable to the Debtors for approval to the Bankruptcy Court.

Acquired Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for the Acquired Assets as determined by the Debtors.

25.    The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for the Auction and Sale Hearing. Accordingly, the Debtors and all parties in interest can be assured that the consideration for the Acquired Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**G.    The Bid Protections are Necessary to Preserve the Value of the Debtors' Estates.**

26.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the Bid Protections to the Purchaser, and thereby facilitating an Auction, will maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

27.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also In re Reliant Energy Channelview, LP, 403 B.R. 308, 311 (D. Del. 2009). Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that

value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

28.     In O'Brien, the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

(A)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(B)     whether the fee harms, rather than encourages, bidding;

(C)     the reasonableness of the break-up fee relative to the purchase price;

(D)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(E)     the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(F)     the correlation of the fee to a maximization of value of the debtor's estate;

(G)     the support of the principal secured creditors and creditors committees of break-up fee;

(H)     the benefits of the safeguards to the debtor's estate; and

(I)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

29.     In this case, Purchaser has expended and will continue to expend a substantial amount of time, money and energy pursuing a purchase of the Acquired Assets.  In recognition of this expenditure of time, energy and resources, and the benefit to the Debtors' estates of securing a minimum bid for the Acquired Assets, and further because the Debtors could not

provide exclusivity to the Purchaser, the Debtors have agreed to provide the Bid Protections to Purchaser.

30.     The Bid Protections correlate with the value provided to the Debtors' estates because they encourage bidding at the Auction by enabling a purchaser without exclusivity to invest time, resources and energy to enter into a Purchase Agreement.  The purchase price being paid by the Purchaser under the Purchase Agreement demonstrates the existing market interest in the Acquired Assets, which enables the Debtors to secure an adequate floor for the Acquired Assets.  With an established floor for the value of the Acquired Assets, the Debtors will be better able to insist that competing bids be materially higher or otherwise better than the Purchase Agreement, a clear benefit to the Debtors' estates.   Without the benefit of the Bid Protections, the bids received at Auction for the Acquired Assets could be substantially lower than that offered by Purchaser.

31.     The Debtors extensively negotiated the terms of the Purchase Agreement, including the Bid Protections, at arms' length with Purchaser and the Purchaser would not agree to act as a stalking horse bidder without the Bid Protections.  Moreover, payment of the Bid Protections will not diminish the Debtors' estate.  The Debtors do not intend to terminate the Purchase Agreement, if to do so would incur an obligation to pay the Bid Protections, unless to accept a higher and better alternative bid.

32.     Furthermore, the Break-Up Fee – three percent (3%) of the total consideration paid in the event the Debtors terminate the Purchase Agreement to pursue an Alternate Transaction – is reasonable in amount and well within the magnitude as break-up fees approved in other cases. *See e.g., In re Radnor Holdings,* Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *In re Global Home Products LLC, et al.*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (order approving a break-up

fee of $650,000 or 3.1% of purchase price of $21 million); *In re Caldor, Inc. – NY*, Case No. 95-B-44080 (JLG) (Bankr. S.D.N.Y. Feb. 4, 1999) (order approving break-up fees of $1,900,000 on purchase price of $75,735,000 and $3,550,000 on purchase price of $142,000,000 or approximately 2.5%).

33.     Because the Debtors would be unable to attract a "stalking horse" bid without the inducement of the Bid Protections, such inducement is in the best interest of the Debtors' estates. Additionally, the Debtors' request for approval of the Bid Protections is an appropriate exercise of the Debtors' business judgment because it provides a benefit to the Debtors' estates by encouraging competitive bidding and incentivizing the Purchaser to serve as a stalking horse bidder.

34.     The Debtors ability to continue to shop the Acquired Assets for a higher or better offer without risk of losing the Purchaser – a "bird-in-the-hand" – would be eliminated if the Debtors are not authorized to provide the Bid Protections.  Therefore, absent authorization of the Bid Protections, the Debtors may lose the opportunity to obtain the highest and best offer for the Acquired Assets and the downside protection provided by the Purchase Agreement.  If the protections are not approved, the Purchaser may not go forward with the Sale.

35.     The Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the Debtors will receive the best possible price for the Acquired Assets.  Accordingly, the Debtors request that the Court approve the Bid Protections as necessary to preserve the value of the Debtors' estates and as an appropriate exercise of the Debtors' business judgment.

**H.      The Proposed Sale(s) Satisfy the Requirements of Section 363(f) for a Sale Free and Clear of Interests.**

36.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell Acquired Assets free and clear of all liens, claims, interests, charges and encumbrances (with any such

liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with

the same rights and priorities therein as in the sold Acquired Assets).  Specifically, section 363(f)

provides as follows:

> The trustee may sell property under subsection (b) or (e) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

  37. Section 363(f) of the Bankruptcy Code is stated in the disjunctive.  Thus, when

proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of

section 363(f) in order to sell Acquired Assets free and clear.  In re Kellstrom Indus., Inc., 282

B.R. 787, 793 (Bankr. D. Del. 2002); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94

B.R. 343, 345 (E.D. Pa. 1988).  The Debtors believe that they will be able to demonstrate that at

the Sale Hearing that they have satisfied one or more of these conditions.

  38. In the event that any secured creditors object to the sale of the Acquired Assets

free and clear, the Sale may proceed pursuant to section 363(f)(5) of the Bankruptcy Code

because the liens of such secured creditors will attach to the proceeds of the sale and the Debtors

will establish at the Sale Hearing that the Secured Lenders can be compelled to accept a

monetary satisfaction of their claims.

39. The Debtors propose that any *bona fide* and allowed Interests shall attach to the sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Acquired Assets prior to such Sale.

**I.      A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

40. Pursuant to section 363(m) of the Bankruptcy Code, "a 'good faith purchaser' is generally one who purchases assets for value, in good faith, and without knowledge of adverse claims." In re Youngstown Steel Tank Co., 27 B.R. 596, 598 (W.D.Pa. 1983); see also In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993); Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007). Judicial inquiry regarding "good faith" in the context of section 363(m) of the Bankruptcy Code focuses on the integrity of the purchaser's conduct during the course of the sale proceedings. In re Abbott's Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986).

41. The Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all or any portion of the Acquired Assets has negotiated at arm's-length, with all parties represented by their own counsel.

42. Accordingly, the Sale Order will include a provision that the Successful Bidder for the Acquired Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Acquired Assets and closing of the same will occur promptly.

**J.      The Assumption and Assignment of Executory Contracts and Unexpired Leases**

43. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (citing Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D.Pa. 1987) (in turn quoting In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)); In re Network Access Solutions Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005).

44.     If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F. 2d at 39-40. The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." In re Wheeling-Pittsburgh Steel Corp., 72 B.R. at 846 (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)); see also In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 183 (Bankr. D.N.J. 2002).

45.     A more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

46.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1993) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's Acquired Assets).

47.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The phrase "adequate assurance of future performance" "'is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.'" Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (quoting Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) and discussing legislative history of "Section 365(f) of the Bankruptcy Code); In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

48.     The Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of Purchaser or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them.  The Sale Hearing therefore

will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts.

49.     The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide Notice Parties with adequate notice in the form of the Notice of Assumption or Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.  Such Notice Parties will then be given an opportunity to object to such notice.  If an objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

50.     Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the Sale of any of the Acquired Assets, the Debtors will cure any such default prior to such assumption and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of Purchaser or the Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

51.     Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in a Successful Bidder's Purchase Agreement.

### K.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

52.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease…is stayed until the

expiration of 10 days after the entry of the order, unless the court orders otherwise." The

Debtors request that any Sale Order be effective immediately by providing that the 10-day stays

under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## VI. <u>NOTICE</u>

53.     Notice of this Motion will be given to:

i.      counsel to Purchaser;

ii.     counsel to the Debtors' postpetition lenders;

iii.    counsel to the Debtors' prepetition lenders;

iv.     any party who, in the past year, expressed in writing to the Debtors an interest in the Assets or the Debtors' other assets;

v.      nondebtor parties to the Anticipated Assumed Contracts;

vi.     all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Assets or the Debtors' other assets;

vii.    the Internal Revenue Service;

viii.   the Department of Treasury for each of the states identified on Schedule 5.3 of the Agreement;

ix.     the Environmental Protection Agency;

x.      the Department of Environmental Protection for the State of Alabama;

xi.     all persons or entities that have requested notice in these Chapter 11 cases under Bankruptcy Rule 2002; and

xii.    the United States Trustee.

The Debtors submit that, under the circumstances, no other or further notice is required.

## VII. <u>NO PRIOR REQUEST</u>

54.     No previous request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order substantially in the form attached hereto as "Exhibit F," (i) approving the Bidding Procedures; (ii) approving the Bid Protections; (iii) scheduling the Auction and Sale Hearing to approve the Sale, and approving the form and manner of notice thereof; and (iv) granting such other and further relief as is just and proper. Additionally, the Debtors request that, at the Sale Hearing, the Court enter a Sale Order subject to the result of the Auction and to the Bidding Procedures (i) approving and authorizing the Sale; and (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases.

Dated: April 30, 2010
      Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By:  /s/ Mark W. Eckard
     Mark W. Eckard (No.4542)
     1201 Market Street, Suite 1500
     Wilmington, DE 19801
     Telephone: (302) 778-7500
     Facsimile: (302) 778-7575
     E-mail:  meckard@reedsmith.com

      - and -

     J. Andrew Rahl, Jr., Esquire
     Mark D. Silverschotz, Esquire
     Han J. Ahn, Esquire
     599 Lexington Avenue
     New York, NY  10022
     Telephone: (212) 521-5400
     Facsimile: (212) 521-5450
     E-mail: arahl@reedsmith.com
         msilverschotz@reedsmith.com
         hahn@reedsmith.com

     Counsel for Taylor-Wharton International
     LLC, *et al.*, Debtors and Debtors-in-
     Possession